# EXHIBIT 7

OSEA
*The Workplace Experts*

Corporate Office
Western New York
3748 South Park Avenue
Buffalo, NY 14219-1802
716-821-0091
Fax: 716-821-0232
e-mail: Experts@osea.com
Website: www.osea.com

Central New York
3532 James St.
Suite 202
Syracuse, NY 13206
315-431-4526
Fax: 315-431-4906
e-mail:
cnyexperts@osea.com

Southeastern U.S.
6604 East W.T. Harris Blvd.
Suite A2
Charlotte, NC 28215
704-399-7945
Fax: 704-399-7946
e-mail:
carolinaexperts@osea.com

June 9, 2004

*fcc@corsolaw.com*

Mr. Frank C. Corso
Law Office of Frank C. Corso
15 Court Street
Boston, MA 02108

Re: **Gordon Noonan**
**D.O.B.: 7-24-29**
**D.O.L.: 10-18-03**

Dear Mr. Corso:

Thank you for providing us an opportunity to work with you regarding the technical review of the above referenced matter and related safety/regulatory issues. Based on your request I present the following review.

## I Background of Expert Witness (John P. Coniglio)

I remain a practicing safety professional with 30 years experience in the construction, heavy industry and commercial areas. My educational background includes the following completed degrees:

- PhD, Safety Engineering, Kennedy Western University;
- M.S., Environmental Engineering, Kennedy Western University;
- B.S., Industrial Technology (Engineering Management), State University College of New York at Buffalo,
- A.A.S., Civil Technology, Erie Community College,
- A.A.S., Fire Protection Technology, Erie Community College

I have also completed numerous safety and environmental specific special courses, seminars and training.

I have been responsible for facility maintenance and security including floor/slip preventing carpet placement, vendor handling and treatments. In these capacities I was responsible for vendor liaison, inspection of floor/walking areas, and selection of carpets/mats for the location as it pertains to the safety implication. This role also required investigation of problems, accidents and incidents and responsibility to oversee changes to eliminate reoccurrence.

The key role requirement involved maintenance of safe walkways and selection of appropriate mats and floor surfaces to achieve same.

My continuing career remains active in this area as it relates to slip and fall prevention and providing advice to clients as to appropriate means to achieve safe walkways, exits and work spaces, among many items.

I have provided consultation and project management for industrial and construction-related operations throughout the United States. Also, my international experience includes project oversight for safety and environmental initiatives in Canada, Europe, Puerto Rico, Mexico and Sri Lanka.

I hold an expert understanding of the federal safety & health rules as promulgated by the Occupational Safety & Health Administration (OSHA), and for those activities in the State of New York I provide consultative support on Code Rule 23 requirements of Protection in Construction, Demolition and Excavation Operations –Part 23 of Title 12 of the Official Compilation of Codes, Rules and Regulations of the State of New York (cited as 12 NYCRR 23).

I have also authored articles as listed in my curriculum vitae and developed and instructed on construction safety training programs. I have also authored curriculums for fall protection and ladder safety training and have attended schools involving ladder safety.

I have been published in several professional journals and periodicals on a variety of topics including falls and floor maintenance as it applies to slips and falls. These include Compliance Magazine and Facility Care magazine

I am an authorized OSHA Outreach Instructor for the 10-Hour OSHA Construction Safety course and continue to attend ongoing professional development in the area of construction safety inclusive of attendance at the Clemson Safety Academy. I maintain several national certifications by examination including Certified Safety Professional and hold State of New York Basic Code Enforcement Training Certificate (#0686-7005A).

In my personal practice I have provided expert consultation on projects related to project, process, and product safety and health issues for construction managers, general contractors, prime contractors, subcontractors, engineers, architects, commodity and specialty chemical producers and distributors, government defense, auto manufacturing, industrial, pharmaceutical, biotechnology, digital photographic print press, and nuclear waste disposal clients.

I have developed responsive programs in the area of construction site accident prevention, site-specific to the exposures at hand and worked on numerous local construction projects including: Key Bank Towers, HSBC Arena, Grand Island bridges, Gold Dome Bank, Occidental Chemical, and Bristol-Myers Squibb. Other construction activities have involved initiatives on the Brooklyn Bridge, Verrazano Narrows Bridge, Voice of American/Marconi International transmission towers in Sri Lanka, and Merck Pharmaceutical. I have extensive experience in the fall protection/ladder safety area and have been called upon on numerous occasions to evaluate fall protection issues as they relate to proper site set up, equipment, adequate protectives, competent person and worker safety.

Also, I have provided technical review and direct testimony, as expert, for both plaintiff and defense counsel on issues relating to occupational safety and health issues including but not limited to safe place to work, fall protection requirements, machine guarding, construction equipment operation and accidents, N.Y. State Labor Law 240/241, and OSHA related matters. I have also represented numerous clients at all stages of proceedings related to OSHA citations, contest, and Administrative Law Hearings with the Solicitor for the Secretary of Labor.

I am pleased to serve as an 'expert' in this matter, and upon your request, I will forward my complete curriculum vitae along with listing of litigation matters on which I have provided assistance.

**II Noonan Matter**

Based on your request and concerns regarding the 'Noonan' matter, we have reviewed submitted material and pertinent documentation related to this matter, inspected the location of the alleged incident (New Wharf Tavern, Water Street, Warren, RI), and thus submit the following expert opinion. Please be aware that we reserve the right to 'add-to', modify, or alter this opinion as more facts become known (to OSEA).

As it relates to the matter at hand, we have spoken to the following individuals, and reviewed the following documents, as provided, which include the following:

- Conversations with Al Coachy, Rhode Island Building Code Commission (401-222-3032)
- Conversations with Bill Hanley, Town of Warren, Rhode Island, Minimum Housing Building Inspector (401-245-7343)
- Research provided by Richard Philben (Law Offices of Frank Corso)
- Building Permit Application (undated)
- Application for Permit to Build (April 19, 1932)
- Application for Permit to Build (July 21, 1944)
- Application for Permit to Build (January 21, 1946)
- Application for Permit to Build (June 14, 1956)
- Application for Permit to Build (June 1956)
- Application for Permit to Build (February 21, 1958)
- Sketch of Wharf Tavern (12/21/1964)
- Application for Permit to Build (December 23, 1964)
- Building Permit Application (2/19/76)
- Building Permit Application (May 2, 1978)
- Building Permit Application (June 6, 1979)
- Building Permit Application (10-28-85)
- Building Permit Application (1-10-86)
- Town of Warren Rhode Island Occupancy Certificate (June 20, 1991)
- Building Permit Application (January 25, 1994)
- Building Permit Application (4-15-98)
- Notes and photographs of the incident location collected by Jacob Coniglio on May 6, 2003

- Rhode Island Department of Health Application/ Permit to Construct (1/2/94)
- Letter from Rhode Island Department of Health Letter (12/31/93) to Wharf Tavern approving submitting plans.
- Letter from Coastal Resources Management Council (CRMC) (June 26, 1990) to Mr. Paul Lazar (Wharf Tavern, Inc.)
- Letter from Coastal Resources Management Council (CRMC) (August 16, 1988) to Elizabeth Olaynack (Wharf Tavern)
- CRMC Assent to Wharf Tavern (1/15/86)
- CRMC Decision to Wharf Tavern (1/13/85)
- CRMC Notice to Wharf Tavern (July 8, 1985)
- CRMC Notice of Public Hearing (May 6, 1985)
- CRMC Notice of Public Hearing Continuation (6/13/85)
- Office of the Building Inspector, Town Hall, Warren, Rhode Island (10/12/84)
- CRMC letter to Paul Lazar (Wharf Tavern), November 3, 1982
- Town of Warren Tax Assessors' Office Tax Roll (April 9, 1975)
- Undated Proposed Restaurant Addition (Map) Application by Wharf Tavern, signed by V.A. Nacci
- Wharf Tavern Fire Inspection Results (December 23, 1974)
- Warren, R.I. – Minimum Housing Standards Dwelling Inspection (9/2/78)
- Warren Fire Department Ambulance Run Report

Based on our preliminary review of this matter, we understand the following regarding this matter.

