# EXHIBIT 8

independent contractors. I'm looking for employees, W-2 employees.
A: All of our employees are W-2 employees, I have no 1099s, so even the part-timers are employees.
Q: Okay.
A: That would be 11.
Q: Of the 11 how many are engineers?
A: Six.
Q: Are you a P.E.?
A: I am not a P.E.
Q: Of the 11 how many are professional engineers?
A: Two.
Q: Any architects on staff?
A: No.
Q: Of the two professional engineers, what are their specialities in engineering?
A: Civil engineering, and I believe the other is an industrial engineer.
Q: Have you brought with you here today all records relating in any way to your assignment in connection with this case?
A: I have.
Q: Can you tell me approximately when you were first contacted regarding this matter?
A: I want to — I couldn't give the exact date, but I



believe it was in 2004. I'd have to check exactly.
Q: Yeah, I'm looking for an approximation. If you need to refer to your records in order to answer that question, please feel free to do so. And if I could assist you, it would appear Jacob Coniglio inspected the location in or about May of 2004, May 6 of 2004.
A: Yes, so it's probably before that May date.
Q: Shortly prior to that?
A: Yes, yes.
Q: Do I understand it correctly — and I will take a moment at some point to look at your file — but do I understand correctly you were first retained by Attorney Corso?
A: That's correct.
Q: Have you ever had occasion to work with Attorney Corso or anyone from his office on any other matter at any time?
A: No.
Q: Do you know how you came to the attention of Attorney Corso?
A: I couldn't say for sure. I believe we were referred, I was referred to him.
Q: Do you know by whom?



A: No, I do not.
Q: What's your hourly rate?
A: One fifty, I believe it is.
Q: What have you billed on this matter?
A: I have to check with Accounting but I would imagine four or 5,000. And that would probably be high, but I can't remember exactly.
Q: You don't have any billing records with you?
A: No, I do not.
Q: Are those kept separately from the file?
A: Yes, they are.
Q: Now, the letter of June of 2004 that you authored, June 9, 2004 refers to the fact that you received a Ph.D. from Kennedy Western University.
A: That's correct.
Q: Where is that?
A: Kennedy Western University was an off campus distance learning facility with locations in California, Los Angeles, California, and Oklahoma City, Oklahoma.
Q: Is that still in existence?
A: Yes, it is.
Q: What did you call it, a distance learning facility?
A: What you have to do is you have to be accepted



into the curriculum, much like many of them right now.
Q: What are "them"?
A: Many of them, the colleges, Clemson and other schools are doing this. You have to sign up for the courses, you're assigned professors, you're given — you buy your course materials; course materials being provided, you have to go through them and then you have to take a proctored examination, including a dissertation with professors to do my argument with, all with a non-classroom environment because of my travel schedule.
Q: My question was, and I thought you used the terminology, something like "distance learning facility" or something like that.
A: I use the term distance — I'm sorry.
Q: And my question is what do you mean by that term, "distance learning"?
A: My term, my definition of that is where you are not required to go into a classroom but you are doing work either through the computer or through telephone with a professor who oversees the work. And as I said, materials are sent, examinations taken, which have to be proctored.

Page 9

Q: Did you ever attend a class at Kennedy Western University?
A: I did not, no.
Q: Did you ever go to Kennedy Western University?
A: No, it's not designed for that type of attendance.
Q: Well, you mentioned it has campuses in California and Oklahoma or something.
A: When I say campus I believe those are offices and where many of the professors are located.
Q: So there is no campus of Kennedy Western University, to your knowledge?
A: Where they have classrooms?
Q: Yes.
A: No, I don't believe there is.
Q: So these are I guess what the layperson would refer to as correspondence courses.
A: I've taken correspondence courses. I would not term them as that. It's not where you have a chapter to do and then answer a chapter.
You have to go through a curriculum which is given to you. The curriculum is provided for tests, just as it was when you were in school. I did go to graduate school and undergrad in a formal classroom environment, same type of material, but you don't sit in classroom where

Page 10

you're actually given instruction. If you get to a point in the program you have a difficult time understanding the material, you have contact with that professor who is assigned to you for that course.
When you are ready to take the exam it's sent to you, you have to arrange a proctor, and the examination is given.
Q: Do you arrange for the proctor?
A: In fact I use counsel, I used a local attorney.
Q: That wasn't my question, who you used.
A: Pardon?
Q: My question was, I said you arranged —
A: I arranged a local attorney, yes.
Q: Please don't interrupt me when I'm speaking, okay?
A: Okay.
Q: Okay? The question was, you arranged for the proctor for these tests?
A: That's correct.
Q: So the person who monitored you while you were taking the test was somebody that you selected?
A: Right, but had to be approved by the school.
Q: Listen to the question. The person that you took the test in front of that monitored your test during these courses was someone you selected?

