# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

GORDON NOONAN and
NANCY NOONAN

vs. C.A. No. 05-150S

NEW WHARF TAVERN, INC.

Deposition of **MICHAEL ASCIOLA**, a witness, taken on behalf of the Plaintiffs, pursuant to the Federal Rules of Civil Procedure, on Monday, November 28, 2005, at the offices of Phillips & D'Aloisio, 91 Friendship Street, Providence, Rhode Island, before Dorothy M. Depointe, Registered Diplomate Reporter and Notary Public, convening at 1:06 p.m.

APPEARANCES:

Phillips & D'Aloisio
BY: PAUL E. PHILLIPS, ESQ.
Counsel for Plaintiffs

Law Office of Frank C. Corso
BY: FRANK C. CORSO, ESQ.
Counsel for Plaintiffs

Rice, Dolan & Kershaw
BY: MARK P. DOLAN, ESQ.
Counsel for Defendant

David E. Maglio & Associates, PC
BY: DAVID E. MAGLIO, ESQ.
Counsel for Defendant

IN ATTENDANCE: Allen C. Rivest,
Mountain Valley Indemnity

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street, Suite 617
Providence, Rhode Island 02903
(401) 351-1660

five-year period you were there?

A. No, it hasn't.

Q. Is there a particular person that you consider your boss at the job?

A. Yes.

Q. Who is that?

A. Banquet manager, Gail Garvin.

Q. And how long has Gail been your boss?

A. Approximately --. The whole duration of the time. Almost five years. Since I was hired there.

Q. All right. Do you work only catered events or do you work any kind of regular schedule?

A. I work just for the parties upstairs, the function room, the banquet room, and there's no set schedule.

Q. So is it an on-call type of arrangement?

A. I'm notified a week in advance.

Q. All right. You were indeed, I understand, working on October 17th of 2003 when an incident occurred with a Mr. Gordon Noonan?

A. Yes, I was.

Q. Is Mr. Noonan someone that was known to you before October 17th, 2003?

A. No, he wasn't.

Q. Have you ever been introduced to him since

A. Court Jesters, or something to that effect.
Q. And had you ever tended to them prior to that night?
A. I'm not sure if I did or not. A lot of our business at the Wharf Tavern is repeat business. I'm not sure if they were one of them. I don't know that. I don't really remember.
Q. All right. Is there anyone else there that was part of what you understood to be the Jesters group that you knew that evening?
A. No.
Q. Do you know a man named Stuart Eddy?
A. I know of him. I don't know who he --. I don't know him personally.
Q. Have you ever had any discussions with him regarding Mr. Noonan?
A. No.
Q. Have you ever had any discussions with him?
A. After he, Mr. Noonan fell down the stairs, he had come back up, he was all shooken up. Very briefly. I don't really even remember. I think it was something like he was looking for his wife, Gordon's wife, who was supposed to be meeting him there.
Q. Did you spend most of the evening of the 17th

Q. What I'm saying is, he asked you at the bar if you've seen her?
A. Right.
Q. So you had a conversation with him.
A. I believe so, yeah. Yeah, it was like --. He was frantic, he was like running around. "Have you seen Arthur's wife?" Or --. I don't know who his wife was.
Q. Gordon's wife.
A. Gordon's wife, right.
Q. And based on that limited interaction, did you make an assessment of whether Mr. Eddy was inebriated?
A. No.
Q. When you say "no," do you mean you didn't make an assessment or he was not?
A. I didn't make an assessment.
Q. Were there any signs that were obvious to you that he may have been?
A. No.
Q. And you feel that --
A. This is Mr. Eddy --
Q. Yes.
A. -- that we're talking about?
Q. Yes.

A. No.
Q. And you feel at that point in time you were qualified to recognize the signs and symptoms --
A. Yes.
Q. -- of intoxication?
A. Yeah.
Q. What in your training and experience are the signs and symptoms of intoxication?
A. Slurred speech; trouble walking, motorized skills; bloodshot eyes; acting loud, you know, out of the normal; I guess personalities change since the time he had gotten there. That type of thing.
Q. Using your criteria, did you observe any of those signs during the period of time you had a conversation with Mr. Eddy?
A. No.
Q. Is he someone that you remember serving that evening as well?
A. I do, yes, I do remember serving Mr. Eddy.
Q. Am I to understand that anyone that received anything to drink had to come to the bar to get it from you?
A. Right.
Q. There was no tray service?
A. No.

Q. And no table service.
A. No.
Q. All right. Now, Gordon Noonan, is it your best recollection that you first came to identify him with your common connection --
A. Correct.
Q. -- during the first time he came up for a drink?
A. Yes, sir.
Q. All right. And when he first came up to see you, did you observe any signs of intoxication as you had been trained to recognize them?
A. No, sir.
Q. And do you remember what you served him?
A. I do remember I served him merlot, red wine.
Q. Okay. And was it in a 4-ounce glass? 3-ounce glass?
A. It was in a wine, a wine glass. A red wine glass has a wider, round glass, where the white wine glasses are tall, cylindrical, thinner.
Q. So it's a stemmed glass?
A. Stemmed wine glass, correct.
Q. And had you, before you served Mr. Noonan that wine, observed anyone get a drink for him?
A. No, I didn't.
Q. And you don't fill the glass to the top, I take

of this evening?
A. Yes.
Q. And in that statement did you ever mention your opinions regarding Mr. Noonan's sobriety?
A. No.
Q. Did anyone ever ask you, "Was the man intoxicated"?
A. I don't believe they'd asked me that, no.
Q. And had they asked you, your response would be what?
A. No, he didn't show any signs of inebriation.
Q. Now, did you ever from the date of this incident, which was October 17th, 2003, until today speak to anyone at the Wharf Tavern who claims to have witnessed Mr. Noonan's fall?
A. No, sir.
Q. No one has ever told you that they saw him fall?
A. No, sir.
Q. Other than Ms. Garvin, from October 17th till today do you know the identity of anyone else that you have spoken to where Mr. Noonan's accident was the subject matter that was discussed?
A. Just someone from the insurance company.
Q. And that was shortly after the incident?
A. This was just last summer he asked me to give a,

Q. Were questions by her asked of you regarding his sobriety?
A. No, asking basically if I had seen anything, or what he had drank, who he was with. Just general questions like that.
Q. Did you know who he was with?
A. I didn't know who he was, no.
Q. And your response to her regarding what he had to drink, you described that he --
A. He was drinking merlot.
Q. And did you describe to her that nothing led you to conclude he was drinking more than he should have been?
A. Correct, yes.
Q. All right. Do you know a waitress there by the name of Zena?
A. Yes.
Q. You're smiling.
A. She's --
Q. That doesn't come out on the record.
A. No, she's --. I don't think you're pronouncing it right.
Q. Zelia?
A. Zelia, correct. Yes.
Q. Was she there that evening?