# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**GORDON NOONAN AND**
**NANCY NOONAN**

**VS** **C.A. NO. 05-150 S**

**NEW WHARF TAVERN, INC.**

COPY

**DEPOSITION OF RAYMOND JOSEPH KEOUGH**, taken on behalf of the Defendant, pursuant to the Rhode Island Rules of Civil Procedure, on July 7, 2006, at the law offices of Rice, Dolan & Kershaw, 170 Westminster Street, Suite 900, Providence, Rhode Island, before Susan J. LeBlanc-Rockcliffe, RPR, convening at 10:41 a.m.

**APPEARANCES:**

**LAW OFFICES PHILLIPS & D'ALOISIO**
BY: Paul E. Phillips, Esquire
Counsel for the Plaintiffs

**RICE, DOLAN & KERSHAW**
BY: Mark P. Dolan, Esquire
Counsel for the Defendant

REPORTING ASSOCIATES
Suite 617 - 10 Dorrance Street
Providence, Rhode Island 02903

# I N D E X


| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| Raymond Joseph Keough | | |
| | Mr. Dolan | 3 |

**DEFENDANT'S EXHIBITS FOR I.D.**

| | | |
|---|---|---|
| A | Raymond Keough's three-page resume | 5 |
| B | A two-page letter dated April 11, 2006, to Paul from Raymond Keough | 14 |
| C | A one-page letter dated July 6, 2206, to Paul from Raymond Keough | 30 |


***

**RAYMOND JOSEPH KEOUGH**, first having been duly sworn, testified as follows:

**EXAMINATION BY MR. DOLAN:**

Q Could you state your full name for the record, please.

A Raymond J. Keough.

Q Mr. Keough, my name is Mark Dolan and I'm one of the attorneys that represents the Wharf Tavern Restaurant in this case. You understand that?

A Yes.

Q You've been deposed before? You've been in depositions before?

A Two times before.

Q Okay. When approximately?

A I was deposed once, gosh, maybe 1990, '91 and then again in 2003, something like that, 2002, in that range.

Q '91 concerned what?

A I had built a factory, a gypsum fire board plant in East Providence, and after we got done building it a fellow that was working at the factory got hurt so, a year after we were completed, so they asked me to come in and give a deposition on the equipment that got installed.

Q And 2004 was what or 2003?

A Yeah, about that time frame. There was a building that got built by a company that I work for, and I was the vice-president of operations. And the project manager who was on the job didn't work for the company anymore, so I went as the official capacity representing the company.
Q You've been deposed twice. Let me just give you a couple of rules of thumb for the deposition. Okay? If at any point during the process you don't understand any question and want any question repeated or rephrased, you let me know and I'll be happy to do so. Okay?
A Okay.
Q If you don't so indicate, we're going to assume that you understood.
A Yes.
Q The person to my left is a stenographer. She's obviously taking down everything we say, and a transcript is prepared at a later date of everything that was said during the course of the deposition. All right?
A Yes.
Q For that reason you have to verbalize all your answers. She cannot take down a shake of the head or any other kind of non-verbal response. All

right?

A Yup. Yes.

Q Have you brought all materials relating to this matter that you've reviewed in connection with your assignment to the deposition?

A Yes, sir.

MR. DOLAN: I have been provided a copy of your resume which I will mark as Exhibit A.

(WHEREUPON A COPY OF A THREE-PAGE RESUME FOR RAYMOND J. KEOUGH WAS RECEIVED AND MARKED AS DEFENDANT'S EXHIBIT A FOR IDENTIFICATION.)

Q I just want to ask you a couple of questions about your background, if I could. You presently are the owner of Keough Construction; is that correct?

A Yes.

Q Now, what is the address of Keough Construction?

A 73 Briarwood Hill Road in Exeter, Rhode Island.

Q Is that your residence address?

A Yes, it is.

Q So you have a home-based office?

A Yes.

Q You work out of your house?

A Yes.

Q Do you have any employees?

A No.

Q How long -- well, strike that. Keough Construction, Incorporated, is a Rhode Island corporation?
A Yes.
Q When was that corporation incorporated?
A October of 2004.
Q Did an attorney handle that?
A Yes.
Q Who was that?
A Gary Pannone from Holland & Knight.
Q Are you basically a consultant?
A I do consulting work for clients, and I also do some HVAC installations.
Q Meaning that you actually act as a HVAC contractor?
A Yes.
Q Is that for union or nonunion work?
A Nonunion predominantly. I don't have any employees, so I hire subcontractors to perform the work.
Q And on those projects are you typically a subcontractor, or do you contract directly with the owner typically?
A Subcontract.
Q Is there a particular general contractor or general contractors with whom you subcontract for HVAC

work?

A Not particularly.

Q Do you do your own estimating in that field?

A Yes.

Q Do you have some sort of expertise or specialty experience with respect to HVAC work?

A I believe I do.

Q That's my question. Why HVAC subcontracting as opposed to some other type of construction work?

A When I worked at ADP Marshall, a floor company -- it used to be called Marshall Contractors -- the predominance of my work, I did a lot of industrial type of projects, and so I gravitated to more mechanically-based projects. When I got out, when I left Fluor Daniel, I went to work for KeySpan Business Solutions to work for developing a co-generation program in New England. They came into New England and bought several HVAC subcontractors. They bought Delta Mechanical. They bought some companies in New Hampshire. So for four years I worked with HVAC companies and did co-generation work. So when they disbanded the group, it was a natural transition to continue doing some HVAC work.

Q What were the circumstances of your departure from

ADP Marshall? Was that 2001 time period, was that the time it was sold?

A No. It was sold about three years prior. I had kind of hit the top of what I thought I could do in terms of a career path at -- Fluor Daniel is a worldwide company, and they demand that you -- they didn't demand. They asked that you travel for them. A lot of their lines were worldwide, so their sales program was developed around client-based programs. It was account management. So if, for example, Biogen was your client, wherever in the world Biogen built, you would have to go. So if they built in Ireland or Texas or China, they wanted you to go there. And my family situation didn't afford me to do that, so I left there and went on over to KeySpan.

Q And your departure from KeySpan in October of 2004?