Mr. Noonan fell approximately 20 feet while either ascending or descending the flight of stairs located adjacent to the hostess desk at the New Wharf Tavern in Warren, RI. Based on a review of building permits and related information, the building has undergone various renovations, change of usage, and improvements over the past 100 years.

Based on our initial review of the case materials provided, OSEA has researched the following regulations and requirements pertaining to this matter:

- <u>The BOCA National Building Code/ 1996</u>
- <u>The BOCA National Building Code/ 1993</u>
- <u>The BOCA National Building Code/ 1990</u>
- <u>The BOCA National Building Code/ 1987</u>
- <u>The BOCA Basic/National Building Code/ 1984</u>
- Rhode Island State Building Code (National Building Code, Regulation SBC-1, April 1, 1998)

## III Summary, Evaluation and Opinion

Based on our understanding of the description of the incident, research performed to date, expertise in the safety industry, review of the material submitted, reasonable assumptions initial, and relevant standards, we conclude the following on this matter.

**A. General**

Based on a review of the following submitted materials, it is apparent that numerous renovations, alterations, and change of usage have undertaken at the 'now' New Wharf Tavern. The documents listed in section 'II Noonan Matter' were reviewed, and based on this review the following information has been extracted which we feel is relevant to our review.

- An 'Application for Permit to Build' was filed in 1932 by RJ Rooks in order to add an addition of offices to the property located at the foot of Miller Street So. The building was to be used as an office.
- An 'Application for Permit to Build' was filed in 1946 by Shirley Rooks in order to add an addition. The building was to be used for storage.
- An 'Application for Permit to Build' was filed in 1956 by the Wharf Tavern Inc. in order to repair the first floor and use it as storage and convert the second floor to rooms and bath. The building was to be used for dwelling and storage.
- Another 'Application for Permit to Build' was filed in 1956 by the Wharf Tavern Inc. in order to alter the first and second floor and to use the building as a Tavern. The building was previously used as an Oyster Shop.
- An 'Application for Permit to Build' was filed in 1958 by William Monast in order to add and alter the first and second floor. The building was to be used as a dining hall.
- An 'Application for Permit to Build' was filed in 1964 by John E. Jordan in order to alter the exterior of the building. The building was to be used as a Restaurant Kitchen, from a Restaurant.
- An undated building permit was filed in order to alter the use of the Wharf Tavern on Water Street to a restaurant and fire tower. Based on the appearance of this permit, we believe it to be circa 1964-1978.
- A Building Permit Application was filed by Paul L in 1985 in order reconstruct the porch and dining room after Hurricane Gloria. The proposed use of the building was as a restaurant.
- A December 23, 1974 inspection of the Wharf Tavern Inc. conducted by Deputy Fire Marshal Stanley Davies determined that this facility was in violation of the following:
  - No two (2) approved means of egress from each level.
    - (State Code 23-28.6-6 Sec. A)
  - Main stairway not code
    - (State Code 23-28.6-8 Sec. A)
- A 9/2/78 Dwelling Inspection conducted by Edmund J. Busiere of the Warren, R.I. – Minimum Housing Standards of the first floor indicated that the Stairway and Porches were in good condition.
- On January 10, 1986 the Wharf Tavern, Inc. filed a Building Permit Application to "construct and maintain a 42' x 94+ ' addition (less cutouts) of approx. 3561 square feet to the existing restaurant as well as a wooden deck walkway varying in dimension from 6' wide to 14' wide total square footage of approx. 4322 sq. ft." with an estimated cost of material and labor (STRUCTURAL) of $200,000.
- According to assessor's office, the assessed value of the New Wharf Tavern (building) for the period from 1985 and 1987 was $294,000.

- The Town of Warren Rhode Island Building Inspector issued an Occupancy Certificate in June of 1991 stating that the New Wharf Tavern, "Complies with all the Requirements of the Town of Warren and is hereby Granted a Certificate of OCCUPANCY (sic)."

Therefore, based on the review of the above documents it is apparent that the current New Wharf Tavern has been used in a variety of capacities, and more importantly, numerous renovations have taken plane on this structure over the past 72 years.

According to Al Coachy, Rhode Island Building Code Commission (401-222-3032), and Bill Hanley, Town of Warren, Rhode Island, Minimum Housing Building Inspector (401-245-7343), if a renovation was completed that was at or above 50% of the properties market value, or the usage of the building was changed, the entire property would have to comply with current building codes.

Also, according to Al Coachy, Rhode Island has typically used the BOCA building codes, with a few additions, as their building codes, and the <u>BOCA Basic/National Building Code/1984</u> were the building codes in effect for Rhode Island in 1986.

Due to the fact that no information has been provided on the date of the construction of the stairs (where the alleged incident occurred) OSEA has used the following hypothesis to complete this review:

- Based on the assessment information provided for 1985-1987 in conjunction with the 1986 building permit, it has been concluded that the renovation completed in 1986 would have met the 50%. Therefore, if the stairs were constructed prior to 1986 they would have had to been in compliance with the <u>BOCA Basic/National Building Code/1984</u>, however, if the stairs were constructed after 1986, they would have had to been in compliance with subsequent BOCA Building Codes.

As such, the review of these stairs that follows has been structured on the above hypothesis.

**B. Overview**

First, the access to, or the actual means of egress of a building are critical components of occupancy. Occupants rely on the access to, and the actual means of egress in order to safely exit buildings. When either of these components is compromised, the safety of the occupants is jeopardized.

Second, stairs are an important part of a means of egress. According to the BOCA 1996 codes, a means of egress is defined as "A continuous and unobstructed path of travel from any point in a building or structure to a public way. A means of egress consists of three separate and distinct parts: the exit access; the exit; and the exit discharge. A means of egress comprises the vertical and horizontal means of travel and shall include intervening room spaces, doors, hallways,

corridors, passageways, balconies, ramps, stairs, enclosures, lobbies, horizontal exits, courts and yards." Thus, the primary objective of stairs is to safely allow occupants to ascend and descend between levels of a building. In order to protect building occupants, Rhode Island have developed and adopted standards to protect occupants while ascending or descending stairs.

Based on our review of this matter, it is our opinion that the stairs where Noonan was injured at the New Wharf Tavern in Warren, RI violated the building codes adopted by Rhode Island.