Page 11

A: That is correct.
Q: When did you receive your master's from Kennedy Western University? What year?
A: I believe that was 2001, 2000 or 2001.
Q: Do you have your CV here?
A: No, I don't.
Q: Is it your testimony that sitting here today you don't recall the year you received your master's?
A: I believe it was 2001. It was close to around December-January of 2000-2001.
Q: But you're uncertain?
A: A lot of dates; I don't remember exactly.
Q: I'm not looking for a date. I'm looking for a year.
A: I would say probably more like 2001.
Q: But you're uncertain as to the year?
A: I just said probably would be 2001.
Q: Are you certain you received your master's degree from Kennedy Western University in the year 2001?
A: I'm as certain as I can be sitting here without looking at my CV, yes.
Q: Okay. For example, I know the year I graduated from college, unequivocally and without looking at any CV or diploma. My question to you is similarly can you tell me definitively what year

Page 12

you received your master's from Kennedy Western University?
A: You want me to answer the question?
Q: Yes, I do.
A: 2001.
Q: Okay. What year did you begin that program?
A: I want to say 1994.
Q: It took you seven years to get your master's?
A: That's correct.
Q: What year did you receive your Ph.D.?
A: Finalized that in 2002, late 2002.
Q: So it took you seven years to get your master's and a year, year and a half to get your Ph.D.?
A: That's correct. If I might expand on why?
Q: I'm not interested in why.
A: Okay.
Q: What did you pay Kennedy Western University in fees or tuition for the master's?
A: It was per course and sitting here I don't recall an exact amount.
Q: What's your best estimate?
A: Four or $5,000.
Q: How about your Ph.D.?
A: I believe it would be similar to that, yes.
Q: Is Kennedy Western University to your knowledge

Page 49

the white trellis work shown in the photograph? Is that correct?
A: Yes, and directly under this deck.
Q: Directly under the dark stack. Could you just circle the stack just where you made reference to that?
A: Okay.
Q: Can you circle that a couple more times?
A: Why don't I put an arrow like this.
Q: Sure. Put an S next to that arrow.
A: Just S?
Q: Yes. And if you could just put 1 for the left side of the photograph, the line you drew, and then number 2 to the area where you stopped.
A: (Deponent complies.)
Q: Now, you said you paced that; is that correct?
A: Correct.
Q: Do you remember what your pacing came up with in terms of number of paces or feet?
A: I have, my pace is around 2.8 inches — feet, I'm sorry, and about 17 paces.
Q: And in your head that comes up to what?
A: It was like, something like 45, 46 feet.
Q: So 45 plus or minus based on your pacing.
A: Yes.

Page 50

Q: Is that right?
A: That's correct.
Q: Did you pace the other dimension?
A: This one here, no, I did not.
Q: So if I understand you correctly, the April 12, 2006 report, the version that we have here in the green folder marked Exhibit A with the 5,390 square feet, that number came from the commercial property card information. If we could use a red asterisk on this with your permission in the lower right-hand corner, —
A: Sure.
Q: — this commercial property card that I've just placed a red asterisk in the lower right-hand corner, that number of 5,390 square feet originally came from the dimensions of 98 by 55 shown on this document. Correct?
A: Yes.
Q: And at the time you authored this report of April 12th, 2006 it was your assumption that the 98 by 55 dimension shown in this document signified the dimensions of the addition; is that correct?
A: Yes.
Q: And you subsequently made a change, a handwritten

Page 51

change within the last several weeks to that total square footage from 5,390 to 4,950. Correct?
A: Yes.
Q: And that was based on your changed assumption that what was shown on the commercial property card document to the right-hand side, the 90 by 55, was in actuality the dimensions of the addition. Is that right?
A: Yes.
Q: And when you went out there today and paced it, your pacing reflected a dimension of what you assumed to be the addition to be plus or minus 45 feet?
A: Yes.
Q: Which would render both the 5,390 and the 4,950 square feet figure referenced in this report of April 12, 2006 to be in error.
A: Certainly questionable.
Q: On what do you base your assumption or conclusion that the 98 by 55 dimensions constituted the addition, as shown in this document?
A: I didn't make that assumption based on that document.
Q: Who did?
A: Nobody.