A The contract that I hired was, I was going to run a co-generation group, they decided to disband the co-generation group and sold the mechanical contracting companies that they bought back to the original owners, and so at that time I said, you know, I'm going to move on.

Q Now, there's a list of projects that you've done since the formation of Keough Construction on the

resume; is that correct?
A Yes.
Q And on some of the projects identified you acted essentially as the owner's representative in a sense as a consultant?
A Yes. Yes.
Q And other projects you've been involved, as you indicated, I assume typically as a subcontractor in connection with air-conditioning installation?
A Yes.
Q What project or projects are you working on now?
A The Wyndham House is under construction now. It's on the resume. The Providence Athenaeum is having additional work done, some exterior stucco revisions. I'm working on that. Gateway Condos is, Gateway Condominiums is coming to completion.
Q So the HVAC system work on both Wyndham House and Gateway Condominiums is ongoing at present?
A Yes, sir.
Q Have you ever been an estimator?
A I've done estimating. My title has never been estimator.
Q Have you ever in any of the businesses that you've worked for prior to forming Keough Construction, have you ever been employed as an estimator in an

estimating department?

A No, but estimators worked for me and, you know, I put, you know, literally hundreds of bids together, sitting with estimators, cranking out the numbers, adjusting the numbers, because I had ultimate responsibility for the bid going out the door so I was intimate with every line item in the bid.

Q All right. Have you ever been involved in restaurant construction?

A Not generally, no.

Q How about specifically? I don't know what you mean by "generally"?

A Well, for instance, we built -- let me just look down the list here -- AT&T in Fairhaven, for example, when I did that project it was a call center. A component of the whole building had a restaurant in it for the employees. The building --

Q Let me stop you there for a second. That says "General Manager SPD."

A SPD stands for Special Projects Division.

Q Was that for Marshall?

A Yes, sir.

Q Was that a design built job, or was that a --

A Which project?

Q AT&T Fairhaven.

A No. The owner did the design, and we did the installation.

Q So Marshall acted as the general contractor?

A Yes, sir.

Q And so that was a bid job of some certain --

A Actually, that was a unique project, and it came to us. It was an old building that existed down in Fairhaven that they wanted to renovate. And they came to us with a small scale that they thought would cost between $2 million and $3 million, and a hundred days later they changed the scope significantly and the project expanded to over $20 million.

Q So was that a sum certain project?

A No, sir. It was a cost plus.

Q How did you come to be contacted in connection with this case?

A Bill O'Gara worked for Holland & Knight. I worked on a number of cases with Bill, Bill and Paul, and Paul was looking for someone to look at this.

Q What cases did you work on with Mr. O'Gara?

A When Bill worked for a company called Holland & Knight, they represented KeySpan in New England, so there's some projects that Delta Mechanical had

that required the services of Holland & Knight. So when Bill came into our office as vice-president of operations, I met with him frequently on those cases.

Q Have you ever acted as an expert witness in connection with litigation on any occasion other than this?

A No.

Q Do you have professional liability insurance?

A No.

Q Do you own your own home?

A Yes.

Q What's your hourly rate? What are you charging for your time in connection with this case?

A $95 an hour.

Q I'm going to show you a report, a letter that you authored of April 11, 2006, and I'm going to ask you some questions about that report. As of the date of this report is everything that you did and everything that you reviewed in order to prepare your opinions and conclusions as set forth in this correspondence identified in the letter?

A Yes.

Q Do you have with you the Sketches 1, 2, 3 and 4 of the "Proposed Addition" referenced in Item 1 of the

report?

A Yes.

Q When approximately -- Can I see those? When approximately were you first contacted regarding this matter?

A I can't be certain. It was, you know, a couple of weeks before.

Q Approximately.

A April 1st, plus or minus.

Q If we can just keep that segregated. You also have the sketch of the "Proposed Restaurant Addition" stamped by Nacci, P.E.?

A Yes, I do.

Q Okay. And the commercial property card from the town of Warren referenced in Item 3?

A Yes, I do.

Q The building permit application of 1/10/06?

A '86, 1/10/86.

Q It says '96 but it's 1/10/86?

A Yeah. I apologize for that.

Q It's okay. Now, you have additional documentation. Are those just copies of what we already looked at?

A No. These are additional, they didn't have like a title on them and like these had, so I didn't include these. But I did have this document, this

one as well and this one as well (indicating).

Q These three pages, if we could just identify them, the first is an elevation drawing on Title Block at the Providence Partnership, correct?

A Yes.

Q The second is a site plan also entitled "Block of the Providence Partnership" with a revision date of 11/25/85.

A Yes.

Q And the third document is some sort of site plan with a revision date of 11/25/85, correct?

A It's more of a building plan. There's really no site on it, but the date is correct, yup.

Q Now, have you reviewed anything else in connection -- strike that. Had you reviewed anything else in connection with this matter prior to the April 11, 2006 report other than what we've already looked at?

A I did have this document (indicating).

Q Okay. So before you issued the April 11, 2006 report you had the report of OSEA of June 9, 2004?

A Yes, I did.

(WHEREUPON A COPY OF A TWO-PAGE LETTER DATED APRIL 11, 2006, TO PAUL FROM RAYMOND KEOUGH WAS RECEIVED AND MARKED AS DEFENDANT'S EXHIBIT B

FOR IDENTIFICATION.)

Q Now, referring to your report, the report of April 11, 2006 marked as Exhibit B, you indicate in the third paragraph, "I have used nationally recognized industry standards for in-place construction costs." Do you see that?

A Yes, I do.

Q What nationally recognized industry standards did you use as referenced in that sentence?

A I used *RS Means* -- I'll tell the exact edition; just a moment -- it was *RS Means Square Foot Cost 20th Annual Edition* Copyright 1998. It's a book that I had on my shelf.

Q That was in your own personal library?

A Yes, sir.

Q So you used a reference text with a date of 1998 for the calculation of an addition '90-'91 time frame?

A Yes, I did.

Q Why did you do that?

A Well, I didn't have a 1991 book, and in the 1998 book there are formulas to calculate it back to prior years.

Q The third paragraph of your correspondence of April 11, 2006 refers to a square foot cost of

$93.21.

A Yes.