## C. Rhode Island Building Codes

Founded in 1915, Building Officials and Code Administrators International, Inc. is a nonprofit membership association, comprised of more than 16,000 members who belong to every aspect of the building community, from code enforcement officials to materials manufacturers. BOCA is dedicated to preserving the public health, safety and welfare in the built environment through the effective, efficient use and enforcement of Model Codes. (http://www.constructionbook.com)

According to Al Coachy of the Rhode Island Building Code Commission, the current building codes in effect for Rhode Island are the 1996 Building Officials and Code Administrators (BOCA) codes in conjunction with the Rhode Island State Building Code, National Building Code, Regulation SBC-1 (April 1, 1998), and the BOCA Basic/National Building Code/1984 were building codes in effect for Rhode Island in 1986.

## D. Physical Description of Stair Components

On Thursday, May 6, 2004, Jacob Coniglio, engineer with OSEA, traveled to the New Wharf Tavern in Warren, RI in order to inspect the stairs where the alleged incident occurred. Physical observations, measurements, and photographs were collected during this visit. The following physical observations were noted during this inspection

- The stairs, or stair run in question, are located between the kitchen and host/ hostess desk.
- The stair run travels from the ground floor to the second floor.
- The stair run contains 16 stairs. The stairs are of wood construction. The stairs are of the closed riser type.
- There are two distinct sections that make-up this stair run. The upper portion (stairs #10 - #16) of the stairs is contained within a set of walls, while the bottom portion (stairs #1-9) of the stairs is open to the atmosphere.
- The upper stairs are narrower than the lower stairs. The 9th stair is 2 different widths.
- There was a canvas tarp that was located in the staircase at approximately the 9th step.
- There was no additional slip resistant coating on the stairs.
- The landing at the top of the stair run is constructed of a tile floor. The edge of the landing that meets the top step is visibly cracked.
- The stairs located on the upper portion are a lighter color than those of the lower portion. The 'nosings' of the upper portion of the stairs are different dimensions than the 'nosings' of the lower portion of the stairs.
- A set of railings is located on the both the top and bottom portion of the stairs. The railings are not continuous or uniform across the entire set of the stairs.

- There were ropes attached to canvas tarps that covered the railings on the lower portion of the stairs.
- There were no railings on the 1st step.
- The stairs and railings were sturdy.

Pictures depicting these stairs are located in the Appendix of this report. The picture below illustrates a view of the stairs in question taken from the top step.



**F. Stair Measurements**

On Thursday, May 6, 2004, Jacob Coniglio, Engineer with OSEA, traveled to the New Wharf Tavern in Warren, RI in order to inspect the stairs where the alleged incident occurred. Physical observations, measurements, and photographs were collected during this visit. The following tables depict the collected measurements and also offer calculations of deviations for the stair run in question.

Frank Corso / Gordon Noonan
June 9, 2004
Page 9

Table 1. Stair Tread Depth and Riser Height

| Stair # | Tread Depth | Adjacent Difference | Riser Height | Adjacent Difference |
|---|---|---|---|---|
| Floor to 1 | N/A | | 5.75 | 0.75 |
| 1 | 11.25 | 0 | 6.5 | 0.75 |
| 2 | 11.25 | 0 | 6.75 | 0.25 |
| 3 | 11.25 | 0 | 7 | 0.25 |
| 4 | 11.25 | 0 | 6.75 | 0.25 |
| 5 | 11.25 | 0 | 6.75 | 0.25 |
| 6 | 11.25 | 0 | 6.5 | 0.25 |
| 7 | 11.25 | 0 | 6.5 | 0 |
| 8 | 11.25 | 0.25 | 6.5 | 0 |
| 9 | 11 | 0.25 | 6.5 | 0 |
| 10 | 11.25 | 0.25 | 6.5 | 0 |
| 11 | 11.5 | 0.25 | 6.5 | 0 |
| 12 | 11.5 | 0 | 6.5 | 0 |
| 13 | 11.5 | 0 | 6.5 | 0 |
| 14 | 11.5 | 0 | 6.5 | 0 |
| 15 | 11.5 | 0.875 | 6.5 | 1.25 |
| 16 | 10.625 | 0.875 | 7.75 | 1.25 |
| Maximum Run Differential | | 0.875 | | 2 |

Note: All measurements in inches

Table 2. Stair Width and Headroom

| Stair # | Width | Headroom |
|---|---|---|
| 1 | 48 | * |
| 2 | 48 | * |
| 3 | 48 | * |
| 4 | 48 | 79 inches |
| 5 | 48 | * |
| 6 | 48 | * |
| 7 | 48 | * |
| 8 | 48 | * |
| 9 | 42-48 | * |
| 10 | 42.5 | 75 inches |
| 11 | 42.5 | * |
| 12 | 42.5 | * |
| 13 | 42.5 | * |
| 14 | 42.5 | * |
| 15 | 42.5 | * |
| 16 | 42.5 | * |

*This was not measured but was visually higher than the measurements taken

Note: All measurements in inches

OSEA
The Workplace Experts

Table 3. Stair Leading Edge Projection

| Stair # | Leading Edge Projection* |
|---|---|
| 1 | 1.5 |
| 2 | 1.5 |
| 3 | 1 |
| 4 | 1.5 |
| 5 | 1.25 |
| 6 | 1.5 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1.5 |
| 10 | 1.5 |
| 11 | 1.25 |
| 12 | 1.75 |
| 13 | 1.75 |
| 14 | 1.5 |
| 15 | 1.5 |
| 16 | 1 |
| 2nd to 16 | negligible |

*Over tread below
Note: All measurements in inches

Table 4. Handrail Measurements

Left Handside (Going Up)

| Stair | Height | Distance from Wall |
|---|---|---|
| 16 | 34.5 | 1.25 |
| 9 | 32 | |
| 1 | no handrail | |

Right Handside (Going Up)

| Stair | Height | Distance from Wall |
|---|---|---|
| 16 | 34.5 | 1.5 |
| 9 | 32.25 | |
| 1 | no handrail | |

Note: All measurements in inches

## G. Regulatory Review

In order to determine if the stairs and stair components were in compliance with applicable codes and standards, this review has been broken into two (2) parts. The first analysis performed is a comparison of the collected observations and measurements with the BOCA Basic/National Building Code/1984. This analysis was conducted in order to determine compliance, had the stairs been constructed prior to the 1986 renovation. The second analysis compares the collected observations and measurements with other editions of the BOCA National Building Code, which would determine compliance post the 1986 renovation.

## G-1. BOCA Basic/National Building Code/1984

A comparison of the measurements and observations collected by Jacob Coniglio on Thursday, May 6, 2004 at the New Wharf Tavern (illustrated in F) has been compared with the BOCA Basic/National Building Codes/ 1984. This analysis has been provided in order to determine if the stairs and related appurtenances were in compliance, had they been constructed prior to the 1986 $200,000 renovation. The code requirements are highlighted below the analysis.

### Stair Width

Based on the observations and measurements collected, the stairs at the New Wharf Tavern varied in width from 48" (1st stair to 8th stair) to 42.5" (9th stair to top) (see Table 2). Due to the fact that the stairway is less than 44 inches in width, this particular stairway is in violation of the BOCA Basic/National Building Codes/ 1984.