Page 52

Q: Why did you use those numbers?
A: Because there are other commercial indexes on the same property that did not show this takeoff, and I got it from there.
Q: I'm not talking about the 90 by 55. I'm talking about the 98 by 55.
A: What I'm trying to say is the other commercial index do not show this diagram on the side which is a 90 by 55. So the only thing that's shown on those is this and I — the only thing in here was the 98.
Q: Right. Let's take a look at another one of those, and I will place a Y on another document in the same packet in the lower right-hand corner. And this is a commercial property card that is precisely identical to that which was previously asterisked but for the takeoff, as you describe it, the 90 by 55 rectangle on the right-hand side.
A: Yes.
Q: Looking at what's been marked as exhibit Y — strike that. Looking at the page that I've marked with a Y, on what did you base your assumption or conclusion that the 98 by 55 constituted the addition?
A: May I look at that?

Page 73

Q: Because it was of interest to you?
A: Yes.
Q: Did you make any effort when you went out there today to determine the accuracy of the measurements referenced in that document that you highlighted?
A: No, I did not.
Q: Why not?
A: I was just — it wasn't an official visit and I didn't want to pull the tape measure out and measure.
Q: Well, you made a rough measurement of the front.
A: Uh'huh (affirmative).
Q: And you came up with 44, 45, somewhere around there.
A: Correct.
Q: Could in fact be 41 and a half feet; correct?
A: Are you asking me if I think the front could be 41 and a half feet?
Q: Yeah.
A: No.
Q: Well, you said the side looked like 80 or 90.
A: Right.
Q: So it could be 81 and a half.
A: Okay. Yup. Okay.

Page 74

Q: Okay. So in fact the one story addition, for all you know, could in fact be 3,383 square feet, not having done the measurements yourself.
A: Not having done the measurements, it's not my belief. But that's true.
Q: Why isn't that your belief?
A: Because my review of all the numbers, which are extremely different from every perspective, I depended on the commercial index, which I believe to be the governing jurisdiction. When I walked into the building today, just to confirm what I had been reading and seeing and the diagrams and the prints, I felt that the way the bar was located and the way the dining area was located, that the existing building ended at the front wall where the stack was, is located, and all the areas to the opposing side of that first floor were the new addition.
Q: But you didn't bother to make any measurements —
A: No.
Q: — of what you assumed to be the new addition?
A: No.
Q: Is it your belief that what is shown on Jannitto 8 was constructed?
A: Yes.

Page 75

Q: And what's the basis for that?
A: Basically looking at the visual, what I see there, including the pilings and what's on the diagram, what I saw out there today.
Q: Really? Okay. So your understanding of construction and documents similar to that would lead you to conclude that what you saw out there today is consistent with what is depicted in that drawing, Jannitto 8?
A: I'd say yes. That's a rough sketch for approval process, but, yes.
Q: Okay.
(Short break taken.)
Q: Now, turning to the defendant New Wharf Tavern, Inc.'s expert disclosure in the green folder marked as Exhibit A, the only items that you highlighted were on the second page, the dimensions of the addition with the total square footage. Correct?
A: Yes.
Q: And the third page relating to plumbing, HVAC service and distribution and light power.
A: Yes.
Q: Now, you have a copy of a report of Raymond Keough of April 13, 2006 among this file; correct?

Page 76

A: Correct.
Q: And this report, the Keough report, refers to a heated building addition of 3,561 square feet; correct?
A: Correct.
Q: Did you attempt to reconcile that number at all with the number used in your April 12 report, either the original number or the hand-corrected number?
A: Reconcile? How do you mean?
Q: What I mean is it's different than the two numbers that you used and I want to know did you attempt to reconcile it in any respect. Did you try to figure out why Mr. Keough was using a different number?
A: No. It was different from all the numbers that I'd seen, but I didn't reconcile it. I just highlighted it because it was different.
Q: Did you make any attempt to determine how he arrived at that figure?
A: No.
Q: Did the fact that another expert retained on behalf of the plaintiffs was using a number so markedly different from the numbers or number you used cause you any concern?