Q I take it you didn't bring the *RS Means* 1998 version to the deposition.

A Yes, I did.

Q Okay. Could you take that out.

A (The witness complied.)

Q Could you walk me through how you arrived at $93.21 per square foot referenced in Paragraph 3 of this correspondence for the 1990-1991 time frame?

A Sure.

Q Okay. And, again, if I could, just for the record, this is *RS Means Square Foot Costs 20th Annual Edition* with a date of 1998. Okay. I'm sorry. I interrupted. I just wanted to identify it for the record. We're at pages 182 and 183 of the text, and the section is entitled "Commercial Industrial Institutional Restaurant, M.530." Okay. Continue.

A Okay. So what I did was I used the square foot costs of a wood-frame building, okay, which is approximately 3,500 square feet, which at the time I used the square foot noted on the building permit. And I used that dollar value right there of $116.40 per square foot to build a wood-frame restaurant, so that's the value that I used. I

then took, there's a -- this is --
Q Can I ask you a question though?
A Sure.
Q That's not correct, is it? This was an addition. This wasn't new construction, correct?
A This was an addition to a building, but I used this reference as new construction costs, an estimated value for the new construction costs.
Q You used the square footage of --. Strike that. You used the construction costs per square foot of $116.40 on this table for new restaurant construction?
A Yes, sir, I did.
Q But you were estimating an addition.
A Yes, I was.
Q So this table wouldn't be applicable, correct?
A I would think it would be a reasonable estimate for the work associated with putting an addition on.
Q Were you aware at the time you performed the analysis set forth in your letter of April 11, 2006 that this was a three-sided addition?
A Yes.
Q And you believe that this *RS Means* table and this square footage of $116.40 a square foot is a reasonable figure to be assigned to a three-sided

addition?
A There are many variables that --
Q Can you answer that question yes or no?
A I believe it to be reasonable, yes.
Q Have you ever utilized the *RS Means* data for commercial industrial institutional restaurant M.330 on any occasion prior to this assignment?
A No.
Q Had you used *RS Means* in connection with your work prior to this assignment?
A Yes, as a general guideline.
Q Did you understand that the $116.40 per square foot figure included kitchen facilities?
A Yes.
Q Were you aware that this addition did not include kitchen facilities?
A I used this as a general guideline.
Q My question was, were you aware that this addition did not include kitchen facilities at the time that you performed this analysis?
A No.
Q Representing to you that this addition did not include kitchen facilities, in retrospect would you agree that the use of $116.40 per square foot figure for a wood-sided new construction restaurant

would not be a fair number to use, an appropriate number to use in attempting to estimate the construction cost of a three-sided addition?

A I would agree with that, yes.

Q Okay. Your letter of April 11, 2006 references a site visit.

A Yes.

Q Had you been to the site before you authored this letter?

A Yes, just on the outside. I took a picture.

Q Was there a reason you didn't go inside?

A No.

Q Were you with anyone at the time of the site visit?

A No.

Q Did you speak with anyone in order to obtain any substantive information that you utilized in connection with the formulation of your opinions and conclusions before you wrote the April 11, 2006 report?

A At the site?

Q Anywhere at any time.

A No.

Q So it's fair to say that you spoke with Mr. Phillips prior to authorizing this report?

A Yes.

Q But you didn't -- it's also fair to say you didn't rely on, you didn't obtain any substantive information from him that you incorporated in connection with the formulation of your opinions and conclusions?
A No.
Q Now, you have an addition, a "heated building" addition reference of 3,561 feet; is that correct?
A Yes.
Q Where did you get that from?
A From the building permit application.
Q And this was given to you by?
A Mr. Phillips.
Q Have you since come to learn that the construction work referenced in this building permit application of 1/10/86 was not performed?
A I'm not aware of that. I thought that represented the addition.
Q So as you sit here today, it is your continuing belief that the work referenced in this building permit of 1/10/86 is the addition that's the subject of your analysis?
A Yes.
Q And that's your continued belief to the present time?

A Yes.
Q How about the document entitled, "Proposed Restaurant Addition" stamped by Professional Engineer Nacci, what is your understanding, if any, at the present time with respect to the construction plans evidenced by this document?
A Well, it's a very vague plan stamped by a registered engineer. I assume that's a Rhode Island stamp on this. It notes the area of the building was different plus or minus 4,500 square feet that was noted on the permit application. It does appear to show or represent an elevation, a couple of elevations of the building, one from the water, one from the side, you know. I don't know what the purpose of it was for, but it was provided to me to represent a document used at or about the time of construction.
Q That was a very unartful question I asked. I guess my question is, what is your understanding as you sit here today as to whether or not what is reflected on this document was in actuality built?
A I can't say. There's some -- I did notice some discrepancies. For instance, this shows a flat roof. It doesn't show a dormer. This picture shows that there, it looks like if this was the

existing building, it looks like during the construction they added a three-gable dormer in addition to the existing structure on top of the addition. It references, you know, concrete piles. It's kind of vague.

Q But again, just so I'm clear, the construction work referenced in the building permit application on January 10, '86, it's your understanding that that work was performed?

A Yes, I believe this is the addition that is in question that was constructed, yes.

Q So it's your understanding that the construction referenced in the building permit application of 1/10/86 that we've looked at constitutes the addition that was built, correct?

A Yes.

Q And the construction work referenced in the Nacci document, sitting here today you don't know whether or not that work was actually done, correct?

A I don't know how that applies. I do have a copy of it. It does seem to reference the same building. It does mention a new addition, so.

Q Now, continuing on with your report of April 11, 2006, it says, "Other construction completed on this project," and by that do I conclude that

you're referring to the 1990-1991 addition?
A I believe it is my contention that even though this permit was pulled, back here, this permit is actually for the construction that occurred during that time frame, so.
Q I appreciate that. That really wasn't my question.
A Okay. I'm sorry.
Q I guess I'm just trying to confirm your phraseology.
A Yup.
Q You say, "Other construction completed on this project." And by that are you referring to the 1990-1991 addition with that terminology?
A It's my understanding that it was all done at the same time.
Q Okay. And you say here, "Other construction completed on this project appeared to be the addition of a wrap around deck on marine piles."
A Yes.
Q What information do you have in support of the proposition that a wrap around deck on marine piles was constructed at or about the same time as the three-sided addition that we're talking about?
A In terms of a time frame, I don't have any scheduling information. None was provided to me.