816.2.1 Width: All interior exit stairways shall not be less than 44 inches (1118 mm) in width, except that such width may be reduced to 36 inches (914 mm) in buildings of single exit construction when permitted by Section 809.3.

### Projections

Based on observations collected on May 6, 2004, a beige tarp could be seen projecting into the stairway (see photos). This tarp was observed hanging at the point where the stairs change in width from 42.5" to 48", going down. This projection is a violation of BOCA Basic/National Building Codes/ 1984 codes which prohibits projections into stairways.

816.2.3 Restrictions: Stairways shall not reduce in width in the direction of exit travel. Projections into a stairway are prohibited except for handrails as indicated in Section 816.5.1.1 and for stairway stringers which may project not more than 1 ½ inches (38 mm).

### Headroom

Based on measurements collected on May 6, 2004, headroom in the staircase was measured at 79 inches and 75 inches (see Table 2.). The minimum headroom BOCA Basic/National Building Codes/ 1984 is 80 inches therefore, the headroom of the stairs at the New Wharf Tavern is in violation of this requirement.

816.2.2 Headrooom: The minimum headroom in all parts of the stair enclosure shall not be less than 6 feet 8 inches (2032 mm) measured vertically from the tread nosing or form the floor surface of the landing or platform.

### Treads, Risers, Dimensional Uniformity

According to BOCA Basic/National Building Codes/ 1984, the maximum riser height shall be 7 ½ inches. Based on measurements collected on May 6, 2004, and illustrated in Table 1, stair #16 had a riser height of 7.75" which is in violation of the standard.

According to BOCA Basic/National Building Codes/ 1984, the minimum tread depth shall be 10 inches. Based on measurements collected on May 6, 2004, and illustrated in Table 1, stair #16 had a tread depth of 10.625" which is in violation of the standard.

Furthermore, according to BOCA Basic/National Building Codes/ 1984, "There shall not be a variation exceeding 3/16" in the depth of adjacent treads or in the height of adjacent risers, and the tolerance between the largest and smallest riser shall not exceed 3/8" in any flight. Based on measurements collected on May 6, 2004, there are multiple adjacent treads and risers with a variation exceeding 3/16", and the tolerance between the largest and smallest riser was measured at 2", while the tolerance between the largest and smallest tread was measured at 0.875", both violations of the code requirements. Of particular note is the fact that where the stairway transitions from 42.5" to 48" (going down), there is a ¼" difference in adjacent tread depth, and the handrail is not continuous.

**816.4 Treads and risers:** Treads and risers of interior exit stairways shall comply with Sections 816.4.1 and 816.4.2.

**816.1.1 Limiting dimensions:** The height of risers and width of treads shall be as indicated in the following Table 816.

**Table 816**
**TREAD AND RISER SIZE[a,c]**

| Use group | Max. riser | Min. tread |
|---|---|---|
| R-3 and within dwelling units in Use Group R-2 | 8 ¼ in. | 9 in. |
| All others[b] | 7 ½ in. | 10 in. |
| Note a. There shall not be a variation exceeding 3/16" in the depth of adjacent treads or in the height of adjacent risers, and the tolerance between the largest and smallest riser shall not exceed 3/8" in any flight. Except in one-and two-family dwellings, tread and riser shall be so proportioned that the sum of two risers plus one tread, exclusive of nosing, is not less than 24 inches nor more than 25 inches.<br>Note b. In balconies and galleries, risers and treads shall be as shown in above table, but one tread in each seat platform width may have a greater width to accommodate access to seats. Seating platforms shall be of a uniform width.<br>Note c. 1 inch = 25.4 mm. | | |

## Stairway Handrails and Guards

First, according to BOCA Basic/National Building Codes/ 1984, stairways shall have continuous handrails and guards on both sides.

Based on observations collected on May 6, 2004 (see attached photos), there is a gap in handrail coverage where the stairway transitions from 42.5" to 48", there is no handrail provided on the first step, and the handrail did not extend beyond the top step on the left hand side-going up, which are all violations of the code requirements.

**816.5 Stairway guards and handrails:** Stairways shall have continuous guards and handrails on both si( addition thereto, stairways more than 88 inches (2235 mm) in required width shall have intermediate handrails dividing the stairway into portions not more than 88 inches (2235 mm) wide. Stairways having a width of less than 44 inches (1118 mm) may have one handrail. Guards shall be constructed in accordance with Section 827.0.

**816.5.1.3 Handrail ends:** Except for stairways within a dwelling unit, handrails shall extend at least 12 inches (305 mm) beyond the top riser and at least 12 inches (305 mm) plus the width of one tread beyond the bottom riser. At the top, the handrail extension shall be parallel to the walking surface. At the bottom, the handrail shall continue to slope for a distance of the width of one tread from the bottom riser with the remainder parallel to the walking surface. The handrail ends shall be returned to a wall or post.

Second, based on observations collected on May 6, 2004, a beige tarp was observed as being attached via a rope to the lower handrail on both sides. However, the tarp was not secured to the lower part of the stairs (see photographs). According to BOCA, "A guardrail system is a system of building components located near the open sides of elevated walking surfaces for the purpose of minimizing the possibility of an accidental fall from the walking surface to the lower level. According to BOCA Basic/National Building Codes/ 1984 guards are required above open-sided walking surfaces. Based on the collected observations and our professional opinion, this tarp would not be considered a guard, and would not provide protection from a falling from the lower stairs, and is thus a violation of the code requirements.

**825.5 Open-sided floor areas:** Guards shall be located along open-sided walking surfaces, mezzanines and landing. The guards shall be constructed in accordance with Section 827.0.

**827.1 General:** Where required by the provision of Sections 609.2.4, 617.7, 815.5, 816.5, 825.5 and 1310.5, guards shall be constructed in accordance with the requirements of this section.

**827.2 Height:** The guards shall be at least 42 inches (1067 mm) in height measured vertically above the leading edge of the tread or adjacent walking surface.

Exceptions
1. Guards shall be not less than 30 inches (762 mm) in height above the leading edge of the tread along stairs which are not more than 20 feet (6096 mm) in height or which reverse direction at an intermediate landing with 12 inches (305 mm) or less measured horizontally between successive flights.
2. Guards in buildings of Use Group R-3 shall be not less than 36 inches (914 mm) in height.

**827.3 Construction:** Open guards shall have intermediate rails, balusters or other construction such that a sphere with a diameter of 6 inches (152 mm) cannot pass through any opening.

Exception: In buildings of Use Groups F, H or S, the construction shall not permit a sphere with a diameter of 14 inches (356 mm) to pass through any opening.

**827.4 Design load:** Guards shall be designed to resist a simultaneous vertical and horizontal thrust of 50 pounds per lineal foot (74.45 kg/m) applied at the top railing. Guards of reviewing stands, grandstands, bleachers and similar assembly structures, shall be capable of resisting a lateral force of 50 pounds per lineal foot (74.45 kg/m) and sustaining a vertical load of 100 pounds per lineal foot (148.9 kg/m).

## G-2. Additional BOCA National Building Code/1996, 1993, 1990, 1987

A comparison of the measurements and observations collected by Jacob Coniglio on Thursday, May 6, 2004 at the New Wharf Tavern (illustrated in F) has been compared with the BOCA National Building Codes from 1996, 1993, 1990, and 1987 below. This analysis has been provided in order to determine if the stairs and related appurtenances are in compliance, had they been constructed after the 1986 $200,000 renovation.