I am assuming that all of the construction that I saw, the new construction that I saw, was all done at the same time. I'm not aware of additional permits that were pulled to do beyond doing this work. This permit here references that a deck was added, so when I referred to the cost of construction of the heated building, this permit references 3,561 square feet to an existing restaurant as well as a 6 X 14-foot wide square foot walkway, deck walkway. So I'm assuming that when this work was done, the walkway was put on as well. The phraseology in my report talks to the way I estimated the job, I came up with a dollar value for the building itself, there was additional work, i.e., the deck was put around the side. So I was just adding that cost to the overall project.

Q I understand that and I'm not worried right now about the dollar figure you assigned to that. What I'm trying to determine, and perhaps you answered it -- let me try it this way. Is it fair to say that the only information you have in support of the proposition that a wrap around deck on marine piles was constructed at or about the time of the three-sided addition that we're discussing is the building permit of January 10, '86?

A Yes.
Q How did you arrive at the square foot figure of $30.15 for a wrap around deck on marine piles?
A I referred to *RS Means* again. I referred to page 60 for -- I don't have that data. I have referenced page 60 in my notes, but it's not correct so I have to go back and see how I came up with that.
Q Going back to the prior page we looked at, could you tell me how you made the time frame adjustment to 1990-1991?
A On page 440 of the book there is a adjustment, historical cost adjustment, that takes it back to the year that it was constructed. And I used -- let me see if that's correct here. This is the adjustment for the year 1990. The value is 120.9. I adjusted it to 1991 when the work was completed of 96. The math states that you take this number, 96.1, divide it by 120.9, and I come up with a cost factor of .795. You multiply that by the current cost based on these square foot numbers in the book, and it discounts the value back to 1991 when the work was completed. So I adjusted the square foot cost in that by that amount.
Q Now, continuing on, you have "Re-siding of the

existing structure including removal of existing materials." Do you see that?
A Yes, I do.
Q What information do you have in support of the proposition that the existing structure was re-sided at or about the time that the three-sided addition was added?
A I performed a site visit. And from a visual appearance it appeared that this siding was the same age and texture as the new siding on the addition, all painted the same color, so I made an assumption that the siding was redone at the same time.
Q That's the only information you have, is your assumption?
A Yes, sir.
Q Did you consider the fact that siding may have been put on both the main structure and the addition sometime subsequent to 1991 prior to 2006?
A I don't have -- when they built the addition, I assume that they made it weather tight and put siding on the outside. The siding on the outside of this appears to be the type and grade and weathered as the siding on the old building. So I made an assumption that it appeared at the same

time while the guy was there they did the work.
Q Is this somehow different? What's the difference between re-siding the existing structure and re-shingling the existing structure?
A The siding is on the vertical, and the shingling is on the horizontal. These are the shingles on the roof. The siding is on the --
Q What information do you have in support of the proposition that the existing structure was re-roofed at or about the time the three-sided addition was added?
A Other than the fact that it's all new and it blends in, it appears -- and I don't have any additional building permit information to show that this three-gable dormer was added at any other time -- so it's my assumption again that when this work was done, all of this work appears to have been done at the same time because it appears to be the same, it's all the same siding, same weathered. It's the same shingles on it. There's only one layer of shingles, so I assumed that the building would have had shingles on it and they would have had to take them off. There's only one layer of shingles on it, so I assume that they did it at all that time.
Q So it's your assumption that the re-shingling of

the main structure was done at the time the three-sided addition was added because it's also your belief that the dormer was added at the same time which has shingles on it which match the main building?

A Yes.

Q What information do you have in support of the proposition that the dormer, that three-peaked dormer, was added at the same time as the addition?

A I didn't see anywhere where there was an additional permit pulled out to do this work, so the --

Q Did you search the building records?

A No. I was only provided what I got from Paul.

Q So you don't have any idea what other building permits were pulled for this building at any other time; is that correct?

A That's correct.

Q So your belief that this dormer that you're talking about went on at the same time as the addition is solely based on the fact that there's a building permit of January 10, 1986 that was provided to you by counsel?

A Yes.

Q Does that building permit reference the dormer at all?

A No.

Q Would it be fair to say, Mr. Keough, that if your assumptions with respect to the wrap around deck on marine piles, the re-siding of the existing structure including removal of existing materials, the re-shingling of the existing structure including removal of the existing shingles, and the expansion of the second floor and the addition of three wood dormers and windows, if your assumptions with respect to those construction related items, your assumptions that those were done at the same time as that three-sided addition, if those assumptions are, in fact, inaccurate, wrong, that as you calculate it as of the report of April 11, 2006, that three-sided addition minus those other items would be less than 50 percent of the value of the overall structure?

MR. PHILLIPS: Objection. You can answer.

THE DEPONENT: What does that mean?

MR. DOLAN: That's for the record. You still answer.

A Yup. The way I do the math, it would have been, yeah, would have been less than 50 percent. Yes, it would, that's correct.

Q All right. Okay. I got another report authored by you.
A What do you want me to do with this?
Q Leave it out. -- another report that I got today we'll mark Exhibit C. That's the copy. Here's the report we're going to mark C.

(WHEREUPON A COPY OF A REPORT DATED JULY 6, 2006, TO PHILLIPS & D'ALOISIO FROM RAYMOND KEOUGH WAS RECEIVED AND MARKED AS DEFENDANT'S EXHIBIT C FOR IDENTIFICATION.)

Q Now, you authored another report yesterday, I guess.
A Yes.
Q And this report would indicate that following the issuance of your April 11, 2006 report you reviewed additional information, correct?
A Yes.
Q Including a document entitled "Defendant New Wharf Tavern, Inc.'s Expert Disclosure."
A Yes.
Q And the report of OSEA.
A This one.
Q Right. The report of OSEA, this is a second report?
A This is dated April 12, 2006.

Q All right. Now, this report indicates that, "After reviewing this information I offer the following amendments to my report of April 13, 2006." There's 1, "At this point, there exists no definitive scaled plans depicting the work performed during the 1989--1991 addition." Did I read that correctly?