As you will note, the 1996 Code requirements are contained in the left hand margin, while the applicable 1993, 1990, and 1987 requirements are indented.

### Stair Width

Based on the observations and measurements collected, the stairs at the New Wharf Tavern varied in width from 48" (1st stair to 8th stair) to 42.5" (9th stair to top) (see Table 2). Due to the fact that the stairway is less than 44 inches in width, this particular stairway is in violation of the BOCA Basic/National Building Codes/ 1984.

1014.3 Width: All means of egress stairways shall not be less than 44 inches (1118 mm) in width. (Consistent with BOCA 1993, 1990, 1987)

### Projections

Based on observations collected on May 6, 2004, a beige tarp could be seen projecting into the stairway (see photo). This tarp was observed hanging at the point where the stairs change in width from 42.5" to 48", going down. This projection is a violation of BOCA 1996, 1993, 1990, and 1987 codes which prohibits projections into stairways.

1014.3.1 Restrictions: Means of egress stairways shall not reduce in with in the direction of egress travel. Projections into a required stairway width are prohibited.

> BOCA 1993 (1014.3.1) & 1990 (817.3.1):
> Restrictions: Means of egress stairways shall not reduce in width in the direction of egress travel. Projections into a required stairway width are prohibited, except at and below handrail height where, at each handrail, the projections shall not exceed 3 ½ inches (89mm) into the required width.
>
> BOCA 1987 (816.2.3):
> Restrictions: Means of egress stairways shall not reduce in width in the direction of egress travel. Projections into a required stairway width are prohibited, except for handrails as indicated in Section 828.2.1 and for stairway stringers which shall project not more than 1 ½ inches (38 mm at each side).

### Headroom

Based on measurements collected on May 6, 2004, headroom in the staircase was measured at 79 inches and 75 inches (see Table 2.). The minimum headroom BOCA 1996, 1993, 1990, and 1987 allow is 80 inches therefore, the headroom of the stairs at the New Wharf Tavern is in violation of this requirement.

**1014.4 Headroom:** The minimum headroom in all parts of a stairway shall not be less than 80 inches (2032 mm), or 78 inches (1981 mm) for a spiral stairway, measured vertically from the tread nosing or from the floor surface of the landing or platform.

> **BOCA 1993 (1014.4), 1990 (816.2.2)**
> Headroom: The minimum headroom in all parts of a stairway shall not be less than 80 inches (2032 mm) measured vertically from the tread nosing or from the floor surface of the landing or platform.
>
> **BOCA 1987 (817.4)**
> Headroom: The minimum headroom in all parts of a stairway shall not be less than 6 feet 8 inches (2032 mm) measured vertically from the tread nosing or from the floor surface of the landing or platform.

**Treads, Risers, Dimensional Uniformity**

According to BOCA 1996, 1993, 1990, and 1987, the maximum riser height shall be 7 inches and the minimum riser height shall be 4 inches. Based on measurements collected on May 6, 2004, and illustrated in Table 1, stair #16 had a riser height of 7.75" which is in violation of the above standards.

According to BOCA 1996, 1993, 1990, and 1987, the minimum tread depth shall be 11 inches. Based on measurements collected on May 6, 2004, and illustrated in Table 1, stair #16 had a tread depth of 10.625" which is in violation of the above standards.

Furthermore, according to BOCA 1996, 1993, 1990, and 1987, "there shall not be variation exceeding 3/16 inch (5 mm) in the depth of adjacent treads or in the height of adjacent risers. The tolerance between the largest and smallest riser or between the largest and smallest tread shall not exceed 3/8 inch (10 mm) in any flight of stairs." Based on measurements collected on May 6, 2004, there are multiple adjacent treads and risers with a variation exceeding 3/16", and the tolerance between the largest and smallest riser was measured at 2", while the tolerance between the largest and smallest tread was measured at 0.875", both violations of the code requirements. Of particular note is the fact that where the stairway transitions from 42.5" to 48" (going down), there is a ¼" difference in adjacent tread depth, and the handrail is not continuous.

**1014.6 Treads and risers:** Maximum riser height shall be 7 inches (178 mm) and minimum riser height shall be 4 inches (102 mm). The riser height shall be measured vertically between the leading edges of the adjacent treads. Minimum tread depth shall be 11 inches (279 mm), measured horizontally between the vertical planes of the foremost projection of adjacent treads and at a right angle to the tread's leading edge.

> **BOCA 1993 (1014.6), 1990 (817.6), 1987 (1014.6)**
> Treads and risers: Maximum riser height shall be 7 inches (178 mm) and minimum riser height shall be 4 inches (102 mm). Minimum tread depth shall be 11 inches (279 mm), measured horizontally between the vertical planes of the foremost projection of adjacent treads and at a right angle to the tread's leading edge.

**1014.6.2 Dimensional Uniformity:** There shall not be variation exceeding 3/16 inch (5 mm) in the depth of adjacent treads or in the height of adjacent risers. The tolerance between the largest and smallest riser or between the largest and smallest tread shall not exceed 3/8 inch (10 mm) in any flight of stairs. (Consistent with BOCA 1993, 1990, 1987)

**Leading Edge Projection**

According to BOCA 1996, and 1993, there is a limitation on the distance that the leading edge of treads shall project beyond the tread below. Based on measurements collected on May 6, 2004, and illustrated in Table 3, there are numerous stairs where the leading edge projection exceeds the requirements set by BOCA 1996 and 1993.

**1014.6.1 Profile:** The radius of curvature at the leading edge of the tread shall not be greater than ½ inch (13 mm). Bevelling of nosings shall not exceed ½ inch (13 mm). Risers shall be solid and vertical or sloped from the underside of the leading edge of tread above at an angle not more than 30 degrees (0.52 rad) from the vertical. The leading edge of treads shall project not more than 1 ¼ inches (32 mm) beyond the tread below.

> **BOCA 1993 (1014.6.1) Profile:** The radius of curvature at the leading edge of the tread shall not be greater than ½ inch (13 mm). Bevelling of nosings shall not exceed ½ inch (13 mm). Risers shall be solid and vertical or sloped from the underside of the leading edge of tread above at an angle not more than 30 degrees (0.52 rad) from the vertical. The leading edge of treads shall project not more than 1 ¼ inches (32 mm) beyond the tread below.

**Stairway Handrails and Guards**

First, according to BOCA 1996, 1993, 1990, and 1987, stairways shall have continuous handrails and guards on both sides. Based on observations collected on May 6, 2004 (see attached photos), there is a gap in handrail coverage where the stairway transitions from 42.5" to 48", and there is no handrail provided on the first step, both violations of the code requirements. Furthermore, the handrails are also in violation of not providing the appropriate appurtenances where the handrail is not continuous.

**1014.7 Stairway guards and handrails:** Stairways shall have continuous handrails on both sides. Guards shall be provided where required by Section 1005.5. Intermediate handrails are required so that all portions of the required width of stairs are within 30 inches (762 mm) of a handrail. On monumental stairs, handrails shall be located along the most direct path of egress travel. Handrails shall be provided for alternating tread stairways in accordance with Section 1014.6.6.1. Guards shall be constructed in accordance with Section 1021.0. Handrails shall be constructed in accordance with Section 1022.0.