A Yes, you did.

Q What information were you provided between your report of April 13, 2006 -- it's actually April 11th -- your report of April 11, 2006 and this report of July 6, 2006 which led you to conclude that there are no definitive scale plans depicting the addition?

A Nothing had changed. I didn't receive -- at the time I wrote the first report I had the same documents. At that time there were no definitive plans, or at least not afforded to me, of exactly how the addition was constructed. I had some sketches, some elevations, a building permit application that said that they were going to put a 3,561 square foot addition on, I based my initial report on that value. There seemed to be a discrepancy between OSEA thought the first-floor addition was significantly larger than 3,561 square

feet, so we investigated why he thought that.
Q Who is "we"?
A I met with Paul last night. He called me to go through and prepare for the deposition.
Q What investigation did you do last night?
A We were reading through this report last night, and he said, "Ray, why is your value of April different than OSEA'S value?" And we went through it and we looked at the sketches we were provided. I showed Paul that my math was done based on the notes on this building permit dated 1/10/86, and we looked at the tax roll records. And the square footage of the addition, of what appears to be the actual addition built, appears to be significantly bigger, based on the tax roll records, than what was written on the building permit.
Q When you were just referencing that, are you referring to the square footage figure of 5,390 square feet referenced in the OSEA April 12, 2006 report?
A Yes.
Q And you inquired, at least with respect to yourself, as to why that number would significantly differ from the 3,561 square foot addition referenced in your April 11 report?

A Yes.

Q Do you know where OSEA came up with this 5,390 square feet?

A I believe I do.

Q What is your belief in that regard?

A They used the tax roll records that showed the addition to the building to be 98 feet by 55 feet.

Q And your understanding is that that math comes up to 5,390?

A Yes, it does, because I did it out.

Q Do you know of any construction estimator that would use a tax roll record like that to perform a cost estimate for construction?

A There's very little data, accurate data, provided to perform any estimate on this building.

Q No. No. My question --

MR. DOLAN: Could you read back the question, please.

(The stenographer read back the last question.)

A Based on the limited information available to me, it is not unreasonable for an estimator to use a square foot price to estimate the cost of a building.

Q Oh, sure. But my question is, do you know -- strike that. Is it your belief that it is

appropriate for a construction estimator to rely on data such as this tax roll record that you're referring to to come up with the square footage of an addition?

A If, if this is accurate, which I believe it is to be accurate, then, yes, that's not an unreasonable assumption to use that.

Q You believe that the addition, the three-sided addition, done in the 1991 to 1990 time frame is 98 by 55?

A Based on this tax roll record, I believe that. I have not performed a field measurement to verify that.

Q Where does it say anywhere in this a tax record that the dimension of 98 by 55 is the addition?

A This is 55. I'm assuming that's 55 feet. And this is 90 --

Q I see the 98 and 55. Where does it say anywhere that the 98 and the 55 are the addition that was performed in '90-'91?

A It shows a demarcation of the building. I'm assuming that this is the addition to the building.

Q It shows a demarcation of the building that says "Second Floor."

A Uh-huh (affirmative).

Q Correct? Is that correct?
A Yes.
Q You've been to this building.
A Yes.
Q Do you own one of those things on the wheels that --
A No, I don't.
Q -- that can give you the square footage?
A No, I don't.
Q Do you own a tape measure?
A Yes, I do.
Q Do you own like a six-foot tape measure?
A Yes.
Q Did you ever at any time before writing either of these reports go out there yourself and measure the dimensions of that three-sided addition?
A No, I did not.
Q Why not? How --. Strike that. How long would you estimate with a six-foot tape measure would it take you to perform a rough calculation of the dimensions of the three-sided addition?
A I have no idea.
Q What's your best estimate?
A I have no idea. With a six-foot? I don't know.
Q With a helper and a six-foot tape measure.

A I don't know, a day.
Q A day, to lay that down, the three sides and go one --
A All right. If --
Q Wait a second. Are you telling us under oath that with a helper you believe it would take you eight hours with a six-foot tape measure to measure the three sides of the exterior of that addition? Is that your testimony before the jury?
A No, it's not.
Q Why don't you estimate how long you are claiming it would take you with a helper to lay a six-foot tape measure on the three sides of the exterior of that building and estimate --
A About an hour.
Q An hour.
A Yes.
Q Why didn't you the spend the hour before you wrote either of these reports to determine what the actual dimensions of that addition were?
A I assumed that these costs were to be a reasonable estimate --
Q I'm not talking about costs. I'm talking about dimensions. Why can't you the spend the hour to find out the dimensions of the three-sided addition

that's the subject of this entire analysis you performed?
A I don't know.
Q You don't know?
A No.
Q You just assumed that the building permit was the correct square footage when you wrote the April report, right?
A I assumed that, yes.
Q And then you just assumed OSEA was right, correct?
A Yes.
Q Okay. And if OSEA is wrong, then you're wrong, correct?
A Correct.
Q And if the building permit is wrong, you're wrong.
A Correct.
Q Now, you were given, before you authored this report of July 6, 2006, this document entitled, "Defendant New Wharf Tavern Inc.'s Expert Disclosure," correct?
A Yes.
Q And you saw in this report the measurements ascribed to the three-sided addition by the two experts, the gentleman from C&L Builders and the gentleman who edits the *RS Means* Construction Data

book that you utilized. You saw the square footage described for the addition in this document, correct?

A Uh-huh (affirmative).

Q Before you wrote this report of July 6, 2006, did you attempt to come to terms with the how and under what circumstances there could be that discrepancy?

A No, I did not.

Q Did you note what the square footage estimates were for the addition referenced in this document for those two experts?

A I read through it briefly.

Q Did you note what the square footage assigned for the three-sided addition was for these two experts in this document?

A I think they came up with 3,400 feet, 33, 51, plus or minus, something like that.

Q Did you make any inquiry before you authored this report of July 6, 2006, to determine why they were using 3,383 square feet as opposed to --

A Thirty-five.

Q -- 5,390?

A No, I did not. And I based my assumption on the tax roll record.