> **BOCA 1993 (1014.7)**
> Stairway guards and handrails: Stairways shall have continuous handrails on both sides. Intermediate handrails are required so that all portions of the required width of stairs are within 30 inches (762 mm) of a handrail. On monumental stairs, handrails shall be located along the most direct path of egress travel. Handrails shall be provided for alternating tread stairways in accordance with Section 1014.6.6.1. Guards shall be constructed in accordance with Section 1021.0. Handrails shall be constructed in accordance with Section 1022.0.

> **BOCA 1990 (817.7)**
> Stairway guards and handrails: Stairways shall have continuous handrails on both sides. Intermediate handrails are required so that all portions of the required width of stairs are within 30 inches (762 mm) of a handrail. On monumental stairs, handrails shall be located along the most direct path of egress travel. Handrails shall be provided for alternating tread stairways in accordance with Section 817.6.5.1. Only one handrail is required on stairways having a width of less than 44 inches (1118 mm). Guards shall be constructed in accordance with Section 824.0. Handrails shall be constructed in accordance with Section 825.0.

**BOCA 1987 (816.5)**
Stairway guards and handrails: Stairways shall have continuous guards and handrails on both sides, and in addition thereto, stairways more than 88 inches (2235 mm) in required width shall have intermediate handrails dividing the stairway into portions not more than 88 inches (2235 wide). Only one handrail is required on stairways having a width of less than 44 inches (1118 mm). Guards shall be constructed in accordance with Section 827.0. Handrails shall be constructed in accordance with Section 828.0.

**1022.2.3 Handrail ends:** At locations where handrails are not continuous between stairway flights, including the top and bottom of a stairway, the handrails shall extend horizontally at least 12 inches (305 mm) beyond the top riser and continue to slope for the depth of one tread beyond the bottom riser. The handrail ends shall be returned to a wall or post.

Where handrails are not continuous between ramp segments, including the top and bottom of a ramp, the handrails shall extend at least 12 inches (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface. The handrail ends shall be returned to a wall or post.

**BOCA 1993 (1022.2.4)**
Handrail ends: At locations where handrails are not continuous between stairway flights, including the top and bottom of a stairway, the handrails shall extend horizontally at least 12 inches (305 mm) beyond the top riser and continue to slope for the depth of one tread beyond the bottom riser. The handrail ends shall be returned to a wall or post.

Where handrails are not continuous between ramp segments, including the top and bottom of a ramp, the handrails shall extend at least 12 inches (305 mm) beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface. The handrail ends shall be returned to a wall or post.

**BOCA 1990 (825.2.3)**
Handrail ends: Except for stairways in a dwelling unit, handrails shall extend horizontally at least 12 inches (305 mm) beyond the top riser and at least 12 inches (305 mm) plus the depth of on tread beyond the bottom riser. At the top, the handrail extension shall be parallel to the walking surface. At the bottom, the handrail shall continue to slope for a distance of the depth of one tread from the bottom riser, with the remainder parallel to the walking surface. The handrail ends shall be returned to a wall or post. Handrails between runs of stairs shall be continuous around newel posts or shall terminate 12 inches (305 mm) beyond the last riser as required in this section.

**BOCA 1987 (828.2.3)**
Handrail ends: Except for stairways in a dwelling unit, handrails shall extend horizontally at least 12 inches (305 mm) beyond the top riser and at least 12 inches (305 mm) plus the depth of on tread beyond the bottom riser. At the top, the handrail extension shall be parallel to the walking surface. At the bottom, the handrail shall continue to slope for a distance of the depth of one tread from the bottom riser, with the remainder parallel to the walking surface. The handrail ends shall be returned to a wall or post. Handrails between runs of stairs shall be continuous around newel posts or shall terminate 12 inches (305 mm) beyond the last riser as required above.

Second, based on observations collected on May 6, 2004, a beige tarp was observed attached via a rope to the lower handrail on both sides. However, the tarp was not secured to the lower part of the stairs (see photographs). According to BOCA, "A guardrail system is a system of building components located near the open sides of elevated walking surfaces for the purpose of minimizing the possibility of an accidental fall from the walking surface to the lower level. According to BOCA 1996, 1993, 1990, and 1987, guards are required above open-sided walking surfaces. Based on the collected observations and our professional opinion, this tarp would not be considered a guard, and would not provide protection from a falling from the lower stairs, and is thus a violation of the code requirements.

1005.5 Open-sided walking areas: Guards shall be located along open-sided walking surfaces, mezzanines, stairways, ramps and landing which are located more than 15 ½ inches (394 mm) above the floor or grade below. The guards shall be constructed in accordance with Section 1021.0.

> **BOCA 1993 (1005.5)**
> Open-sided walking areas: Guards shall be located along open-sided walking surfaces, mezzanines, stairways, ramps and landing which are located more than 30 inches (394 mm) above the floor or grade below. The guards shall be constructed in accordance with Section 1021.0.
>
> **BOCA 1990 (803.6)**
> Open-side floor areas: Guards shall be located along open-sided walking surfaces, mezzanines and landings which are located more than 30 inches (762 mm) above the floor or grade below. The guards shall be constructed in accordance with Section 824.0.
>
> **BOCA 1987 (825.5)**
> Open-side floor areas: Guards shall be located along open-sided walking surfaces, mezzanines and landing. The guards shall be constructed in accordance with 827.0.

Third, according to BOCA 1996, 1993, 1990, and 1987, stairways shall have continuous handrails that are prohibited from obstructions, and that at least 1.5" of space be allowed between the wall and the handrail. Based on observations collected on May 6, 2004 (see attached photos), there is rope tied around the lower handrail, which creates an obstruction and is a violation of the code requirements. Furthermore, the handrail on the left hand side-going up was measured as only being 1.25" away from the wall, also a violation of the code requirements.

1022.2 Handrail details: Handrails shall be continuous, without interruption by newel posts, other structure elements or obstructions. A handrail and any wall or other surface adjacent to the handrail shall be free of any sharp or abrasive elements. The clear space between the handrail and the adjacent wall or surface shall not be less than 1 ½ inches (38 mm) except that the clear space shall not be less than 2 ¼ inches (57 mm) for stairways. Edges shall have a minimum radius of 1/8 inch (3 mm).

Exception: Handrail bracket or balusters attached to the bottom surface of the handrail and which do not project horizontally beyond the sides of the handrail within 1 inch (25 mm) of the bottom of the handrail shall not be considered to be obstructions.

> **BOCA 1993 (1022.2)**
> Handrail details: Handrail-gripping surfaces shall be continuous, without interruption by newel posts, other structure elements or obstructions. A handrail and any wall or other surface adjacent to the handrail shall be free of any sharp or abrasive elements. The clear space between the handrail and the adjacent wall or surface shall not be less than 1 ½ inches (38 mm). Edges shall have a minimum radius of 1/8 inch (3 mm).