Q Did you see that this document included actual

measurements for the three-sided addition?
A No, I did not.
Q That somebody had gone out and measured the sides of it?
A No, I did not know that.
Q Can we agree that that would probably be a better way to go about in determining the size of the addition, actually going out and maybe measuring it in the field as opposed to making assumptions off a building permit from 1986 or making assumptions off a tax roll record?
A Yes.
Q Can we agree on that?
A Yes.
Q Now, in your July 6, 2006 report you used a different per square foot calculation for the estimated construction costs of 1990-1991, correct?
A Yes.
Q Why did you do that?
A The building addition I assumed was a little bit bigger based on the tax roll records that I used to estimate the square footage of the building. And as the building increases in size, it costs a little less per square foot.
Q You also made certain subtractions, correct?

A Yes.
Q Why did you do that in July but you didn't in April?
A I noticed in their report that they mentioned that HVAC costs were not to be included in the replacement cost calculation, so I deducted those to be on par.
Q Meaning "they," meaning the experts identified in the Defendant New Wharf Tavern, Inc.'s Expert Disclosure?
A Yes.
Q So basically you learned a little bit about estimating and made some recalculations based on the information that you learned in that document, correct?
A Yes.
Q And this document, by July 6, 2006, you were applying a total cost per square foot of $53.63.
A Yes.
Q Now, we can agree, can we not, that if the actual square footage of this three-sided addition done in 1990-1991 was in actuality 3,383 square feet, plus or minus, as opposed to 5,390 square feet, that the 1990-1991 dollar cost of that three-sided addition would be less than 50 percent of the value of the

overall structure, correct?
A Correct.
Q Even including the gable, dormer, decking, and --
A I would have to do that math out, but, I would have to use a calculator to do that.
Q Do you have a calculator with you?
A No, I don't.
Q All right. But that's just a mathematical computation that you would either agree or disagree with if you simply ran the numbers?
A Yes.
Q Have you got *Means*?
A Yup.

(Book handed to Mr. Dolan.)

Q Did you review before you authored your report of July 6, 2006, the expert designation of the defendant specific with respect to Mr. Waier's estimate, the editor of *RS Means*?
A I read through it.
Q Did you see the items that he subtracted for this addition from the overall per square foot of the restaurant?
A I believe I saw them. I would have to review them. I don't know the report in detail, so I would have to look at it.

Q Well, did you or did you not review this document entitled, "Defendant New Wharf Tavern Inc.'s Expert Disclosure"?
A Yes, I did.
Q And did you or did you not review the portion of this document that related to the opinions of Mr. Waier?
A Yes, I did.
Q Okay. And you noted before you authored your July 6th report that Mr. Waier made some adjustments based on the fact that this addition was not new restaurant construction, did not include a foundation, did not include kitchen facilities, was only three-sided, did not have various finish work and plumbing, etc., correct?
A Yes, I noted that.
Q Okay. And did you agree or disagree with the deductions that he made to the overall square foot cost?
A You know, I noticed -- I agree with some of them, you know. It's -- I deducted for wall finishes, plumbing. I mean, it was not an absolute estimate. It's using very rough numbers, square foot numbers. Once again, the only way to do it is to have a full set of drawings to do an accurate estimate. So I

was using square foot numbers to perform a ballpark estimate that's a reasonable --

Q Why did you subtract wall finishes with your report of July 6, 2006 and you didn't with April 11, 2006?

A Just to be on par with some of the items that he deducted.

Q All right. Did you reduce the total restaurant cost by $4.79 per square foot as Mr. Waier did as a result of only three sides of existing closure required for foundation?

A No, I did not.

Q Why not?

A I have no answer.

Q So you used some of his deductions but not all --

A Yes.

Q -- in your July 6, 2006 report, correct?

A Yes.

Q And sitting here today you don't know why you used some of them but not all of them; is that correct?

A Correct.

Q Do you know anything about the BOCA-Code?

A Not much. I can't quote it chapter or verse.

Q But you understand that this analysis, this construction cost estimate of this addition, the reason anyone really cares about it in connection

with this case is whether or not that addition done in '90 and '91 was greater than 50 percent of the value of the existing structure. You understand that the relevance of that in this case is to determine whether or not entire building needed to be brought up to code at the time of that addition. You understand that?
A Yes, I do.
Q And you understand from the plaintiff's perspective, that's a critical element in this case, correct?
A I do, as you explained it.
Q You understand that the plaintiff wants to show, wants to prove that the value of that addition in 1990-1991 was greater than 50 percent, correct?
A Yes.
Q You understood that when you did this analysis?
A Yes.
Q But no one ever asked you to go out and actually measure the addition?
A No.
Q And you were never provided any deposition transcripts of people whose depositions were taken in this case?
A No, I don't think so.

Q And you were never given any information about what work was actually done at the time that three-sided addition was put on?

A Other than what I show in front of you here and a bunch of general assumptions on the relative size of the addition and what work was actually done or not --

MR. DOLAN: That's all I have. Thank you.

(The deposition was adjourned at 11:47 p.m.)

***

STATE OF RHODE ISLAND

ss. Providence, Rhode Island

COUNTY OF PROVIDENCE

Be it know, that I, Susan J. LeBlanc-Rockcliffe, Shorthand Reporter, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a duly appointed Commissioner in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said witness was reduced to typewriting; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition.

I FURTHER CERTIFY that I am not part of counsel nor attorney for either or any of the parties to said action or otherwise interested in the events thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF I have hereunto subscribed my name this 20th day of July, 2006.

Susan J. LeBlanc-Rockcliffe

Susan J. LeBlanc-Rockcliffe
Commissioner for the State
of Rhode Island

My Commission expires:
January 31, 2010

RAYMOND J. KEOUGH
73 Briarwood Hill Road
Exeter, RI 02822
Email: rkeough1@cox.net
401-294-2518

Profile Sheet

---

**Education**

Worcester Polytechnic Institute
BS – Civil Engineering
1983

MBA
University of RI
1993

**Experience**

President/Owner - Keough Construction, Inc.