> BOCA 1990 (825.2)
> Handrail details: Handrail-gripping surfaces shall be continuous, without interruption by newel posts, other structure elements or obstructions. A handrail and any wall or other surface adjacent to the handrail shall be free of any sharp or abrasive elements. The clear space between the handrail and the adjacent wall or surface shall not be less than 1 ½ inches (38 mm). Edges shall have a minimum radius of 1/8 inch (3 mm).

> BOCA 1987 (828.2)
> Handrail details: Handrails shall conform to the requirements of Section 828.1 through 828.2.5.

Fourth, according to BOCA 1996, 1993, 1990, and 1987, handrails shall not be less than 34 inches nor more than 38 inches in height from the floor. Based on measurements collected on May 6, 2004 (see Table 4), the handrail is only 32.25" (right handside – going up) and 32" (left hand side- going up) in height from the 9th stair, a violation of the code requirements. This deficiency occurs at the point where the stairs transition from 42.5" to 48" (going down).

**1022.2.2 Height:** Handrails shall be not less than 34 inches (864 mm) nor more than 38 inches (965 mm), measured vertically, above the leading edge of the treads or above the finished floor of the landing or walking surface.

> BOCA 1993 (1022.2.2)
> Height: Handrails shall be not less than 34 inches (864 mm) nor more than 38 inches (965 mm), measured vertically, above the leading edge of the treads or above the finished floor of the landing or walking surface.

> BOCA 1990 (825.2.2)
> Height: Handrails shall be not less than 34 inches (864 mm) nor more than 38 inches (965 mm), measured vertically, above the nosing of the treads or above the finished floor of the landing or walking surface.

> BOCA 1987 (828.2.2)
> Height: Handrails shall be not less than 34 inches (864 mm) nor more than 38 inches (965 mm), measured vertically, above the nosing of the treads or above the finished floor of the landing or walking surface.

## H. Summary of Opinion

In summary, based on our understanding of the description of the incident, research performed to date, expertise in the safety industry, review of the material submitted, reasonable assumptions initial, we offer the following summary opinion:

Although due the vague nature of the building permits submitted the actual age of construction of the stairs could not be determined, the stairs, when compared up against the <u>the BOCA National Building Code/ 1996, BOCA National Building Code/ 1993, BOCA National Building Code/ 1990, BOCA National Building Code/ 1987, the BOCA Basic/National Building Code/ 1984</u> has serious defects. Summarized, these defects are the following

| BOCA | 1984 | 1987 | 1990 | 1993 | 1996 |
|---|---|---|---|---|---|
| Stair Requirement | *Violation of Requirement* | | | | |
| Width | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Headroom | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Projection (nosing) | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Tread depth | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Riser height | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Dimensional uniformity | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Leading edge projection | *No* | *No* | *No* | *Yes* | *Yes* |
| Handrail (continuous) | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Handrail height | *No* | *Yes* | *Yes* | *Yes* | *Yes* |
| Handrail (obstructions) | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Handrail (distance from wall) | *No* | *Yes* | *Yes* | *Yes* | *Yes* |
| Guards | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |

In conclusion, as shown in the above analysis, the stairway system involved in the accident of Mr. Noonan fails to meet acceptable standards of minimum construction. These stairs are defective in total make up; materials construction, dimension, uniformity, continuity, maintenance, and do not meet any acceptable code (regulated, consensus or advisory) and in my opinion were a direct cause of the accident suffered by Mr. Noonan.

If you have any questions please do not hesitate to contact me directly.

Very truly yours,

John P. Coniglio

John P. Coniglio, PhD, CSP, RPIH, CHMM
Executive Vice President, Operations

Legal/corso/corso ma ri/corse expert opinion 6-10-04

Attachments

OSEA
The Workplace Experts

**Corporate Office**
Western New York
3748 South Park Avenue
Buffalo, NY 14219-1802
716-821-0091
Fax: 716-821-0232
e-mail: Experts@osea.com
Website: www.osea.com

**Central New York**
3532 James St.
Suite 202
Syracuse, NY 13206
315-431-4526
Fax: 315-431-4906
e-mail:
cnyexperts@osea.com

**Southeastern U.S.**
6604 East W.T. Harris Blvd.
Suite A2
Charlotte, NC 28215
704-399-7945
Fax: 704-399-7946
e-mail:
carolinaexperts@osea.com

April 12, 2006

Paul E. Phillips Esq.
Law offices of Frank C. Corso
15 Court Street
Boston, MA 02108

***FAX: 401-453-5903***

**RE: Building Values**
**Gordon Noonan**
**D.O.B. 7-24-29**
**D.O.L. 10-18-03**

Dear Mr. Phillips:

Pursuant to our telephone conversation and my additional review of the file and materials you have sent, I steadfastly believe that the stairway in question that is violative of numerous regulations over a period of many years is also out of compliance as it relates to Rhode Island Statute Health & Safety 23-27.3-106.5 "Physical Value."

During my review of this matter, and as per my original opinion letter of June 9, 2004, numerous violative conditions exist relating to the 2nd floor stairway and have existed for numerous years. Regarding valuation of the property and the above referenced statute I also believe with valuations of the property at varying times that the new addition in approximately 1986 increased the value by over 50% of the appraised value. This is supported by a $200,000 cost for the addition in 1986 and an appraised value for the property through assessment at $294,000. Further, in reviewing the commercial property card I have performed a review with some modification.

I have attached a copy of my brief calculations and as you will note in particular I have taken the per square foot cost of $108.52 and multiplied it by a factor of .96 to represent a lower per square foot cost for the two-story original portion of the building. This is as per standard valuation practice given the fact that original foundation supports, etc. already exist for the second floor. This adjustment, therefore, is necessary to properly modify the per square foot cost. Simply put, a two-story building would have a lower per square foot cost than a single-story building.

Based on that review the newer first floor addition of 5,390 square feet has a property valuation of $584,923. The original two-story building with small single-story additions has a valuation of $573,377. As can be seen, the new addition exceeds 50% of the original building value.

The above numbers do not even reflect the cost of the wood decks provided around the building. An estimate based on the diagram provided shows 1962 square foot of deck around the one-story newer addition with 1568 square foot provided around the original structure. Whatever square foot cost would be applied to the decking, the newer addition pricing would further elevate the new construction cost.

Based on the ongoing review of the building, its additions and this commercial property card review, the values associated with a new construction easily exceed a 50% valuation per the statute and all Life Safety and Building Code requirements would need to be updated.

As you know, I feel strongly after reviewing thousands of commercial properties where Life Safety situations exist that it is uncommon for any interior main exit way from a floor area to ever be grandfathered in as improper in construction and design. Typically, the 50% valuation factor is for upgrading the building regarding major components for ADA compliance, exterior fire escapes that need to be enclosed, etc.

In summary, the valuation supports the need for upgrading the entire property to current code no matter what time you view the additions and costs as per the attached. Further, it is clearly necessary to upgrade in Life Safety Code requirements for safe building utilization regardless of the valuation consideration.

If I can provide any further detail, please don't hesitate to call.