- Provide Owner consulting services for pre-construction and construction related activities
- Provide general contracting and construction management services to our clients
- Provide detailed contracting bidding and award activities for Owners award of architects and engineers, contractors and/or subcontractors
- Provide design/build services
- Provide program/project planning and Master Planning services

Chief Operating Officer – KeySpan Business Solutions – New England (Feb 2001 to October 1, 2004)

- Develop business integration plan for energy delivery solutions in NE
- Oversee operations of $125mm/annual mechanical contracting division
- Develop acquisition strategy for engineering and other key components of energy delivery master plan
- Develop proposals for co-generation projects integrating the full menu of KeySpan deliverables – permitting, planning, design, energy analysis and mechanical contracting

ADP Marshall, a Fluor Daniel Company (1985 – 2001)

- Manager of Business Development, New England - New sales in support of a $400mm business program, key account executive, overall sales forecasting and presentations to corporate
- General Manager Special Projects Division – Increased revenues from $12mm to $42mm in 4 years, committed to 5 year $65mm growth plan, overall responsibility for all aspects of this division including business development, estimating and bidding, operations, G&A expenses and OROA. Won ABC Gold Step Safety Award 3 consecutive years

DEFENDANT'S EXHIBIT
A
7/7/06 SLR

- Project Executive – Malden Mills Re-build $120mm, Pepsi Co. – multiple projects totaling $80mm, Scott Paper $45mm, Polaroid 11x $117mm, Highland American $37mm
- Project Manager – multiple projects 1985 to 1995

Personal — Married, 2 children, RI resident for 20 years, EWG Youth Basketball Coach, Ocean State Youth Soccer Coach

**Projects List (Partial)**

Keough Construction

- Wyndham House – Installation of custom HVAC system including radiant flooring in Newport, RI
- The Providence Athenaeum – Owner's consulting services for pre-construction and construction activities – Phase I Structural and Life Safety Renovations
- The Providence Athenaeum – Act as Owner's representative for self performing general contracting of Phase II, Bound Finishes Program
- Weinberg Residence – Installation of dehumidification system for natatorium
- Gateway Condominiums – Design/build HVAC system for 46 unit condominium project
- Ida Chaffee Nursing Home – Installation of air conditioning
- Collette Tours – Owner's representative for pre-construction and construction activities for site development and future/master plan expansion
- St Anthony's Shrine – Owner's representative services for the re-location and development of an existing church, its monastery and all its worship, ministry and sanctuary requirements
- ATMC – General contracting of repairs due to water leaks

Business Development

- Equity Office Properties - $17mm commercial/office development
- American Superconductor - $45mm wire manufacturing line
- Schepens Eye Research Institute - $9mm eye research lab
- Monticello Raceway Development - $350mm Casino/hotel development
- Corning Lasertron - $8mm test lab/scale up facility

General Manager SPD

- AT&T, Fairhaven – 275,000 sf call center in 100 days ($22mm)
- 400-2 Totten Pond Road – 80,000 sf commercial office space ($4.5mm)
- CVS Attleboro – 80,000 sf accounting office fit out ($1.7mm)
- CVS Woonsocket – 40,000 sf sales/marketing office ($2.7mm)
- Crabtree & Evelyn – 43,000 corporate headquarters ($1.7mm)
- Alkermes – 36,000 sf manufacturing fill line cGMP facility ($10.8mm)

- Eaton Corp. – 12,000 sf chiller plant and addition ($2.1mm)
- Seabrook Maintenance 22,000 sf maintenance bldg inside the fence at Seabrook Nuclear Power Plant ($2mm)
- Marshall Properties - multiple projects for 150,000 sf of tenant and commercial renovations ($20mm)
- Firepond – 45,000 sf corporate headquarters for software dev. Co. ($1.4mm)
- BMC Software – 125,000 sf NE Headquarters for software co. ($8.3mm)
- Pfizer – 10,000 office mock-up for proposed corp. expansion ($500k)
- CVS Business Integration Center – 45,000 sf office development ($1.8mm)

Project Executive

- Malden Mills Re-build – 600,000 sf design/build and equipment installation of fabric manufacturing in 12 months, start of design to operation ($120mm)
- Polaroid 11X- 286,000 sf film manufacturing plant ($117mm)
- Highland American – 185,000sf gypsum manufacturing plant ($37mm)
- Scott Paper – 110,000 web line addition and equipment installation ($45mm)

Project Manager

- Pepsi Corp – 180,000 distribution facility ($12mm)
- Alcon Surgical – 10,000 sf class 100 manufacturing plant ($4mm)
- Regency Towers – 16 story apartment bldg. ($16mm)
- Plantation Towers – 136 unit MHFA housing development ($20mm)

Mechanical Installations (Vice President)

- Providence Housing Authority Boiler Replacement
- Providence Public Library Chiller Replacement
- Ida Chaffee Nursing Home Air Conditioning Installation
- University of Rhode Island Steam Line Replacement (2002)
- University of Rhode Island New Steam Line Installation (2004)
- Newport Heights Low Income Housing Heating and Plumbing Installation
- Newport Navy Fire Station HVAC, plumbing and sprinkler installation
- CCRI Newport Campus HVAC and sprinkler installation
- Grace/Harwood Residence

April 11, 2006

Phillips & D'Sloisio
Attorneys at Law
91 Friendship Street
Providence, RI 02903

RE: 215 Water Street
Warren, RI

DEFENDANT'S EXHIBIT
B
7/7/06 SLR

Dear Paul,

I have attached my resume for your review and consideration. In summary, I have over 25 years of experience in the Rhode Island and New England construction market. I have estimated and constructed well over $ 750,000,000 of in place construction value in this time. I have experience in large scale residential, commercial and advanced technology projects.

It is my opinion to a reasonable degree of certainty that the cost to construct the 1990 - 1991 addition along with the exterior renovations to the Wharf Tavern exceeded 50% of the replacement cost of the existing structure.

To formulate this opinion, I have used nationally recognized industry standards for in place construction costs. It is my calculation that the cost of the addition, adjusted for 1990,1991 time frame, would have been $ 93.21 per square foot. The 'heated building' addition of 3,561 would have cost $ 331,918. Other construction completed on this project appear to be the addition of a wrap around deck on marine piles estimated at $ 30.15 per sf or $19,153, re-siding of the existing structure including removal of existing materials estimated at $7.36 per sf or $28,777, re-shingling the existing structure including removal of existing shingles estimated at $ 1.87 per sf or $ 10,262 and the expansion of the second floor and the addition of 3 wood dormers and windows which is estimated at $32,624. These supplemental construction activities added to the base cost of the addition make the total project cost $422,736.