Very truly yours,

John P. Coniglio, Phd, CSP, CHMM, RPIH
Executive Vice President – Operations

Attachments: Building Permit History
Commercial Property Card

Corso/noonan/noon-bldg values-to Phihllips 4-06

**Prepared for:** Law Offices of Frank C. Corso

**RE:** Gordon Noonan (D.O.B. 7-24-29; D.O.L. 10-18-03)

## BUILDING PERMIT HISTORY

Originally built 1914

| | | |
|---|---|---|
| 1933 | $__?__ | 1st permit 8x8 1-story addition use office |
| 1944 | $__?__ | Roofing & siding |
| 1946 | $200 | 12x20 additional 1-story addition |
| June 14, 1956 | $__?__ | Existing bldg 22'x60', 2 stories, renovation 1st & 2nd |
| June 1956 | $__?__ | Alterations |
| 1958 | $2000 | 9x50 2nd floor add<br>5-12 powder room |
| 1964 | $2000 | 22x25 kitchen add |
| 1975 | Bldg Code Violations for exits, 2nd floor | |
| 1976 | $7800 | Addition? |
| No date | $2600 | Alterations 1248 ⊟' all area |
| 1978 | $1500 | 6x40 addition 240 ⊟' |
| 1979 | $4900 | 700 ⊟' deck |
| 1985 | $24,000 | Reconstruction porch, dining after hurricane |
| 1986* | $200,000 | 42x94' addition 3561 ⊟' plus deck |
| 1994 | $40,000 | Renovate |
| 1998 | $15,000 | Renovate |

**Notes:**
Frame Construction

| | |
|---|---|
| 1-14-75 | Main stairway not enclosed<br>State code 23-28.6-8 Sect.A |
| | No 2 app'd means of egress ea. Level 23-28.6-6 Sect A |
| 1985-87 | Value assessed @ $294,000 bldg. |
| 1984-86 | Assessment of bldg $294,000 |
| 1986 | $200,000 addition |

# Commercial Property Card

Page 1

Sketch on following page

Town of Warren, RI Printed: 4/12/2006 9:33:23 AM

| | |
|---|---|
| Map 4 | Lot 1 |
| Usage: | Restaurants |
| Class: | D |
| Quality: | Average |
| Base Area: | 11478 |
| Basement Area: | 0 |
| Usage: | |
| Perimeter: | 701 |
| Story Height: | 2 |
| Concourse: | 0 |
| Mezzanine: | 0 |
| Usage: | |
| Heated Area: | 11478 |
| Year Built: | 1989 |

**Recent Sales Information**

Location 215 WATER ST

Recorded Plat:

State Code 06
Card 1 of 1

Zoning W 10000

Record of Ownership:

NUSAN REALTY LLC
215 WATER ST
WARREN RI 02885

14038478

$1400000
7/19/2005
589/328

| | | |
|---|---|---|
| Total Adjusted Unit Price: | | 108.52 |
| Total Building Area: | x | 11478 |
| Total Replacement Cost: | | 1245580 |
| Add: Garage: | | 0 |
| Less Physical Depreciation: | 30% | 373670 |
| Functional Depreciation: | 10% | 87190 |
| Economic Depreciation: | 20% | 156940 |
| Total Depreciation: | | 617800 |
| **Net Value:** | | **627780** |
| Additions: | | 0 |
| Values from other cards: | | 0 |
| Land Value: | | 236600 |
| **Total Value:** | | **864380** |

| | | |
|---|---|---|
| **Base Cost Estimate:** | | **73.22** |
| Adjustments: | Sprinklers: | 1.96 |
| | Elevators: | 0.00 |
| | Heat: | 12.10 |
| | Basement: | 0.00 |
| | Concourse: | 0.00 |
| | Mezzanine: | 0.00 |
| | OFP: | 0.00 |
| | EFP: | 0.00 |
| **Total:** | | **87.28** |
| Multipliers: | Perimeter: | 1.03 |
| | Story Height: | 1.00 |
| | Wall Height: | 1.04 |
| | Current Cost: | 1.02 |
| | Local Cost: | 1.14 |
| **Total Adjusted Unit Price:** | | **108.52** |

# Commercial Property Card



Map 4 Lot 1 Card 1 of 1

**NUSAN REALTY LLC**

| Lot Computations | | | | | | | |
|---|---|---|---|---|---|---|---|
| Building Lot | Str Pr | Adj % | Adj SF | Total | Cond % | Cause | Value |
| 10000 | 20.00 | 1.00 | 20.00 | 200000 | 0 | EASEMENT | 200000 |
| 0 | 0.00 | | | | | EASEMENT | 0 |
| **Acreage Computations** | | | | | | | |
| Classification | Acres | Rate | Total | Cond % | Cause | | |
| Excess 0-5 Acres | 0.420 | 87100 | 36600 | 0 | | | 36600 |
| Excess 5-20 Acres | 0.000 | 69700 | 0 | 0 | EASEMENT | | 0 |
| Excess Over 20 Acres | 0.000 | 43600 | 0 | 0 | EASEMENT | | 0 |
| Tillable - Pasture | 0.000 | 6000 | 0 | 0 | EASEMENT | | 0 |
| Woodland | | | | | | | |
| Wasteland | 0.000 | 300 | 0 | 0 | EASEMENT | | 0 |
| TOTAL AREA | 0.650 | | | | TOTAL LAND VALUE | | 236600 |

**Exterior Wall**
**Clpbd/Shingle**
☐ Party Wall ☐ Plate Glass Framed

**Heat** EASEMENT
**Warm or Cool Air**
☐ Oil ☐ Electric ☒ Gas

Roof: **Asphalt**
Ceilings: **Suspended**
Interior Finish: **Drywall**

**Partitions**

| | B | 1 | 2 | 3 |
|---|---|---|---|---|
| Lath. & Pl. | ☐ | ☐ | ☐ | ☐ |
| Drywall | ☐ | ☒ | ☒ | ☐ |
| Brick | ☐ | ☐ | ☐ | ☐ |
| Conc. Bl. | ☐ | ☐ | ☐ | ☐ |

**FLOORING**

| | B | 1 | 2 | 3 |
|---|---|---|---|---|
| Conc | ☐ | ☐ | ☐ | ☐ |
| Hardwood | ☐ | ☐ | ☐ | ☐ |
| Single Fl. | ☐ | ☐ | ☐ | ☐ |
| Tile | ☐ | ☒ | ☐ | ☐ |
| Terrazo | ☐ | ☐ | ☐ | ☐ |
| Wood Joist | ☐ | ☒ | ☒ | ☐ |
| Steel Joist | ☐ | ☐ | ☐ | ☐ |
| Reinf. Conc | ☐ | ☐ | ☐ | ☐ |
| WWC | ☐ | ☒ | ☒ | ☐ |

**Plumbing**

| | |
|---|---|
| Bathrooms: | 0 |
| Toilet Rooms: | 5 |
| Water Clos.Extra: | 0 |
| Lavatories | 0 |
| Sink Extra: | 0 |
| Slop Sinks: | 0 |
| Urinals: | 4 |
| No Plumbing | ☐ |

Bath Tile ☐ T.R. Tile ☐

**Wiring**
☒ Fluxlume/Equiv. ☐ Pipe Conduit

Notes:
FUNCTIONAL DEP = 2BLDG ON LOT ECONOMIC = OFF STREET INFLUENCE

Town of Warren, RI Printed: 4/12/2006 9:23:23 AM

Location 215 WATER ST Card 1 of 1
State Code 06 Zoning 10000

NUSAN REALTY LLC




Town of Warren, RI