The estimated value of the building is calculated using the existing total square footage of the building (11,478) less the 1991 addition (3,561) yielding an original building size of 7,917. Using the same square foot construction cost as above ($93.21) the total replacement cost of the existing building would have been $ 737,944. Simple division, addition project costs divided by replacement cost, equals a 57.3% ratio.

The information we were provided for this calculation is as follows:

1. Sketches 1, 2, 3 and 4 of "Proposed Addition" developed by The Providence Partnership with unknown dates
2. Sketch of "Proposed Restaurant Addition" stamped by P.E. V.A. Nacci

3. Commercial Property Card from the Town of Warren on 215 Water Street
4. Building Permit Application dated 1/10/06 for Owner Wharf Tavern
5. A site visit to the existing building

Should you require a more detailed estimate, please feel free to contact us.

If you have any questions, please do not hesitate to contact us.

Sincerely yours,

Raymond Keough
President

July 6, 2006

Phillips & D'Aloisio
Attorneys at Law
91 Friendship Street
Providence, RI 02903

RE: 215 Water Street
Warren, RI
Amended Report

Dear Paul,

On this date, I did review additional information provided to me by your office. This included the following:

- US District Court for the District of Rhode Island, C.A. No. 05-150 S "Defendant New Wharf Tavern, Inc.'s Expert Disclosure"
- OSEA letter addressed to yourself date April 12, 2006

After reviewing this information, I offer the following amendments to my report of April 13, 2006:

1. At this point, there exists no definitive scaled plans depicting the work performed during the 1989 - 1991 addition. There are several pieces of information from which to base the actual size of the 'heated' addition done during this time period; the building permit which states the size as 3,561 sq, ft., sketches created by The Providence Partnership which contain no scale nor clear data on the size, the sketch stamped by Professional Engineer V.A. Nacci depicting an addition of +/- 4,500 sf. ft., and the Commercial Property Card from the Town of Warren which depicts the as-built addition dimension(s) to be 98' x 55'. Based on my review of this information, the most reasonable assertion of the actual size of the addition would be the Commercial Property Card issued by the Town of Warren. This information would have been determined by a field visit to the building by a Town appointed representative after the addition was completed to measure the actual size of the building(s) (to be used to determine the property value and thus the tax basis). This card indicates that on July 19th, 2005, the actual footprint of the addition completed in 1991 is 98' x 55' or 5,390 sq. ft.

Therefore, I offer the following calculations which I believe to be reasonable determinations of the values of the both the addition and the existing building:

| | |
|---|---|
| 1. Building addition without decking | $ 112.14 psf (per square foot) |
| 2. Less wall finishes | $ 1.40 |
| 3. Less plumbing cost | $ 8.07 |
| 4. HVAC costs | $ 28.85 |



DEFENDANT'S EXHIBIT
C
7/7/06 SLR

C

| | | |
|---|---|---|
| 5. Less electrical cost | | $ 9.57 |
| | Total cost per sf | $ 64.25 |
| | Adjusted for 1991 | x .795 |
| | Adjusted for geography | x 1.05 |
| | Total cost per sf. | $ 53.63 |

If you multiply the addition of 5,390 sf times cost of construction of $53.63, then the cost of the 'heated' addition would have been $ 289,080. The balance of the existing building, per The Commercial Property Card, would be 5,702 square feet. Using this as the cost basis, multiply 5,702 times the cost of all new work at the time ($ 93.61) the replacement value would have been $533,757. Based on this calculation, the cost of the addition, in 1991 dollars, exceeded 50% (54%) of the replacement cost of the existing structure. It should also be noted that additional work appears to have been done during this construction phase. A three gabled dormer was installed over the new addition, new siding and trim installed over the existing building, a new roof installed over the existing addition plus the cost(s) of the new wrap around deck with marine pilings at the new addition. In my previous review, these costs would have added another $90,816 to the cost of the addition. If these costs are included into the addition calculation, the relative percentage would increase to 71% of replacement costs.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Raymond Keough

Raymond Keough
President

- Eaton Corp. – 12,000 sf chiller plant and addition ($2.1mm)
- Seabrook Maintenance 22,000 sf maintenance bldg inside the fence at Seabrook Nuclear Power Plant ($2mm)
- Marshall Properties - multiple projects for 150,000 sf of tenant and commercial renovations ($20mm)
- Firepond – 45,000 sf corporate headquarters for software dev. Co. ($1.4mm)
- BMC Software – 125,000 sf NE Headquarters for software co. ($8.3mm)
- Pfizer – 10,000 office mock-up for proposed corp. expansion ($500k)
- CVS Business Integration Center – 45,000 sf office development ($1.8mm)

Project Executive

- Malden Mills Re-build – 600,000 sf design/build and equipment installation of fabric manufacturing in 12 months, start of design to operation ($120mm)
- Polaroid 11X- 286,000 sf film manufacturing plant ($117mm)
- Highland American – 185,000sf gypsum manufacturing plant ($37mm)
- Scott Paper – 110,000 web line addition and equipment installation ($45mm)

Project Manager

- Pepsi Corp – 180,000 distribution facility ($12mm)
- Alcon Surgical – 10,000 sf class 100 manufacturing plant ($4mm)
- Regency Towers – 16 story apartment bldg. ($16mm)
- Plantation Towers – 136 unit MHFA housing development ($20mm)

Mechanical Installations (Vice President)

- Providence Housing Authority Boiler Replacement
- Providence Public Library Chiller Replacement
- Ida Chaffee Nursing Home Air Conditioning Installation
- University of Rhode Island Steam Line Replacement (2002)
- University of Rhode Island New Steam Line Installation (2004)
- Newport Heights Low Income Housing Heating and Plumbing Installation
- Newport Navy Fire Station HVAC, plumbing and sprinkler installation
- CCRI Newport Campus HVAC and sprinkler installation
- Grace/Harwood Residence