# EXHIBIT K

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ORIGINAL

GORDON NOONAN AND
NANCY NOONAN

vs. C.A. No. 05-150 S

NEW WHARF TAVERN, INC.

---

Deposition of **JOHN PAUL CONIGLIO, Occupational Safety & Environmental Associates, Inc.**, taken on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure, at the offices of Rice, Dolan & Kershaw, 170 Westminster Street, Suite 900, Providence, Rhode Island, on July 13, 2006 before Denise P. Veitch, Notary Public, convening at 1:06 p.m.

APPEARANCES:

Phillips & D'Aloisio
BY: PAUL E. PHILLIPS, ESQ.
Counsel for the Plaintiff

Rice, Dolan & Kershaw
BY: MARK P. DOLAN, ESQ.
Counsel for the Defendant

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street, Suite 617
Providence, Rhode Island 02903
(401) 351-1660

M

# INDEX


| EXAMINATION | PAGE |
|---|---|
| MR. DOLAN | 3 |


## EXHIBITS


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| A | Green folder containing various documents | 43 |
| B | Manila folder containing various documents | 43 |
| C | Black and white copy of photograph | 48 |


(Stenographer's Note: Exhibit A and Exhibit B has been retained by Mr. Coniglio and therefore are no included with this deposition transcript.)

**JOHN PAUL CONIGLIO**, first having been duly sworn by the Notary Public, was examined and testified as follows:

**EXAMINATION BY MR. DOLAN:**

Q. Would you state your name for the record, please.
A. John Paul Coniglio, C-O-N-I-G-L-I-O.
Q. Mr. Coniglio, my name is Mark Dolan and I represent the defendant, the New Wharf Tavern, Incorporated, in this lawsuit that we're concerning ourselves with here today. Do you understand that?
A. Yes, I do.
Q. I'm sure you've been deposed on a number of occasions previously. Just a couple of ground rules: If at any point you don't understand any of my questions or want any of them repeated or rephrased, you let me know and I'll be happy to do so. Okay?
A. That's fine. Yes.
Q. And if you don't so indicate I'm going to assume you understand the question. Is that fair?
A. Yes.
Q. The stenographer has a very difficult time if we're both speaking at the same time so, if you would, please allow me to finish my question even

if you can anticipate what it is I'm going to ask. All right?
A. Yes.
Q. And you have to obviously verbalize all your answers. She can't take a shake of the head or any other kind of nonverbal response.
A. Yes.
Q. Could you tell me your residential address, please.
A. 4351 Fairview Parkway, that's Blasdell, B-L-A-S-D-E-L-L, New York, 14209.
Q. And your present employer?
A. Occupational Safety and Environmental Associates, Incorporated.
Q. How long have you worked for OSEA?
A. I'm the owner. I established the firm with my wife as a partner in 1991. We currently have offices in Buffalo, Syracuse, and Charlotte, North Carolina.
Q. How many employees do you have at present?
A. I believe we have 18 full-time and five or six part-time.
Q. All right. The Buffalo office is staffed by how many employees? I'm not asking now whether, I don't want -- I want to exclude specifically any

independent contractors. I'm looking for employees, W-2 employees.
A. All of our employees are W-2 employees, I have no 1099s, so even the part-timers are employees.
Q. Okay.
A. That would be 11.
Q. Of the 11 how many are engineers?
A. Six.
Q. Are you a P.E.?
A. I am not a P.E.
Q. Of the 11 how many are professional engineers?
A. Two.
Q. Any architects on staff?
A. No.
Q. Of the two professional engineers, what are their specialities in engineering?
A. Civil engineering, and I believe the other is an industrial engineer.
Q. Have you brought with you here today all records relating in any way to your assignment in connection with this case?
A. I have.
Q. Can you tell me approximately when you were first contacted regarding this matter?
A. I want to -- I couldn't give the exact date, but I

believe it was in 2004. I'd have to check exactly.
Q. Yeah, I'm looking for an approximation. If you need to refer to your records in order to answer that question, please feel free to do so. And if I could assist you, it would appear Jacob Coniglio inspected the location in or about May of 2004, May 6 of 2004.
A. Yes, so it's probably before that May date.
Q. Shortly prior to that?
A. Yes, yes.
Q. Do I understand it correctly -- and I will take a moment at some point to look at your file -- but do I understand correctly you were first retained by Attorney Corso?
A. That's correct.
Q. Have you ever had occasion to work with Attorney Corso or anyone from his office on any other matter at any time?
A. No.
Q. Do you know how you came to the attention of Attorney Corso?
A. I couldn't say for sure. I believe we were referred, I was referred to him.
Q. Do you know by whom?

A. No, I do not.
Q. What's your hourly rate?
A. One fifty, I believe it is.
Q. What have you billed on this matter?
A. I have to check with Accounting but I would imagine four or 5,000. And that would probably be high, but I can't remember exactly.
Q. You don't have any billing records with you?
A. No, I do not.
Q. Are those kept separately from the file?
A. Yes, they are.
Q. Now, the letter of June of 2004 that you authored, June 9, 2004 refers to the fact that you received a Ph.D. from Kennedy Western University.
A. That's correct.
Q. Where is that?
A. Kennedy Western University was an off campus distance learning facility with locations in California, Los Angeles, California, and Oklahoma City, Oklahoma.
Q. Is that still in existence?
A. Yes, it is.
Q. What did you call it, a distance learning facility?
A. What you have to do is you have to be accepted

into the curriculum, much like many of them right now.
Q. What are "them"?
A. Many of them, the colleges, Clemson and other schools are doing this. You have to sign up for the courses, you're assigned professors, you're given -- you buy your course materials; course materials being provided, you have to go through them and then you have to take a proctored examination, including a dissertation with professors to do my argument with, all with a non-classroom environment because of my travel schedule.
Q. My question was, and I thought you used the terminology, something like "distance learning facility" or something like that.
A. I use the term distance -- I'm sorry.
Q. And my question is what do you mean by that term, "distance learning"?
A. My term, my definition of that is where you are not required to go into a classroom but you are doing work either through the computer or through telephone with a professor who oversees the work. And as I said, materials are sent, examinations taken, which have to be proctored.

Q. Did you ever attend a class at Kennedy Western University?
A. I did not, no.
Q. Did you ever go to Kennedy Western University?
A. No, it's not designed for that type of attendance.
Q. Well, you mentioned it has campuses in California and Oklahoma or something.
A. When I say campus I believe those are offices and where many of the professors are located.
Q. So there is no campus of Kennedy Western University, to your knowledge?
A. Where they have classrooms?
Q. Yes.
A. No, I don't believe there is.
Q. So these are I guess what the layperson would refer to as correspondence courses.
A. I've taken correspondence courses. I would not term them as that. It's not where you have a chapter to do and then answer a chapter.
You have to go through a curriculum which is given to you. The curriculum is provided for tests, just as it was when you were in school. I did go to graduate school and undergrad in a formal classroom environment, same type of material, but you don't sit in classroom where

you're actually given instruction. If you get to a point in the program you have a difficult time understanding the material, you have contact with that professor who is assigned to you for that course.

When you are ready to take the exam it's sent to you, you have to arrange a proctor, and the examination is given.

Q. Do you arrange for the proctor?

A. In fact I use counsel, I used a local attorney.

Q. That wasn't my question, who you used.

A. Pardon?

Q. My question was, I said you arranged --

A. I arranged a local attorney, yes.

Q. Please don't interrupt me when I'm speaking, okay?

A. Okay.

Q. Okay? The question was, you arranged for the proctor for these tests?

A. That's correct.

Q. So the person who monitored you while you were taking the test was somebody that you selected?

A. Right, but had to be approved by the school.

Q. Listen to the question. The person that you took the test in front of that monitored your test during these courses was someone you selected?

A. That is correct.
Q. When did you receive your master's from Kennedy Western University? What year?
A. I believe that was 2001, 2000 or 2001.
Q. Do you have your CV here?
A. No, I don't.
Q. Is it your testimony that sitting here today you don't recall the year you received your master's?
A. I believe it was 2001. It was close to around December-January of 2000-2001.
Q. But you're uncertain?
A. A lot of dates; I don't remember exactly.
Q. I'm not looking for a date. I'm looking for a year.
A. I would say probably more like 2001.
Q. But you're uncertain as to the year?
A. I just said probably would be 2001.
Q. Are you certain you received your master's degree from Kennedy Western University in the year 2001?
A. I'm as certain as I can be sitting here without looking at my CV, yes.
Q. Okay. For example, I know the year I graduated from college, unequivocally and without looking at any CV or diploma. My question to you is similarly can you tell me definitively what year

you received your master's from Kennedy Western University?
A. You want me to answer the question?
Q. Yes, I do.
A. 2001.
Q. Okay. What year did you begin that program?
A. I want to say 1994.
Q. It took you seven years to get your master's?
A. That's correct.
Q. What year did you receive your Ph.D.?
A. Finalized that in 2002, late 2002.
Q. So it took you seven years to get your master's and a year, year and a half to get your Ph.D.?
A. That's correct. If I might expand on why?
Q. I'm not interested in why.
A. Okay.
Q. What did you pay Kennedy Western University in fees or tuition for the master's?
A. It was per course and sitting here I don't recall an exact amount.
Q. What's your best estimate?
A. Four or $5,000.
Q. How about your Ph.D.?
A. I believe it would be similar to that, yes.
Q. Is Kennedy Western University to your knowledge

accredited by any national organizations?
A. That I'm not aware of.
Q. Do you know whether its Ph.D. program is accredited by any national organizations related to institutions of higher learning?
A. I believe in the state of Oklahoma it is accredited. That's the only one.
Q. Its Ph.D. program?
A. All their programs, yes.
Q. Your dissertation was titled what?
A. It had to do with the business of safety.
Q. What was its title, sir, the dissertation?
A. The title was, I believe it was The Business of Safety, Economic Impact of Regulatory.
Q. You trailed off at the end there. Is that the complete title?
A. I don't remember the exact word for word title, but it was the Impact of Regulatory or Impact of Regulations.
Q. All right. So as you sit here today at this deposition you cannot tell us precisely the title of the dissertation you wrote, you authored, that was the critical step for the obtaining of your Ph.D.?
A. Not word for word.

Q. Okay. What did you pay in fees or tuition for the Ph.D.?
A. I believe you asked that already.
Q. I know. I can't remember the answer.
A. I think I said around three or four, between three to 5,000. I can't remember that.
Q. You said that for the master's. Same thing for the --
A. I believe it is the same. Sitting here, my recollection is yes.
Q. Do you know how many Ph.D.s in safety engineering Kennedy Western University has granted within the last 10 years?
A. I do not.
Q. Do you know whether or not Kennedy Western University has granted any Ph.D.s in safety engineering other than the one they granted to you within the last 10 years?
A. Absolutely there are, yes.
Q. What professor at Ph.D. acted as your supervisor, mentor, or liaison in connection with your dissertation?
A. I can't remember his name, the exact names. I couldn't tell you the exact name of the mentor for my dissertation; I just don't recall. But I have

it written down. I can look it up.

Q. Without looking it up you can't tell me the person?

A. There's too many names day in and day out. I don't remember.

Q. You didn't have one professor with whom you coordinated your Ph.D. work?

A. No. Actually professor per course.

Q. Who did you submit your dissertation to?

A. That name, as I indicated, I don't recall the name.

Q. That was one person?

A. That is correct. It was a master's thesis and it was a dissertation.

Q. Right, and I'm not talking about the master's. I'm talking about the dissertation. Sitting here you can't tell us the name of the professor to whom you submitted your dissertation for review and acceptance?

A. That's correct.

Q. This letter also indicates -- strike that. You do have a resume, a CV?

A. Yes.

Q. Would you have any problem providing a copy of that to Mr. Phillips for my review --

A. Not at all.
Q. -- at a future date?
A. Not at all.
Q. Now, this letter indicates that you received a BS in Industrial Technology; is that correct?
A. Correct.
Q. What year did you obtain that degree?
A. 1973.
Q. Where did you go to high school?
A. Lackawanna Senior High School.
Q. And where is that?
A. Lackawanna, New York.
Q. What year did you graduate from high school?
A. 1969.
Q. Is the State University College of New York, is that the SUNY system?
A. That's correct.
Q. So you got a BS in Industrial Technology at SUNY Buffalo?
A. That's correct.
Q. Why does it say Industrial Technology (Engineering Management)?
A. That is the Texas A&M curriculum that they picked up in the SUNY system which is designed to train engineers to manage engineers and -- (interruption

by the stenographer) -- that was adopted by the SUNY system and its design to provide a broad spectrum of all of the engineering sciences so you could manage engineers and manage projects.

Q. I guess my real question, perhaps inartfully phrased, it sounds like two names: Industrial Technology, Engineering Management. What was your degree in? Both things? Why is there a parenthetical explanation next to Industrial Technology?

A. The actual degree on my diploma was Bachelor of Science Industrial Technology. The department, in all their referred and their handouts, publications, Engineering Management was a key concept, which is why this was paraphrased in there.

Q. Was the Industrial Technology degree awarded out of the Engineering Department at SUNY Buffalo?

A. I don't believe -- no, this was actually part of their technology area.

Q. Well, you know, when I went to college if you majored in political science the courses were out of the Political Science Department and there was an engineering department and a history department, that sort of thing. You follow me?

A. Yes.
Q. The question I have, the Industrial Technology would have been out of which department?
A. I always called it the Technology Department. That was my understanding.
Q. Okay. So when you attended SUNY Buffalo there was an academic department there, with professors and a department chair, called the Technology Department?
A. Yes, that's correct.
Q. Now, Erie Community College is where?
A. Erie Community College has three campuses. I attended the north campus which would be in Williamsville, New York.
Q. And an AAS is what?
A. Applied Associate's degree in science -- Associate's of Applied Sciences; I'm sorry.
Q. And you received AAS in Civil Technology from Erie Community College in what year?
A. 1971.
Q. And an AAS in Fire Protection Technology, what year?
A. That degree I received, I believe was in 1986.
Q. Did you go to SUNY Buffalo for four years?
A. No. Transferred the credits from the civil

technology program into the bachelor's program.
Q. Okay. So you did your first two years at a community college?
A. That's correct.
Q. And then you obtained a degree there and transferred those credits to SUNY Buffalo?
A. Correct.
Q. What was your first job out of SUNY Buffalo?
A. My first job was as a Highly Protected Risk Inspector with Royal Globe Insurance Company which later became Royal Insurance.
Q. I thought you said something about a Highly Protected something. Could you use that terminology for me again, please.
A. It's what we call a HPR Inspector, Highly Protected Risk, which is part of the Loss Prevention Department. It was my job to inspect commercial industrial properties relative to underwriting considerations and obviously safety.
Q. Well, in actuality I spent my entire career doing insurance defense so I know a little bit about underwriting and insurance inspections. The inspections you performed for Royal were with the specific proviso that they were not to be relied on by the insured who you were providing

inspection services; solely for Globe, for Royal Globe; correct?
A. Well, I can't answer the question the way you phrased it.
Q. Let me try it this way. You were working under the auspices of the Underwriting Department; correct?
A. They would make the request for us to go out, yes.
Q. Right. And your report would be directed to the Underwriting Department?
A. That's correct.
Q. And you'd go out and take a look at a property and report back to the Underwriting Department as to whether or not it was a risk, whether it had the potential problems with it, so Underwriting could make a determination as to whether or not Royal Globe and then Royal wanted to underwrite the risk, wanted to issue coverage for the risk, and/or set premium. Correct?
MR. PHILLIPS: Objection as to form. You may answer.
A. That is correct, but it won't be on that, also.
Q. How long did you work for Royal?
A. I worked for Royal when I first came out with my bachelor's in '73 through 1978; five years.

Q. Then where did you go?
A. At that point I was recruited by Allied Chemical Corporation.
Q. How long did you work there?
A. I believe I worked for them three years.
Q. And your title?
A. I was the Safety Supervisor, official title was Employee and Safety, Employee Relations and Safety Supervisor.
Q. Out of what facility?
A. I was in charge of three facilities: Allied Chemical Industrial Chemicals Division in Buffalo, New York. I was also in charge of the facility in Ransomville, New York, where aluminum chloride was made. And I was in charge of the location at Peabody Street which was a research and development facility.
Q. Have you ever taken any courses in engineering?
A. Several, yes.
Q. Structural?
A. Yes.
Q. When?
A. In my civil technology program.
Q. In the late 1960s, early 1970s?
A. '69 through '71.

Q. So the Technology Department at SUNY Buffalo taught engineering classes?
A. No, that was actually at Erie Community College and that program was designed to teach you how to build, estimate, and manage a construction project on a commercial basis.
Q. You would consider that kind of course work in the community college in the late 1960s to constitute structural engineering?
A. I took structural engineering along with vector analysis, systems engineering, as part of these curriculums, and I believe many of the texts were similar to the first and second year programs of engineering curriculums.
Q. Okay. Now, where did you go after Allied Chemical?
A. After Allied Chemical I was recruited by Dresser Industries.
Q. Why do you keep saying that, "I was recruited by." I'm just looking for where you went next. Why do you phrase it that way?
A. Because they contacted me.
Q. Okay.
A. So.
Q. I haven't asked why you left one job and went to

another one yet.
A. Just the way I phrase it. Is there a problem with that?
Q. Well, I'm just kind of wondering why you're trying to offer that kind of information in response to my question.
A. That's the way...
Q. That's the way you testify?
A. No, that's the way I talk.
Q. Okay. Now, you went to Dresser in what year?
A. Right after my Allied Chemical stint which would then -- somewhere around '81.
Q. You told me you were at Allied Chemical from '78 to '83.
A. I said I was there approximately three years, so '78 through '81, '82, somewhere in there.
Q. Okay. And what did you do at Dresser?
A. I was in charge of their Transportation Equipment Division, a single plant of about 15 hundred individuals, and my title was Director of Safety and Security.
Q. Okay. How long were you there?
A. I believe there, between two to three years.
Q. And then where did you go?
A. Then I was, then I accepted a position with a firm

called SH Gow, G-O-W, and Company, which is a multi-line brokerage service in the insurance industry, and I was hired to start up Gow Management Services, which was a technical consulting portion of that business.

Q. Meaning what?

A. The brokerage, like many of the larger companies which I'm sure you're aware of, Marsh & McLennan, Alexander & Alexander, have their own loss control services to support the brokerage operation. SH Gow, which had several offices, was doing the same thing essentially.

Q. And how long were you there?

A. Through 1991.

Q. And that's when you --

A. I'm sorry, I was there through 1989.

Q. Then what?

A. Then I started, I was involved with a partnership in a consulting firm called Risk & Technical Management.

Q. Where was that located?

A. Buffalo, New York.

Q. And what did that do?

A. That was a safety and environmental consulting firm.

Q. Who was your partner?
A. A gentleman by the name of Thomas Naples.
Q. Is he still around?
A. I believe he's still in Buffalo. I haven't talked to him in a while.
Q. In what employment were you responsible for facility maintenance?
A. Both at Dresser and Allied.
Q. So with those titles you gave me for Dresser and Allied Chemical, those positions included responsibility for facility maintenance?
A. And as well structure design, estimating.
Q. That wasn't my question. I didn't ask "as well."
A. Okay.
Q. What I want to know is with the titles you gave me for Dresser and Allied Chemical, those titles included responsibility for facility maintenance?
A. That and many other items, correct.
Q. In what position and with what employer did you have responsibility for security?
A. At Dresser Industries.
Q. Did you hire the security guards there?
A. I had 35 that I hired and as well managed.
Q. In what position and for what employer did you have responsibility for carpet placement?

A. That would be at Dresser Industries, primarily.
Q. You decided where and under what circumstances carpet would be required?
A. Absolutely. We had 15 hundred people tracking through a very busy area. It was important --
Q. This is going to go a lot more quickly if you can just answer the questions I ask.
A. I think I am.
Q. No, I really don't think you are, respectfully. I'm not asking right now why that role would be required or how many employees they had or how busy the traffic area was involved. What I'm looking for is to determine what employer and at what position you had responsibility for the location and selection of carpet placement, and if that's with Dresser that's solely what I'm looking for at this time. Okay?
A. Understood. Just trying to be clear.
Q. Okay. Now, for what employer and in what capacity were you responsible for treatments?
A. Also be Dresser and as well Allied Chemical. Floor treatments, you're referring to; correct?
Q. Well, it says "carpet placement, vendor handling, and treatments." Do each of those terms refer in some respect to carpeting?

A. Carpeting and/or floors.
Q. Okay. So you, in those titles that you gave me for Dresser and Allied, had the responsibility to interface with the companies that came out and swapped out the carpets, the vendors?
A. Right.
Q. Is it fair to say that at both Dresser and Allied Chemical the key role requirement involved maintenance of safe walkways and selection of appropriate mats and floor surfaces to achieve same?
A. As right off my letter there I believe, yes, be part of it.
Q. I guess the question would be did you misrepresent yourself in this correspondence?
A. No, I did not.
Q. So it would be fair to say then at both Dresser and Allied Chemical the key role requirement involved maintenance of safe walkways and selection of appropriate mats and floor services to achieve same.
A. That's correct.
Q. So for your private industrial experience your key role requirement has involved the maintenance of safe walkways and selection of appropriate mats

and floor surfaces to achieve same?
A. One of the key areas, that is correct.
Q. Well, see, that's not what that letter says and that's not what that sentence says and that's why I asked you specifically.
With your correspondence you say "the key role," not one of many roles. It says "the key role," and I guess my question would be is that correct, or did you misrepresent yourself either intentionally or unintentionally with this correspondence.
A. I did not misrepresent. That was a key role.
Q. Was it the key role?
A. I would say it was the key role --
Q. All right.
A. -- because of the number of people we were dealing with.
Q. So it would be fair to say that the majority of your private industrial experience, the key role of that experience has been the requirement involving maintenance of safe walkways and selection of appropriate mats and floor surfaces to achieve same. Correct?
A. Correct.
Q. Now, who is Jacob Coniglio?

A. He was one of our engineers and who happens also to be my son.
Q. How many family members do you have working in the business?
A. Currently two.
Q. All right. Who are they?
A. As I indicated before my wife was my partner, and my --
Q. Is she still employed?
A. Yes.
Q. In what capacity?
A. She's the President.
Q. Do you market yourself or hold yourself out to be a women's business enterprise?
A. We market ourselves that way, yes.
Q. Have you sought at any time to obtain any contract, any set-aside, for a women's business enterprise?
A. Have we sought?
Q. Yes, OSEA.
A. Us going to them, no. I'm answering your question.
Q. Has OSEA ever applied for or received a contract that involved a set-aside for what we would call a WBE, a women's business enterprise?

A. I do not believe we've ever received a set-aside because we are a WBE.
Q. When you said that, when you agreed that you market yourselves as a women's-owned business, where do you do that?
A. I believe on some of our letterhead it indicates a women's business enterprise; for example, the bottom of the letter you're looking at. And it may be also mentioned on our Web site.
Q. So that you have sought certification in New York state as a women's business enterprise?
A. That is correct.
Q. For what purpose?
A. To be on lists that the State provides to employers and contractors so that hopefully we would be approached to bid on projects.
Q. Tell me your wife's educational background.
A. My wife's background?
Q. Post high school degrees.
A. She has a BS degree in education.
Q. From what institution?
A. Also through the SUNY system.
Q. What campus?
A. Buffalo State.
Q. In what year?

A. I don't recall an exact year.
Q. How old are you?
A. Fifty-four.
Q. How old is she?
A. Fifty-two.
Q. Did she ever work as a teacher?
A. Yes.
Q. What level?
A. She worked with the developmentally disabled at Wisanica (phonetic spelling) Developmental Center.
Q. Any other post high school degrees other than a BS in education?
A. She has a master's degree in I believe Education, also.
Q. Okay. Anything else?
A. And she has her SC, her school system administrator's certificate, also, in New York. I believe that's the name of it.
Q. Your wife's name?
A. Gina, G-I-N-A, Coniglio.
Q. How many years was Gina in education?
A. She was in education from the time she graduated, which I can't recall exactly, up through the time we started OSEA in 1991.
Q. At the time you started OSEA in 1991 where was she

working?
A. Wisanica Developmental Center, which is a New York state facility.
Q. When you started OSEA in 1991 was she the President?
A. I was originally President.
Q. When did you make her President?
A. Almost immediately after we got the company going --
Q. When --
A. -- and she came on board full-time.
Q. When did you first apply for New York state certification as a women's business enterprise?
A. It was several years after we formed the company. I believe around '94.
Q. And I take it the corporate filings in the state of New York would identify your wife as the President?
A. Yes.
Q. And they would identify your wife as the President of OSEA as of what year?
A. I want to say 1992.
Q. Now, you said at the present time. Have any other family members worked for OSEA other than your wife and son?

A. Jacob, who I identified before.
Q. Right, but you qualified that as at the present time.
A. Yes, Jacob.
Q. The question was, is Jacob still an employee?
A. No, he's not.
Q. Have any other family members at any time worked for OSEA other than your wife and son?
A. One other.
Q. Who is that?
A. That would be my brother-in-law.
Q. His name?
A. John Bermingham, with an e, B-E-R-M-I-N-G-H-A-M.
Q. What was his position?
A. He was our IT person, computer.
Q. How long did he work there?
A. John was with us four years, I believe.
Q. Now, Jacob is how old?
A. Thirty.
Q. Where does he work now?
A. Jacob works for a company called Epocrates, E-P-R-A-C-R-A-T -- E-P-O-C-R-A-T-E-S, I believe.
Q. Do you have any relationship to that business?
A. No, I do not.
Q. What does Epocrates do?

A. It's attached to the pharmaceutical industry and deals with marketing of physicians' technical information related to pharmaceutical drugs and products electronically.
Q. Jacob's post high school education background is what?
A. Jacob has a degree in Chemical Engineering from the State University of New York as well as an MBA.
Q. An MBA from where?
A. SUNY Buffalo.
Q. Is he a P.E.?
A. No, he's not.
Q. When did he leave OSEA?
A. Just a year ago.
Q. What construction activities involving initiatives on the Brooklyn Bridge have you been involved with?
A. What were the projects?
Q. In your letter you represent that you had construction activities involving initiatives on the Brooklyn Bridge.
A. Correct.
Q. And what I want to know is what construction activities involving initiatives on the Brooklyn

Bridge were you involved with?
A. I was involved with Syracuse Rigging Corporation. I was working with Perini Construction. I was on the project assisting with the setup of the safety program, safety management, and code compliance.
Q. So you were hired by Syracuse Rigging? Is that right?
A. That's correct.
Q. To develop their safety program?
A. To develop it and as well make sure it was implemented on this bridge project.
Q. So safety rigging was the sub-subcontractor on that project?
A. I'm sorry, safety?
Q. Are you familiar with the term "sub-subcontractor"?
A. Safety rigging threw me. I didn't know what that was.
Q. You said -- I'm sorry. Syracuse Rigging --
A. Syracuse Rigging, yes.
Q. -- was the sub-subcontractor on that job?
A. We were a sub to, well, we were hired by Syracuse Rigging, so I believe we would be the sub.
Q. Why do you say "we"? Were you an employee?
A. The company, we.

Q. Were you an employee of Syracuse Rigging?
A. No. OSEA.
Q. Okay. But Syracuse Rigging was a sub-subcontractor in that project?
A. Sub-subcontractor to?
Q. Do you know who Syracuse Rigging contracted with to perform services on the Brooklyn Bridge?
A. They, I believe, subbed to Perini Construction.
Q. So Perini hired Syracuse?
A. That would be my understanding, yes.
Q. How many times have you worked for Syracuse Rigging?
A. For years.
Q. And does the state of New York have a requirement -- strike that. What type of services did Syracuse Rigging provide for that job?
A. Syracuse Rigging provided steel erection services for the bridge.
Q. They didn't supply the steel; just erection?
A. No steel, no -- correct, they would put the steel up; steel provided by a supplier.
Q. Okay. What year would this have been, the Brooklyn Bridge job, or years?
A. It would be early on around '91, '92; I don't recall exactly.

Q. And at the time did Syracuse Rigging have an in-house safety officer?
A. No.
Q. Do they now?
A. I couldn't answer that, no.
Q. Now, is it your testimony that you provided on-site safety inspection services to Syracuse Rigging on that project?
A. Yes.
Q. And were those services required under New York law?
A. At that time, no.
Q. Were they required under Syracuse's contract with Perini?
A. That they hire us or they hire somebody?
Q. They hire somebody.
A. I don't recall that being a provision.
Q. And how often would you provide those inspection services during the course of the project?
A. We'd be down on a regular basis whether it be -- depending on the project scope, early on when steel was lifted into place. When connection was going on and you had the greatest fall hazard we would probably be there almost weekly. After that as the project began to be decked and safeties put

in place and exposure decreased, we would be there less often.

Q. So the services related principally to fall protection?

A. Yes. It was a bridge project.

Q. Seeing to it that employees were properly tied off or harnessed or otherwise?

A. The whole gamut of fall protection from walking the decks to tying off, yes.

Q. Are the construction projects and construction activities referenced in this correspondence, does that work relate principally to fall protection?

A. The construction-related projects, yes, because construction falls are one of the greatest hazards. So to answer your question, yes, but we did provide full safety consulting.

Q. Let me try it again. Is it fair to say that the construction work and construction projects referenced in this correspondence, the work that OSEA provided, was principally related to fall protection?

A. I would say yes.

Q. Now, how many times have you testified at deposition?

A. At depositions?

Q. Yes.
A. I believe three or four times.
Q. How many times have you testified at trial in any court?
A. Oh, I would say in the 30s. My best recollection is approximately 30 some times. Could be more.
Q. Usually it's the converse for experts. You understand that, that usually people have testified more at deposition than trial. But you're saying deposition is three to four but actual courtroom testimony is upwards of 30 or so?
A. Yes, that's correct.
Q. Do you have a list of your testimonial experience?
A. Yes, I do.
Q. Over what period of time?
A. Since the day I was involved with a legal matter.
Q. And how is that list? Is it by case number and/or client and/or subject matter?
A. Actually it can be any way you want. We have them on a spreadsheet.
Q. And in fact some of the jurisdictions in which you appear as an expert witness require that?
A. Particularly in Federal Court, that is correct.
Q. And each of those occasions where you've had an opportunity to testify as an expert, both in

deposition and in court, has been as an expert providing opinion testimony?
A. Yes.
Q. Have you ever testified in any court in the state of --
A. Can I correct that, if I might?
Q. Yes.
A. The first time I testified in court was not being called as an expert. I was subpoenaed and declared an expert when I was on the stand.
Q. Have you ever testified in connection with any injury that occurred on a job site and you had been involved with the job site as a safety consultant? Do you understand the question?
A. Yes. I'm trying to think. I believe it had to do with a case involving Darren Construction.
Q. But, in any event, the answer to that question is yes?
A. Rephrase the question, please.
Q. Have you ever testified in court in connection with any case that resulted from a construction-related injury where your involvement was that you were retained by some entity as a safety consultant with respect to the construction project?

A. In court, no.
Q. All right. But I take it in deposition?
A. I believe there was one.
Q. But you're not including that on your list?
A. No, I'm not.
Q. Have you ever testified previously in any court in the state of Rhode Island?
A. No, I have not.
Q. Have you ever testified in deposition in any matter involving an accident, injury, lawsuit or claim, emanating from the state of Rhode Island?
A. I don't recall a case being, involving a jurisdiction in Rhode Island.
Q. Have you ever been consulted in connection with any matter emanating from the state of Rhode Island?
A. Sitting here I can't recall one.
Q. So sitting here today you can't recall any occasion prior or subsequent to that assignment where you've had a reason to consult or attempt to interpret the Rhode Island building code?
A. That would be correct.
Q. Now, referring to your report of June 9, 2004, specifically page three, you indicate that you as of that date had spoken to the following

individuals and reviewed the following documents and thereafter a list ensues, and your first bullet point there is conversations with Al Cocci ("ko-chee"), Rhode Island building Code Commission.
A. Yes.
Q. I take it you would have initiated that telephone call?
A. That's correct.
Q. How many times did you speak with him?
A. I believe I spoke with him once, and I believe Jacob also spoke with him.
Q. Are there any notes in your file relating to either of those conversations?
A. I do not recall of any.
Q. Did you review your file in preparation for today's deposition?
A. Not all of it, no.
Q. Could I take --
MR. DOLAN: Why don't we go off the record for a moment, if I could take a look at the file.
(Discussion off the record.)
(Short break taken.)
Q. Mr. Coniglio, I had an opportunity and thank you for the time to take a look at the files you

brought with you here today. I'm going to mark the files as Exhibits A and B. You of course are going to retain all original documents with you when you leave here today, but that's simply for an administrative matter while I discuss with you what's in the files.

MR. DOLAN: If we could just mark the green folder as Exhibit A and the manila folder as Exhibit B, please.

(Defendant's Exhibit A, green folder containing various documents, was marked in evidence for identification.)

(Defendant's Exhibit B, manila folder containing various documents, was marked in evidence for identification.)

MR. DOLAN: Turning to the green folder, I am going to ask at my expense for a copy of everything in Exhibits A and B, but I just want to identify, if we could, just what's in here.

Q. The first document appears to be a copy of the report of June 9, 2004 that is 20 pages in length; correct?

A. Appears so, yes.

Q. Okay. And appended to this copy is a copy of the subsequent report of April 12, 2006, two pages, --

A. Correct.

Q. -- along with a document attached to it entitled

Building Permit History --
A. Correct.
Q. -- with five pages of commercial property card information. Correct?
A. Yes.
Q. A fax cover sheet from Mr. Phillips, another property card document, and then we begin in this package with some pages of handwritten calculation, five pages in number. Is this your handwriting, sir?
A. Yes, it is.
Q. So these were calculations performed by you in connection with your second report?
A. I would say just in general. I wouldn't connect them to the report.
Q. Can you date in any respect, by year, the calculations that were performed as evidenced on these five pages of handwritten notes?
A. Those were done recently.
Q. Okay. Sometime before or after the April 2006 report?
A. Oh, after.
Q. The version of the April 12, 2006 report that is in the green folder, the first page last paragraph, the originally typed version said, "The

newer first floor addition of 5,390 square feet."
Do you see that?
A. Yes.
Q. Then it's crossed out and it says 4,950. Do you see that?
A. Yes, I do.
Q. Do you know how and under what circumstances that change was made?
A. Yes.
Q. Could you tell us.
A. Well, this file, from my review perspective, has gone through a lot of discussion based on my review of the areas and values, and I keep going back to the diagrams. And as I received material from an attorney through your office, your expert, I was looking at areas and remeasuring based on the commercial building index and the best diagrams available, and there was some changes in the actual area.
Q. This is your handwriting, 4,950?
A. Yes.
Q. Do you know when you made that change?
A. Just recently in the last couple of weeks.
Q. That's your best recollection?
A. Yes.

Q. And do you know specifically what document or information prompted that change?
A. May I?
Q. Sure.
A. I believe, I believe -- yes, I exactly know. When I did my hand notes here it reflected the 5,390. I had looked at the commercial guide diagram. If I can identify this in some way for you, it's a diagram that's attached on 215 Water Street. And when I looked at the dimensions, the way it is assembled was showing 55 as the one dimension on the front of the building, and there's a 98 here which I took to be the length of the building. Then afterwards I noticed that they had broken this out separately and it was 90 by 55, so that I just changed regarding that 90 as opposed to 98.
Q. Have you ever been to the Wharf Tavern?
A. Yes.
Q. When did you first go there?
A. I was there today.
Q. When did you first go there?
A. First time I was there was today.
Q. Did you perform any measurements?
A. No.

Q. Is it your understanding that the addition to the premises referenced in your reports is measured 90 by 55 feet?
A. My understanding based on that diagram, yes.
Q. How about from your inspection?
A. It looked very close.
Q. Did you make any attempt to correlate this document and your assumption that the 90 by 55 references the addition to the building with what you actually saw today?
A. I paced the front in the parking lot.
Q. What time did you arrive at the Wharf Tavern today?
A. Probably around 11, 11.
Q. And did you speak with anyone while there?
A. No, I didn't.
Q. Were you accompanied by anyone?
A. No.
Q. Did you go inside the building?
A. I bought a beverage inside, yes.
Q. At the bar?
A. Yes.
Q. Did you go inside anywhere in the building other than the bar area?
A. I walked down the hallway into the actual

reception area where the lobby or the --
Q. Hostess stands?
A. Greeters, yes.
Q. Did you view the subject stairs at all?
A. I did not.
MR. DOLAN: I'm going to mark a copy of a photograph in your file as Exhibit C.
(Defendant's Exhibit C, black and white copy of photograph, was received in evidence for identification.)
Q. Now, you mentioned walking -- strike that. You mentioned pacing the front of the building; is that right?
A. Yes.
Q. Could you, with either the pen that you have or this Flair if it's easier, denote for me the area that you paced out, as you've described.
A. You want me to write it on the bottom here?
Q. Sure, just draw a line from point to point.
A. Right here to approximately (indicating).
Q. So looking at the photograph, you paced from the left side, the extreme left side of the building, the left side of the photograph, as well; is that right?
A. Yes.
Q. To the location approximate to the right side of

the white trellis work shown in the photograph?
Is that correct?
A. Yes, and directly under this deck.
Q. Directly under the dark stack. Could you just circle the stack just where you made reference to that?
A. Okay.
Q. Can you circle that a couple more times?
A. Why don't I put an arrow like this.
Q. Sure. Put an S next to that arrow.
A. Just S?
Q. Yes. And if you could just put 1 for the left side of the photograph, the line you drew, and then number 2 to the area where you stopped.
A. (Deponent complies.)
Q. Now, you said you paced that; is that correct?
A. Correct.
Q. Do you remember what your pacing came up with in terms of number of paces or feet?
A. I have, my pace is around 2.8 inches -- feet, I'm sorry, and about 17 paces.
Q. And in your head that comes up to what?
A. It was like, something like 45, 46 feet.
Q. So 45 plus or minus based on your pacing.
A. Yes.

Q. Is that right?
A. That's correct.
Q. Did you pace the other dimension?
A. This one here, no, I did not.
Q. So if I understand you correctly, the April 12, 2006 report, the version that we have here in the green folder marked Exhibit A with the 5,390 square feet, that number came from the commercial property card information. If we could use a red asterisk on this with your permission in the lower right-hand corner, --
A. Sure.
Q. -- this commercial property card that I've just placed a red asterisk in the lower right-hand corner, that number of 5,390 square feet originally came from the dimensions of 98 by 55 shown on this document. Correct?
A. Yes.
Q. And at the time you authored this report of April 12th, 2006 it was your assumption that the 98 by 55 dimension shown in this document signified the dimensions of the addition; is that correct?
A. Yes.
Q. And you subsequently made a change, a handwritten

change within the last several weeks to that total square footage from 5,390 to 4,950. Correct?

A. Yes.

Q. And that was based on your changed assumption that what was shown on the commercial property card document to the right-hand side, the 90 by 55, was in actuality the dimensions of the addition. Is that right?

A. Yes.

Q. And when you went out there today and paced it, your pacing reflected a dimension of what you assumed to be the addition to be plus or minus 45 feet?

A. Yes.

Q. Which would render both the 5,390 and the 4,950 square feet figure referenced in this report of April 12, 2006 to be in error.

A. Certainly questionable.

Q. On what do you base your assumption or conclusion that the 98 by 55 dimensions constituted the addition, as shown in this document?

A. I didn't make that assumption based on that document.

Q. Who did?

A. Nobody.

Q. Why did you use those numbers?
A. Because there are other commercial indexes on the same property that did not show this takeoff, and I got it from there.
Q. I'm not talking about the 90 by 55. I'm talking about the 98 by 55.
A. What I'm trying to say is the other commercial index do not show this diagram on the side which is a 90 by 55. So the only thing that's shown on those is this and I -- the only thing in here was the 98.
Q. Right. Let's take a look at another one of those, and I will place a Y on another document in the same packet in the lower right-hand corner. And this is a commercial property card that is precisely identical to that which was previously asterisked but for the takeoff, as you describe it, the 90 by 55 rectangle on the right-hand side.
A. Yes.
Q. Looking at what's been marked as exhibit Y -- strike that. Looking at the page that I've marked with a Y, on what did you base your assumption or conclusion that the 98 by 55 constituted the addition?
A. May I look at that?

Q. Sure.
A. I believe that was generated from a review of the building code applications and a multiple of other diagrams showing sketches of the new addition for the coastal board, which I believe is also on this page here.
Q. Did any of the other documentation to which you refer reference or utilize those dimensions of 98 by 55?
A. No, they did not.
Q. So on what did you base your assumption or conclusion that the 98 by 55 on that document, the one that has the Y on it, constituted the dimensions for the addition?
A. My assumption was based on discussions in all the depositions and materials identifying the first floor area, single story, and then as I saw the commercial index card with the breakoff on the side I felt that they were identifying that as the first floor addition.
Q. But you don't know.
A. I, I'm only working with that document.
Q. Right. And in fact you, on the scene pacing today, would call into question the accuracy of your assumption or conclusion that the 90 by 55 is

in fact the dimensions of the addition; correct? Because you came up with 45 when you paced what you assumed to be the addition.

A. I believe all the dimensions including those are in question. It was part of my concern when I actually did the pacing.

Q. So as you sit here today you don't know the dimensions of the addition?

A. I did not personally measure it.

Q. That wasn't my question.

A. I don't know.

Q. As you sit here today you don't know the dimensions of the addition; correct?

A. I can't answer the question the way you're asking.

Q. Why not?

A. Because I should know the dimensions of the building by looking at the commercial index.

Q. We can agree that perhaps one could determine the dimensions of the building by looking at the commercial index. That had nothing to do with my question, however. I'm not interested in your state of knowledge with respect to the dimensions of the building. In fact, I think that's irrelevant for the purposes of attempting to evaluate the cost of the addition. Okay?

A. You've totally lost me.

Q. Well, just try to focus on the question, then, okay? As you sit here today you don't know the dimensions of the addition. Correct?

A. Correct.

Q. And you made two assumptions that we've seen so far. One assumption of 98 by 55; correct?

A. Assumption based on the index card.

Q. I'm not asking what it's based on. You made an assumption that the addition dimensions were 98 by 55 at one point. Correct?

A. I don't want to spar with words here all day, but I wouldn't call that an assumption. When I look at an index card and I look at a diagram and I see a dimension on there, I don't believe that's an assumption. That's a reference.

Q. Really?

A. Yes.

Q. Okay. What about this document, in your professional expertise, provided you with sufficient certainty that any of these dimensions related to an addition on some indeterminate date? What dimensions on this document or what indication on this document that I've marked with a Y, based on your professional expertise, allowed

you to conclude that there's any information here indicating what the dimensions of an addition to this building was?
A. On this document, none.
Q. All right. So you made an assumption that numbers on this document related to an addition, because nothing in the diagram indicated that any of the numbers related to an addition. Correct?
MR. PHILLIPS: Objection.
A. Based on that, yes.
Q. So you made an assumption that numbers on this document Y constituted an addition. Correct?
A. Correct.
Q. And you later concluded that that assumption was misplaced since you later saw another document with what you've described as a takeoff to the right-hand side. Correct?
A. Correct.
Q. Now, when did you receive this document that we've marked as Y?
A. I don't recall the exact date.
Q. Well, it's got a fax transmission date of April 12, 2006. Correct?
A. Is that to me? I'm not sure.
Q. Well, it's from the law office. I assume you're

not law office.

A. No.

Q. So I assume that would be to you.

A. I assume it could be around that time.

Q. Well, it's dated April 12, 2006; correct?

A. That's correct.

Q. Now, the other document with the asterisk on it with the takeoff has the same fax transmission date of April 12th, 2006. Correct?

A. Yes.

Q. Now, what on this document, in your professional expertise, your years of experience, would indicate to you as an expert that the dimension on this, what you would call a takeoff of 90 by 55, constitutes an addition?

A. My review of the depositions, including the building inspector's, the coastal board elevations which show the front of the building and identify that addition, and my general review of materials that were in the file.

Q. Is there anything on this document that's been marked with an asterisk which would lead you to conclude in your professional experience and expertise that the dimensions of 90 by 55 on this document are in reference to an addition on this

building?
A. No.
Q. So there was some corroborating evidence that you saw in the material you just described in your prior answer which led you to form the belief that the dimensions of 90 by 55 constituted the dimensions of the addition?
A. Yes.
Q. Could you tell me what in the deposition of Mr. Jannitto there was which led you to conclude that the dimensions of 90 by 55 constituted the dimensions of the addition.
A. You want me to describe it?
Q. Yes. Page reference?
A. Page 24.
Q. Line?
A. Starting line 20.
Q. Why don't you read it into the record for us.
A. (Deponent reading:)
""Question: Okay. So as you walk in on the left-hand side is the cocktail lounge; correct?
"Answer: Is the cocktail lounge.
"Question: And then there's...
"Answer: Kitchen is on the right.

"Question: Okay. And the cocktail lounge and that whole dining area, that's part of the addition; correct?

"Yes.""

And that's on page 25, I'm sorry, lines 1 through 2.

Q. What information did you glean from that testimony that related at all in any respect to the dimensions of the addition?

A. The location of the cocktail lounge, in part.

Q. Well, did this property card reference the cocktail lounge at all, the one marked with the asterisk?

A. That does not, no.

Q. Well, you told me that you made an assumption that the 90 by 55 takeoff on the right-hand side, as you describe it, constituted the dimensions of the addition; that nothing on this card referenced that but you concluded such based on your review of other evidence, including the deposition transcript of Mr. Jannitto.

MR. PHILLIPS: Objection. You can answer. Asked and answered. You may answer.

A. Yes.

Q. What in the deposition transcript of Mr. Jannitto

assisted in the formulation of your conclusion that the 90 by 55 constituted the dimensions of the addition?
A. As to dimensions, nothing.
Q. Now, you also mentioned another document, and I'm going to show you what was marked as Exhibit 8 to the Jannitto deposition.
A. Yes.
Q. Is that another document that you identified as something you relied on in forming the conclusion that the 90 by 55 was the dimension of the addition?
A. Yes.
Q. What on this document led you to conclude that the 90 by 55 takeoff, as you've called it, on the right-hand side of the property card with the asterisk on it, constituted the dimensions of an addition?
A. As you look at this diagram, based on my visit today confirming what I saw here --
Q. Wait a second. I've asked you about the assumptions you've made and the numbers you've used in the report of April of 2006; correct?
A. Correct.
Q. And you told me that the number of 5,390 was

included in this report of April 12, 2006; correct?
A. Correct.
Q. And that certainly predates any visit of you to this premises; correct?
A. That's correct.
Q. And you told me the 4,950 figure was arrived at several weeks ago; correct?
A. Correct.
Q. All right. And that certainly predates any visit to the premises.
A. Correct.
Q. So what we're exploring now is the basis for your conclusion that the 90 by 55 on the asterisked property card documentation related to an addition. So please don't reference anything about today because you're misunderstanding my question --
A. Okay.
Q. -- if you work that into an answer. Okay?
A. Yes.
Q. We've already reviewed, you told me you thought you relied on something in the Jannitto deposition transcript that assisted you in formulating your conclusion regarding dimensions, and having

reviewed the Jannitto transcript you now agree that there's nothing in there relating to dimensions. Correct?

MR. PHILLIPS: Objection.

A. Correct.

Q. Okay. Now, is there something in this document that you would have reviewed prior to the formulation of either that 5,000 plus figure or the 4,900 plus figure in the report we just looked at?

A. Yes.

Q. Okay. What?

A. Looking at this, identified as the west addition, west elevation, I'm sorry, identifies it as new addition. In looking at this portion above, there's an indication "existing restaurant building" and a design which I assume to be the first floor area, corresponding to the first floor area of the commercial index.

Q. Well, the numbers on this document for the addition are 48 by 94. Correct?

A. One of many sets of different numbers, yes.

Q. Could you answer the question?

A. Yes.

Q. All right. So the numbers used on this document,

Jannitto 8, for the addition are 48 by 94.
A. Correct.
Q. So you as an expert reasonably relied on this document, Jannitto 8, when you concluded that the 90 by 55 on this asterisk constituted the dimensions of the addition. Is that your testimony?
A. You're asking me if I relied on this document?
Q. Yes.
A. For my dimensions I relied on that document.
Q. Right. And you've told me that that document, the one with the asterisk on it, the 90 by 55, mentions nothing about an addition.
A. Correct.
Q. And that it was information extraneous to this document that led you to conclude that the 90 by 55 was referring to an addition.
MR. PHILLIPS: Objection.
Q. Correct?
A. Yes.
Q. And I want to know what extraneous documentation you relied on when you concluded that the 90 by 55 related to an addition. You told me about the Jannitto deposition, we took a look at that and determined there was nothing about dimensions in

there. Right?

A. Right.

Q. Did you rely on this document, Jannitto 8, as extraneous information that lead you to conclude that the 90 by 55 dimension on the asterisk page related to an addition?

MR. PHILLIPS: Objection as to form.

A. Not the dimension, but the location.

Q. Can you point to me any extraneous information upon which you relied in support of your conclusion that the 90 by 55 dimension, shown on this asterisk page, constituted an addition?

A. Besides this, too? I don't understand your question. There's a lot of words and I'm trying to --

Q. Let's take it one at a time.

A. I'm trying to explain how I made the connection here. I'm using this diagram here, Jannitto 8, as an identifier of what I assume to be the new addition which matches up, in my opinion, this 55 by 90 section, which in my mind confirmed that that was why they broke it off. The dimensions obviously being different, but the location being what I'm identifying.

Q. I'm not interested in location at all. Okay?

A. I don't understand the question.
Q. Then, fine, let me finish it, okay? Put location out of your mind. Don't talk to me about location. I'm not interested in location. Okay?
A. Okay.
Q. You authored a report of April 12th, 2006 that represented that the first floor addition had a square footage of 5,390 feet. Okay?
A. Yes.
Q. And you've told us how you came up with that figure; correct? That was multiplying 98 by 55 on this document that's been marked Y.
A. Yes.
Q. And you've also told us how you came up with the figure 4,950; right?
A. Yes.
Q. You did that by multiplying 90 by 55; correct?
A. Yes.
Q. Now, when you came up with the first figure in the April report, you made an assumption that the 98 by 55 were the dimensions of an addition. Correct?
A. Yes.
Q. All right. And when you saw at some later time the card marked with an asterisk you changed your

assumption. You assumed that the 90 by 55 were dimensions of an addition.

A. Yes.

Q. And I've asked you repeatedly now on what you relied in support of your assumption that the 90 by 55 related to an addition. Okay? You with me so far?

A. I'm with you.

Q. And you told me you agree with me there's nothing on this document with the asterisk on it which would indicate that the 90 by 55 constitutes an addition. Correct?

A. That's correct.

Q. And you told me you relied on extraneous information to form the conclusion that the 90 by 55 related to an addition. Correct?

A. Correct.

Q. You referred to the Jannitto deposition. Correct?

A. Correct.

Q. We reviewed that and you didn't note any reference in that deposition to dimensions. Correct?

A. Correct.

Q. Now, is there any other information or documentation other than the Jannitto deposition upon which you relied when forming the assumption

that the 90 by 55 dimensions shown on this page with the asterisk constituted an addition?

A. Besides Jannitto 8?

Q. Yeah, we'll start with besides Jannitto 8.

A. May I look at --

Q. Sure, look at anything you want.

A. By location, not by dimension, I also referred to Roger Houche ("hoo-chay") 3/14/06 deposition.

Q. When we started the exercise I told you I'm not interested in your assumptions regarding location, so please don't refer to location again in response to this question.

A. There's nothing else regarding dimension.

Q. All right. What was it in Jannitto 8 that informed you in any respect with respect to the 90 by 55 dimensions on the asterisk and your conclusion that those constituted an addition?

A. As I -- we're not talking dimensions now?

Q. Yeah, we're talking dimensions.

A. There is no dimensions to make a reference.

Q. All right. What information did you rely upon in any respect to form the basis for your assumption that the 90 by 55 dimension shown on this document, with the asterisk on it, constituted dimensions of an addition?

A. The only document was the commercial index card.
Q. That the card that doesn't say anything about an addition.
A. That was my prime assumption, yes.
Q. Well, it was your sole document upon which you relied; correct?
A. Well, as I indicated, you talk about dimensions but I used these other documents as comparatives for the location of that addition.
Q. What other documentation if any did you rely upon in assisting you in formulating the conclusion that the 90 by 55 dimension shown on this document with the asterisk constituted an addition?
A. Only the documents we've discussed, which is Jannitto 8, which has a dimension of 48 by 94. But there is no direct reference to the 90 by 50, other than the commercial index card.
Q. So the document exhibit 8, Jannitto 8, with the dimensions of 48 by 94 assisted you in concluding that the dimensions of 90 by 55 on the page with the asterisk constituted the dimensions for an addition. Is that your testimony?
A. Assisted me, yes.
Q. Such that the fact that this Jannitto 8 had dimensions for a proposed addition which were

different from the dimensions shown on the asterisk page, that led you to reasonably conclude that the dimensions on the asterisk page were in fact the dimensions for an addition, causing you to alter your report of April 12, 2006. Is that your testimony?

A. I was only altering it to match up with the index to show the takeoff which I believe represented the addition.

Q. You're going to make me ask the question again, aren't you?

A. Yes.

Q. Would you answer the question, please.

A. I'm trying to answer as best I can.

Q. Sure. You've told us that the Jannitto 8 with the dimensions of 48 by 94 assisted you in concluding that the dimension shown in the property card of 90 by 55 constituted an addition. Is that correct?

A. I indicated before that I used the Jannitto 8 which had different dimensions but in my opinion referenced the same location. The 98 and 90 difference is only reflective of the takeoff on that index sheet, which was not on the first one I looked at, which has nothing to do with the

Jannitto document.

Q. Well, actually the first one you looked at with the Y on it actually had a 98 dimension on it.

A. Correct. And that's why originally I used 98 times 55. Then came upon what you marked with an asterisk and saw the takeoff.

Q. Oh.

A. Jannitto was just something I used a reference.

Q. So the Jannitto 8 led you to conclude that the dimensions on Y, 98-55, were the correct dimensions of an addition?

A. No. You're not following me. When I did the math on this, when I did the simple math I looked at the first index, which I saw the 98 by 55. I later came upon this which showed, in my opinion, the takeoff which reflected 90 by 55, which I concluded the 98 to be a dimension relative to the decking. Jannitto 8 was only used by me as a reference that the location of this, which was taken off the index, was the same. That's my fin --

Q. Okay, try this question again. What is it about this page with the asterisk that, based in your professional experience, would allow anyone to conclude, looking at that document, that any

dimension on this document related to an addition?

A. There's no indication of that on the document.

Q. What is it in your professional experience, training, or education, which would allow someone to utilize this type of document from a town record to conclude as to what if any dimensions on the document constituted an addition?

A. On that document by itself?

Q. Yes.

A. Nothing.

Q. Okay. And in fact when you went out there and paced it, the dimension that you paced was 45 plus or minus --

A. Yes.

Q. -- for the one dimension you paced.

A. Yes.

Q. Why didn't you pace the other dimension?

A. I was just simply trying to see, in my opinion, based on my references and assumptions, that this front dimension, 48, 45, 50, it's been called a lot of numbers, matched up what I believed to be by my visual with the existing break was between the existing break of the existing building -- apologize -- and what I perceive to be the first floor addition.

Q. Why didn't you pace the other dimension?
A. In looking at it I felt it looked to be around 80 feet, 90 feet. I've seen a number of other documents that were very close to that.
Q. In your files is a copy of the defendant New Wharf Tavern, Inc.'s expert disclosure. Correct?
A. Yes.
Q. Did you read that?
A. Yes.
Q. Well, you saw in that document, in fact you've highlighted -- strike that. You reviewed this document prior to your visit today; correct?
A. Yes.
Q. And you saw in the document and in fact highlighted the fact that that document referenced the dimensions of the addition at 41 and a half by 81 and a half for a total one story addition of 3,383 square feet?
A. Yes.
Q. Was that in any way of interest to you?
A. Certainly.
Q. That's why you highlighted it. Right?
A. Because there was so many numbers out there --
Q. That's why you highlighted it. Correct?
A. I'm explaining to you why.

Q. Because it was of interest to you?
A. Yes.
Q. Did you make any effort when you went out there today to determine the accuracy of the measurements referenced in that document that you highlighted?
A. No, I did not.
Q. Why not?
A. I was just -- it wasn't an official visit and I didn't want to pull the tape measure out and measure.
Q. Well, you made a rough measurement of the front.
A. Uh'huh (affirmative).
Q. And you came up with 44, 45, somewhere around there.
A. Correct.
Q. Could in fact be 41 and a half feet; correct?
A. Are you asking me if I think the front could be 41 and a half feet?
Q. Yeah.
A. No.
Q. Well, you said the side looked like 80 or 90.
A. Right.
Q. So it could be 81 and a half.
A. Okay. Yup. Okay.

Q. Okay. So in fact the one story addition, for all you know, could in fact be 3,383 square feet, not having done the measurements yourself.
A. Not having done the measurements, it's not my belief. But that's true.
Q. Why isn't that your belief?
A. Because my review of all the numbers, which are extremely different from every perspective, I depended on the commercial index, which I believe to be the governing jurisdiction. When I walked into the building today, just to confirm what I had been reading and seeing and the diagrams and the prints, I felt that the way the bar was located and the way the dining area was located, that the existing building ended at the front wall where the stack was, is located, and all the areas to the opposing side of that first floor were the new addition.
Q. But you didn't bother to make any measurements --
A. No.
Q. -- of what you assumed to be the new addition?
A. No.
Q. Is it your belief that what is shown on Jannitto 8 was constructed?
A. Yes.

Q. And what's the basis for that?
A. Basically looking at the visual, what I see there, including the pilings and what's on the diagram, what I saw out there today.
Q. Really? Okay. So your understanding of construction and documents similar to that would lead you to conclude that what you saw out there today is consistent with what is depicted in that drawing, Jannitto 8?
A. I'd say yes. That's a rough sketch for approval process, but, yes.
Q. Okay.
(Short break taken.)
Q. Now, turning to the defendant New Wharf Tavern, Inc.'s expert disclosure in the green folder marked as Exhibit A, the only items that you highlighted were on the second page, the dimensions of the addition with the total square footage. Correct?
A. Yes.
Q. And the third page relating to plumbing, HVAC service and distribution and light power.
A. Yes.
Q. Now, you have a copy of a report of Raymond Keough of April 13, 2006 among this file; correct?

A. Correct.
Q. And this report, the Keough report, refers to a heated building addition of 3,561 square feet; correct?
A. Correct.
Q. Did you attempt to reconcile that number at all with the number used in your April 12 report, either the original number or the hand-corrected number?
A. Reconcile? How do you mean?
Q. What I mean is it's different than the two numbers that you used and I want to know did you attempt to reconcile it in any respect. Did you try to figure out why Mr. Keough was using a different number?
A. No. It was different from all the numbers that I'd seen, but I didn't reconcile it. I just highlighted it because it was different.
Q. Did you make any attempt to determine how he arrived at that figure?
A. No.
Q. Did the fact that another expert retained on behalf of the plaintiffs was using a number so markedly different from the numbers or number you used cause you any concern?

A. Certainly. All the numbers caused me concern.
Q. Why did you not therefore make some effort to reconcile or determine how Mr. Keough arrived at the number he used in his report?
A. In my opinion the best method, again, was to go back to the commercial index that we've been discussing. I felt that to be the governing document.
Q. Wouldn't the best way to do it is to go out there with somebody who knows by history where the addition is located and then measure it? Isn't that the best way to do it?
A. No. The best way would be to have the original construction documents with the as-builts available so you could see where the actual addition was, how it penetrated what parts of what building, so we know exactly what was done and the cost.
Q. Sure.
A. That would be the best way.
Q. Yeah. And it may be that there were no architectural renderings of the addition either pre or post construction. Correct?
A. I would hope not. I hope that's not accurate because --

Q. That wasn't my question, what your hopes or dreams or desires would be. It may be that there was a general contractor who was a partner, an owner in the property at the time of the addition and that the addition was constructed in or about 1991 without there being any architectural renderings either pre or post construction. Correct?
A. I guess could be. I would be surprised.
Q. Did you make any effort to determine whether or not there were any architectural renderings either pre or post construction?
A. Just by our contacts with the building code officials, as we talked about before, to see what permits may have been issued.
Q. Did you ever make any effort to locate any architectural renderings either pre or post construction this addition?
A. Requested through the local building official, but never provided. I don't know if they exist.
Q. Absent such architectural renderings the best way to figure out what the dimensions of that addition would be would be to go out in the field and measure the actual dimensions of the addition; correct?
MR. PHILLIPS: Objection. Asked and

answered.

A. Correct.

Q. Now, also included in Exhibit A, the green folder, is multiple copies of and/or versions of the June 9, 2004 report but one with a black clippy on it.

A. Yes.

Q. That has a version of the report with photographs underneath it covered by a June 25, 2004 memo to the Law Office of Frank Corso; correct?

A. Yes.

Q. And there's also a copy of an e-mail from you to Mr. Corso, it appears to be undated, which indicates that, "Attached is the final draft in the above matter. Photographs will be attached with the mailed report. Invoice for our services will follow shortly. Please follow with any questions." Correct?

A. Yes.

Q. There's another e-mail from you to Mr. Corso which states, "Attached is our draft report in the Gordon Noonan matter for your review. Call us with any revisions or questions and we will finalize the report for you." Did I read that correctly?

A. Yes.
Q. Is that how you typically do it?
A. The way it's worded does not represent how we typically do it, no. That's just a fast e-mail.
Q. Why would you send a draft report, as a purported expert in the field of safety, to an attorney for review prior to finalization?
A. I would normally send a draft report for the review prior to the finalization in case I had made any mistakes in the facts or there was typos, and only after I would agree to a revision would I make one, obviously, but it would not affect my opinion.
Q. Were there any revisions made following the forwarding of the draft report?
A. No.
Q. So all of the versions of the June 9, 2004 report contained in this Exhibit A are the same?
A. Yes. I think you're looking at a lot of copies of the same and highlighting different and so forth.
Q. Now, there's a series of pages in the same packet, we have an initial two pages of yellow lined paper with handwriting. Whose handwriting is this?
A. May I see it? That appears to be Jake's, Jacob's handwriting.

Q. Your son's?
A. Yes.
Q. There's a blue sticky on this, it says, "Date stairs changed" and "Re:" something. Can you interpret that?
A. No, I can't.
Q. Is that your handwriting?
A. No.
Q. Or your son's?
A. Appears to be his. I don't know what that is.
Q. Fair to say -- strike that. Have you ever reviewed these pages, these yellow pages?
A. Yes.
Q. Fair to say these pages memorialize information obtained by Jacob in the course of his investigation on this matter?
A. Part of his research and investigation, yes.
Q. It says here in his handwriting, "Prior to 1977 no codes." Correct?
A. That's what it says, yes.
Q. Did you ever ask him what he meant by that?
A. I believe Rhode Island is not -- if I recall what he told me, that Rhode Island did not have a building code per se prior to '77.
Q. The state of Rhode Island didn't adopt a statewide

building code until 1977?
A. That may be.
Q. Correct?
A. Yes.
Q. And it adopted in 1977, to your understanding, to a vast extent the BOCA code?
A. Correct.
Q. Now, does the phrase here "grandfathered in" and then an arrow "age of construction of stairs," do you see that?
A. Uh'huh (affirmative).
Q. Is that a yes?
A. Yes. I'm sorry.
Q. What is your understanding as to what Jacob was referencing with that note?
A. My understanding is that he was memorializing his thoughts as to grandfathering. Should probably be a question mark there. Can I see the bottom again? Age of construction, when were the stairs put in. He's putting notes of questions that would be, that would pertain to this.
Q. Meaning at the time he was conducting his initial investigation --
A. The rough notes.
Q. Let me finish the question.

A. Sorry.
Q. Meaning that at the time he was conducting his initial investigation these notes would reflect that he was considering the issue as to whether or not the stairs in question, given their age, were grandfathered in under the building code?
A. Concerning all issues. Those would be his notes, I would imagine, yes.
Q. Including that issue?
A. Yes.
Q. Now, you -- strike that. Jacob authored a letter to the building code official of the Town of Warren dated May 25, 2004. Correct?
A. Yes.
Q. And with that letter he requested, number one, "All inspection information related to the issuance of the June 20, 1991 certificate of occupancy." Correct?
A. Yes.
Q. Two, "A change in usage of the premises." Correct?
A. Uh'huh (affirmative).
Q. Is that a yes?
A. I believe, yes. The document speaks for itself, I believe.

Q. I'm asking you questions about it.
A. Okay.
Q. Why would he want the information or documentation from the Town of Warren about a change in usage of the premises?
A. We're investigating all possibilities as to what occurred at the property and we were requesting these documents to see if they existed.
Q. You're going to fight me on that one aren't you?
A. It's a request, free information type of question. We wanted to know what existed. We didn't know what was there.
Q. Why would that be of relevance whether or not there was a change of use to the premises?
A. Oh, I'm sorry, I see.
Q. Okay.
A. If it was a fishery before it became a restaurant, if it changed occupancy-type considerations that could be an issue regarding both the safety aspects of it and as well as the, just the general use of the property.
Q. Could have to do with the code applicability; correct?
A. That's what I'm referring to, yes.
Q. But you didn't say that.

A. I didn't use those words.
Q. I know. You didn't reference the topic when you were answering the question.
MR. PHILLIPS: Objection.
Q. You knew at that time when you read that letter, whenever you first read it, that he was considering whether or not there had been a change in usage in order to determine whether there might be some trigger that would require pre-existing conditions to come up to code at the time of the change of usage. Correct?
A. That would be part of it.
Q. Sure. Number three, "Any permitted renovations that exceeded 50 percent of the property's market value." That was number 3; --
A. Yes.
Q. -- correct? Now, when you read that letter, whenever it was you first read it, why did you believe that Jacob was asking for that information? What relevance would that have in connection with the analysis here?
A. Because of the statute that is available within Rhode Island talking about updating properties with 50 percent valuations over the original cost of building.

Q. Meaning that if there were renovations that exceeded 50 percent of the property's value, that would require the entire property to be brought up to code at that time.

MR. PHILLIPS: Objection.

Q. Correct?

A. I believe that's what the code says.

Q. Well, what is your understanding as you sit here today as to what specifically the code or the statute, as you referred to it, provides in that regard?

A. There's actually several portions of the code that talk about renovations to the property.

Q. What I'm talking about is the reference that OSEA used in this letter of May 25, 2004 to renovations that exceed 50 percent of the property's value. What is your understanding as to what any code or statute applicable in Rhode Island provided as of the date of Mr. Noonan's accident of October 18, 2003 with respect to that topic?

MR. PHILLIPS: Objection as to form.

A. If I understand the question, the statute is --

Q. Is there any uncertainty in your mind as to what I'm asking? Because I will repeat it, if I must.

A. Please.

Q. Sure. What is your understanding as you sit here today as to what either Rhode Island statute, regulation, or code provides with respect to this topic, item three in the OSEA letter of May 25, 2004, specifically relating to renovations that exceed 50 percent of the property's market value, as of the date of Mr. Noonan's injury of October 18, 2003?

MR. PHILLIPS: Objection. You can answer.

A. That the statute, to my understanding, indicates that if a renovation or addition is made to a property, and the value of that renovation or addition is over 50 percent of that value for the property, described in this letter as market price, that the entire property has to be brought up to the full code requirements.

Q. So you understand that as of October of 2003 a property that predated the Rhode Island adoption of the statewide building code was grandfathered in under the code. Correct?

MR. PHILLIPS: Objection.

A. What was grandfathered in?

Q. The property, the existing structure and improvements that predated the adoption of the statewide building code.

MR. PHILLIPS: Objection.
A. I don't agree with that.
Q. Okay. Are you serious?
A. I'm looking -- yeah, I'm serious.
Q. Why the heck did you spend any time trying to figure out what the value of the addition was, whether it was plus or minus 50 percent, if that wasn't provided for or of relevance in this case?
A. Because we were requested to take a look at that.
Q. When you were requested to take a look at that, did you inform whoever requested you that your opinion had no relevance?
A. As it relates to the safety and health of the property I did on many occasions indicate that I felt, notwithstanding the statute and others that deal with 25 percent, that Life Safety was preeminent and didn't depend on that statute. I believe I'm answering your question.
Q. No, you don't.
A. As of the time I communicated that on numerous occasions.
Q. I didn't ask you at all what you felt. I asked you what your understanding was with respect to the law in the state of Rhode Island as of October of 2003. Now, we're going to have ample time to

talk about your feelings here today. But it will go much smoother if you will direct your attention to my questions, okay, and much more quickly as well. Okay?

A. I'm not worried about quick, and your question was how many times did I communicate or did I communicate --

Q. I am concerned about quick, okay? I want to be efficient here today.

A. I understand.

Q. And if you persist in not answering my questions, so be it, we'll let the judge decide whether or not you're being responsive. All right?

What I want to know is what your state of knowledge is at the present time with respect to the law in the state of Rhode Island as of October of 2003 and the applicability of the building code in Rhode Island to properties that pre-existed the adoption of the statewide building code. Okay? Do you understand?

A. I understand, and I believe I answered that.

Q. What is your understanding as you sit here today as to the applicability of the Rhode Island building code to properties that pre-existed the adoption of the statewide building code in Rhode

Island?

A. My understanding of the Rhode Island code as it deals with properties in existence prior to the implementation of the code. Correct? Am I answering your question? Is that there's a 50 percent requirement regarding the value of the addition needing to exceed the market or the appraised value of the property, called replacement cost, and if it did exceed that 50 percent, they would have to bring the property in full compliance with the code.

Q. That's why your office was requesting information with respect to any permitted renovations before you authored even a draft report in this matter. Correct?

A. Certainly.

Q. In an effort to determine what if any building code provisions would apply. Correct?

A. Correct.

Q. You didn't have to be asked to do that. You would do that in connection with any case with a property that may predate the adoption of a building code, wouldn't you?

A. Well, when we were looking at values we would, yes.

Q. No, no, that's not my question. Was this a concept that was foreign to you prior to your retention in this matter, that is, that properties under the BOCA code that predate the adoption of the particular version of the BOCA code are not required to be compliant unless there's been a renovation or addition within one calendar year that has a value in excess of 50 percent of the existing structure?

MR. PHILLIPS: Objection as to form.

Q. Is that a concept that was unfamiliar to you before the retention in this matter?

A. No.

Q. All right. So that was something OSEA would be sensitive to any time getting an assignment like this involving a building which clearly predated or potentially could predate the building code. Correct?

A. We would investigate that, yes.

Q. And that's why Jacob was doing a good job in requesting immediately at the outset any information with respect to renovations that might exceed 50 percent of the property's market value in order to be able to make a determination as to the applicability of any code to the structure.

Correct?

A. Correct.

Q. Now, do you know, did OSEA receive a response to that letter of May 25, 2004?

A. I believe we received a response that was much of the material we're looking at today, the code -- I'm sorry -- the commercial index.

Q. Well, that came from Mr. Phillips, okay? I've reviewed this file and I haven't seen anything that was received from the Town of Warren.

A. You're correct, we did not receive. It came through counsel.

Q. So the question was did OSEA receive any response to this letter request of May 25, 2004?

A. I don't believe so, no.

Q. Okay. Now, Jacob also sent a fax to Mr. Corso of May 25, 2004 stating, "This is to update you on the status of the Wharf Restaurant inspection. I am still waiting for information regarding the assessed value for the period around 1986. I will advise you as soon as I receive it." Do you see that?

A. Yes.

Q. Why would Jacob be looking for information regarding the assessed value for the period around

1986?

A. Probably as a part of determining the applicability of the statute.

Q. Now, there's a handwritten sheet from the file dated November 7, '05; correct?

A. Correct.

Q. Whose handwriting is this?

A. It appears to be Steve Drodzowski, D-R-O-D-Z-O-W-S-K-I. He's one of our P.E.s in the office. Appears to be his writing.

Q. Now, this memorandum states in part, "I mentioned that somewhere I remember reading that the person fell about 20 feet and Paul said yes and that 16 feet might relate to that." And then there's several exclamation points. Do you see that?

A. Yes.

Q. Did you ever discuss that note with your employee?

A. I don't believe so.

Q. This memo attempts to calculate the height of the stairs; correct?

A. Yes.

Q. From top to bottom?

A. Correct.

Q. Of approximately 16 feet; is that right?

A. Yes.

Q. Now, there's a set of calculations on a memo pad from Ferguson Electric. Do you know what these are; what that is a calculation of?
A. I believe that I -- just based on my viewing of this, it has to do with I believe this, where they're trying to determine stair tread and length.
Q. Now, Jacob sent a similar letter that he had sent to the Town of Warren to the Building Code Commission of May 18, 2004; correct?
A. Yes.
Q. Similarly, I did not see any response from the Rhode Island Building Code to this letter. Is that fair to say?
A. I believe it is, yes.
Q. Now, there's another set of handwritten notes I want to review with you, if we could. I'm just going to number these in the lower right-hand corner. The first page here, whose handwriting is that?
A. That is Jacob's, I believe.
Q. The second page is his handwriting as well?
A. Yes.
Q. Third page, same?
A. Yes.

Q. Fourth page?
A. Yes.
Q. Now, the fourth page has distances of handrails.
Do you see that?
A. Where are you looking? I'm sorry.
Q. Right handrail going up, --
A. Okay.
Q. -- it says 9th to 16th. Do you see that?
A. Yes.
Q. Do you know what that's in reference to?
A. I believe it has to do with the break in the
railing on the lower stairs, the 16th stair
through the 9th. I believe that's what it is.
Q. Now, on the fifth page, that's his handwriting?
A. Yes.
Q. It says, "Handrails 34 to 38 inches above leading
edge of treads." Do you see that?
A. Yes.
Q. There's a reference 1022.2.2?
A. Yes.
Q. What's that in reference to?
A. That has to be a code reference and I'm not sure
what code, whether it was a BOCA code or Rhode
Island.
Q. It says continuous; right?

A. That's another word.
Q. Yes, that's another word that says "continuous;" right?
A. Right.
Q. Then it says, "Space between wall." Correct?
A. Yes.
Q. And then it says, "Handrail ends"?
A. Yes.
Q. Now, page six is a series of questions.
A. May I see?
Q. Surely.
A. Yes.
Q. Is that all his handwriting?
A. Yes, I believe so.
Q. Would he have got these questions from you?
A. In consulting with me, yes, I give direction on all the work.
Q. Where did he get these questions from?
A. Appears to me he wrote down -- I don't know all the sources. I'm sure some are from me and some from his own reference and research and his own knowledge.
Q. Seven is his handwriting?
A. Yes.
Q. Eight is his handwriting?

A. Yes.
Q. Nine is his handwriting?
A. Yes.
Q. Now, there's another document here on a form, Calculations Subject. Do you know whose handwriting that is?
A. It appears also to be Jake's. He does that, so.
Q. Two pages on white paper. Now, all of the pages of notes, the handwriting is Jacob's; correct?
A. Yes.
Q. There's a spreadsheet here with some information in highlighting. Do you know what that's in reference to?
A. May I look at it?
Q. Sure.
A. This is a listing of, I don't -- he may have used it for scrap paper and he wrote down the bottom. I believe there are some cases we worked on listing the case and attorneys, unrelated to this. It looks like he may have used the bottom for some notes.
Q. In Exhibit B there's a disc. Do you know what that is?
A. I believe the disc has the same pictures that were in the file.

Q. Okay.
A. Would you keep that together?
Q. Sure.
MR. PHILLIPS: Mark, can we go off the record for a minute.
(Discussion off the record.)
Q. Now, Exhibit B includes a memorandum from Richard Philbin at the Law Offices of Frank Corso to you of May 28, 2004.
A. Correct.
Q. And that memorandum relates to the possible valuation issues we discussed previously; correct?
A. That's correct.
Q. Now, in a memorandum that your son sent to Mr. Corso on May 18, 2004, he states in part, "Third, based on our review of the submitted building permits the age of the stairs in question is unclear. However, it is clear that a second floor existed prior to June 14, 1956. The age of the stairs leading to the second floor is critical as this will determine the year of application of the pertinent building codes." Did I read that correctly.
A. Yes, you did.
Q. Do you agree with that statement?

A. Yes.
Q. All right. It says, fourth, "If the stairs existed prior to any inspection or application of building codes they, the stairs, could have been grandfathered in." Did I read that sentence correctly?
A. Yes.
Q. Do you agree with that statement?
A. I'll say yes.
Q. All right. In conclusion at the second page of the memorandum Jacob stated, "Therefore, in closing, as this case proceeds the following information will be critical: One, actual age of stairs. Two, determination of building codes employed at time of stairs construction. Three, what building codes were in effect in Warren prior to 1977. Four, was a change in use instituted after 1977. Five, did the 1986 renovation exceed the 50 percent rule."
Do you agree with that?
A. Yes.
Q. Did OSEA make a determination as to the actual age of the stairs?
A. No.
Q. Did OSEA make a determination of the building

codes employed at the time of the stairs construction?

A. Couldn't because we didn't know the age of the stairs or the building.

Q. Did OSEA make a determination as to what building codes were in effect in Warren prior to 1977?

A. There were no codes.

Q. Did OSEA make a determination as to whether or not a change in use was instituted after 1977?

A. I believe we could not find any change of use.

Q. Did OSEA determine whether the 1986 renovation or any other renovation exceeded the 50 percent rule?

A. We did not determine that exactly, no.

Q. Let's go back to the June 7 report -- I'm sorry -- the June 9 report. Now, at page four of the report you state --

A. Excuse me.

Q. -- towards the middle of the page, "Mr. Noonan fell approximately 20 feet while either ascending or descending the flight of stairs located adjacent to the hostess desk at the New Wharf Tavern in Warren, Rhode Island." Do you see that?

A. Yes.

Q. Do you know where that information came from at the time you memorialized in the report of June 9,

2004 to the fact Mr. Noonan fell approximately 20 feet?
A. That would have come from depositions, I believe. The exact location I don't recall.
Q. The only depositions that I saw in your file are of Mr. Jannitto and Mr. Croteau, C-R-O-T-E-A-U.
A. If I may review the material I looked at here.
Q. And I'll represent to you that this lawsuit was filed in 2005 and this report is dated 2004, unless it could have been no depositions taken.
A. It must have come then from discussions with counsel.
Q. So it would be fair to say that information was provided to you from counsel to the effect that Mr. Noonan fell approximately 20 feet in connection with this incident; correct?
A. That's correct.
Q. Now, is it fair to say that at the time you authored this report you did not know whether or not Mr. Noonan was going up or going down the flight of stairs?
A. That's true. That's correct.
Q. Was it in any way relevant to you in performing your analysis and writing this report as to whether or not Mr. Noonan was going up or going

down the stairs?
A. Well, it could be relevant in a number of ways.
Q. I didn't ask if it could be. Let me try the question again.
A. Okay.
Q. Was it relevant to you in performing your analysis and authoring this report of June 9, 2004 as to whether or not Mr. Noonan was going up or going down the stairs at the time of the incident?
A. It would be relevant as part of the consideration, certainly.
Q. Why did you not inquire as to whether or not Mr. Noonan was going up or going down the stairs at the time you authored this report?
A. I believe at that point information was still being collected and they weren't sure.
Q. All right. So it's your --
A. That's my recollection.
Q. It's your recollection that as of June 9, 2004, counsel for the plaintiffs did not know whether or not Mr. Noonan was going up or down the stairs?
A. That's correct.
Q. Because that information certainly, as you've indicated, would have been of relevance to you in performing your analysis.

A. It would have had relevance.
Q. And you would have asked for that information if it was available; correct?
A. Yes.
Q. Okay. Now, at the time you authored this report you had never been there; correct?
A. Correct.
Q. But Jacob had been there?
A. Correct.
Q. And you knew at the time you authored this report that the building was plus or minus a hundred years old --
A. Yes.
Q. -- because in this very paragraph you talk about improvements over the past 100 years.
A. Correct.
Q. Now, the next paragraph says, "Based on our initial review of the case materials provided, OSEA has researched the following regulations and requirements pertaining to this matter." And then you list a series of BOCA national building code versions by year. Is that correct?
A. Correct.
Q. Now, as of the date of this letter why did you believe that the 1996 BOCA national building code

pertained to this matter?
A. We weren't sure.
Q. As of the date you authored this report why did you believe that the 1993 BOCA national building code pertained to this matter?
A. We weren't sure which code would apply.
Q. Or as to, the same question as to any of the building codes referenced.
A. Same reasoning.
Q. And that was because you didn't know the effective date of the Rhode Island adoption of the building code at the time?
A. That, and the applicability of other codes that might precede the '77. We weren't sure what code could have had impact. We checked them all.
Q. Let's go back to Jacob's notes. Now, we can agree that Jacob authored these notes --
A. Correct.
Q. -- prior to the time you authored your report; correct?
A. Yes.
Q. All right. And at the time you authored your report OSEA was aware that prior to 1977 there was no state code in effect; correct?
A. Correct.

Q. With that information why did you reference the '98, '84, '97, '90, '93 or '94 or 1996 BOCA national building codes in your report of June 9, 2004?
A. We were looking at all of the BOCA codes that may have predated '77 or after to compare them as to the requirements, not knowing how the state of Rhode Island was impacted certainly before the '77 date when they adopted their own. That was a comparison of the BOCA codes.
Q. Well, why would you perform an analysis analyzing whether or not a property met a particular code if you did not first conclude or consider whether or not the code was applicable to the property?
A. Well, BOCA was to my recollection the code that was eventually to be used by Rhode Island and we were looking to see what the BOCA code had to say about stairs in general and so forth.
Q. Could you listen to the question?
A. I am.
Q. Why would you author a report in June of 2004 analyzing whether or not a property, or any component to it, complied with a particular version of the BOCA code without first determining whether or not the code was applicable to the

property?
A. I think that's kind of a legal question. We were researching the codes wondering what would apply, but we wanted to have information on all of them.
Q. Well, why didn't you analyze this, this property to the code in effect in June of 2004?
A. I'm sorry, say that again.
Q. Why in your report of June of 2004 didn't you analyze this property and the stairway in particular in relation to the building code in effect in 2004?
A. Because we were not sure when, what date the stairs were put in and what might have applied.
Q. Well, you knew they were there before 2004. The incident happened in '03. Right?
A. Correct.
Q. But why didn't you analyze the stairs as it would relate to the 2004 version of the BOCA code when you did this report?
A. Well, I believe we did for the Rhode Island code, the last one.
Q. What's that?
A. The Rhode Island state building code, we did look at that.
Q. As of 1998?

A. Right.
Q. Was it your understanding that the national building code version April 1, 1998 was in effect as of June 9, 2004 --
A. Yes.
Q. -- and October of 2003?
A. Yes.
Q. Why did you perform an analysis with respect to the applicability of the other codes referenced? Why didn't you just use 1998?
A. Because to my understanding BOCA was the basis of the Rhode Island state building code, so we were researching all the variations that preceded that document, the Rhode Island document.
Q. Why did you go back to only 1984?
A. I believe -- '84?
Q. Yes.
A. I believe that had to do just looking at the various permits that were issued. It was probably somewhat arbitrary.
Q. It was completely arbitrary; correct?
MR. PHILLIPS: Objection.
A. Somewhat.
Q. Why didn't you look at the code in 1977 when it was first adopted?

A. The Rhode Island code?
Q. I'm not talking about the New York code. You understand that the state of Rhode Island adopted a statewide building code in 1977.
A. Yes.
Q. Why didn't you look at that?
A. We were looking at the code more current to the actual accident date.
Q. Why didn't you look at the 1977 version?
A. I can't sit here and tell you that. I don't know the answer to that.
Q. Why did you pick any of the years that you used here?
A. We were just looking at all available BOCA codes that were, predated the actual Rhode Island '98 date.
Q. And why didn't you look at 1977?
A. I can't answer that.
Q. But you're the one that selected these and authored this report. What was your thought process? You said --
A. I was --
Q. Wait a second. You said we used all available codes that predated this accident. Why didn't you use 1977?

A. My recollection is that I looked at the BOCA codes that were closest to the date of the accident. Why I didn't pick '77, I don't -- sitting here I don't recall BOCA had a code in '77 or what it was. I did not come upon it.
Q. Why did you use one 19 years before the date of the accident?
A. I'm sorry, I don't understand that.
Q. You said, We selected the code contemporaneous to the accident. That's what you said. Correct?
A. Correct.
Q. Why did you use one from 1984, 19 years before the date of the accident?
A. To my recollection, in looking at the variety of building permits that were issued, I must have -- there was dates of '84, and others were, improvements were made to the property and must have used that as a basis for that.
Q. Jacob was smart enough when he looked at this in May to know that was critical to determine the age of the construction of the stairs and applicability of whatever code applied at the time of construction. Correct?
A. Correct.
Q. Did you know to do that when you wrote this

report?

A. Yes. I gave him the instructions.

Q. And when you wrote this report you did not know the age of the construction of the stairs or what code was in effect at the time the stairs were constructed. Correct?

A. That's correct.

Q. And at the time you wrote this report you understood that the state of Rhode Island did not adopt a statewide building code until 1977. Correct?

A. Correct.

Q. And to a reasonable degree of probability you knew that these stairs predated the adoption of the statewide building code. Correct?

A. Correct.

Q. And you knew that under BOCA's very terms, that it did not apply retroactively. Correct?

A. Correct.

Q. Now, there's no reference in this report of June 9, 2004 to any analysis to determine whether or not there was any addition or improvement to the structure which had a valuation of greater than 50 percent of the structure. Is that correct?

A. That's correct.
Q. Why not?
A. My main focus was still remaining to be on the relative safety of the stairs.
Q. This whole report has to do with the stairs compliance with various versions of the building code, the BOCA code; correct?
A. That's correct.
Q. That was the focus of your report; correct?
A. Which lends to the safety of the stairs, correct, which is what I answered before.
Q. This report is a report as to whether or not the stairs at the Wharf Tavern comply with various versions of the BOCA code; correct?
A. Correct.
Q. Yet you knew that these versions of the BOCA code did not apply to these stairs unless there had been an improvement or addition to the structure greater than 50 percent after 1977. Correct?
MR. PHILLIPS: Objection. You can answer.
A. For your answer dealing with the 50 percent, correct -- your question, I'm sorry, dealing with the 50 percent, correct.
Q. But nowhere in this report did you discuss or analyze or form any conclusion with respect to

that issue. Is that correct?
A. That's correct.
Q. Why not?
A. Because, again, my focus on this beyond the codes, are the stairs safe. The various BOCA codes and other codes use those as a reference to support my opinion that the stairs are not safe.
Q. The only thing in this report, these 20 pages all involve your analysis of the stairs compliance with various versions of the BOCA code. Correct?
A. Correct.
Q. Then I'll ask you again.
MR. DOLAN: Is there some portion of the report or page you want to direct him to, Paul?
MR. PHILLIPS: No, I'm just looking.
MR. DOLAN: If you want to I don't have a problem.
MR. PHILLIPS: No, no, no.
Q. I'll ask you again. Why didn't you at or before the time you authored this report perform any analysis to determine whether or not there was any addition or improvement to this structure following 1977 that was greater than 50 percent of the value of the existing structure?
A. The only analysis we did in that relationship was

a review of the various permits, a copy of which we've discussed before.
Q. No, we discussed before your later report, okay? That was in 2006.
A. I understand that.
Q. Let's focus on this report and the time frame of this report, okay? We're going to get to the later report. Try to focus on the question.
A. I am.
Q. Then let me ask it again. Why, in this 20 page report, did you not offer any analysis, opinions, or conclusions, as to whether or not there were renovations or additions to the existing structure that were greater than 50 percent of the value of the existing structure at any time from 1977 up until the date of the accident?
MR. PHILLIPS: Objection.
A. The answer to your question, I used the BOCA codes, given the fact that Rhode Island eventually adopted them in 1977, to support my opinion and premise that the stairs were unsafe by design and construction. I looked at a variety of those codes to see if there was any differences or variations I wasn't aware of and placed them in the report.

Q. So you thought it of relevance to formulate opinions and conclusions about the stairs compliance with codes that didn't apply to them as of the date of the incident.

MR. PHILLIPS: Objection.

Q. Is that correct?

A. No, I don't agree with that question. I don't --

Q. Well, you provide in this report an opinion and formulate conclusions as to whether or not that stairway applied to multiple versions of the code, different years. Correct?

A. Correct.

Q. You're not suggesting that there could be different years of the BOCA code, different versions that apply to that stairway as of the date of the incident, are you?

A. No, there should be one code.

Q. Okay. And you made no conclusion as to what if any one code applied to that stairway as of the date of the incident. Correct?

A. Correct.

Q. And you made no opinion or conclusion whether or not any particular version of the BOCA code applied to that stairway as of the day you authored that report.

A. That's correct.
Q. Now, did you at any time discuss the report at all, this report with Mr. Keough of Keough Construction?
A. Did I?
Q. Yes. Have you ever spoken to Mr. Keough of Keough Construction?
A. No, I have not.
Q. At the time you authored this report you had no idea as to how this incident happened.
A. Exact details?
Q. Well, you knew somebody fell down the stairs, --
A. Correct.
Q. -- but you had no idea as to how. You didn't even know if he was going up or going down.
A. That's correct.
Q. So you have no idea as to how it happened on the stairway.
A. That's correct.
Q. So you had no opinion or conclusion as to whether or not any purported defect, deficiency, or unsafe feature of this stairway caused or contributed to this incident at the time you wrote this report. Correct?
A. No.

Q. That's a correct statement?
A. No. If I understand your question I'm saying it's not a correct statement.
Q. If you had no idea as to how this incident happened, how could you possibly know when you wrote this report whether or not any alleged defect or deficiency caused or contributed to the incident? Could you explain that to the jury, please.
MR. PHILLIPS: Objection.
A. Sure. When you have a set of stairs that are so out of compliance with these regarding tread depths differences, falls on those stairs, whether ascending or descending, typically are caused by those deformities or those variations. That's why codes, which are many and which we researched and I went through them, including the current Rhode Island code, talk about differences of 3/16 or 3/8 of an inch for treads and risers. Now, if someone trips on stairs, that's typically the cause of that accident, from my many years of experience investigating these accidents.
Q. So you believe, sitting here today, that the discrepancies between treads and risers referenced in your report were the cause of Mr. Noonan's

fall. Is that correct?
A. Among other things. There were additional items also.
Q. But you believe that the discrepancies in treads and risers contributed to Mr. Noonan's fall. Is that correct?
A. Yes.
Q. And that was your opinion in June of 2004?
A. That's correct.
Q. If Mr. Noonan fell, if the facts reveal in June of 2004 that Mr. Noonan fell when he stepped off the top landing and didn't encounter any of the treads or risers on the stairway, your conclusion in that regard would be fundamentally wrong. Correct?
MR. PHILLIPS: Objection.
A. Could be, yes.
Q. It would be. If he didn't come into contact with any of the treads or risers, your conclusion, your assumption that the discrepancies in treads and risers contributing to his fall would necessarily be wrong. Correct?
MR. PHILLIPS: Objection.
A. On the tread and riser issue, yes, if he's going on the first step, very first step, yes.
Q. And you don't know sitting here today whether or

not that's exactly what happened. Correct?
A. That's correct.
Q. You don't know sitting here today whether or not the stair width in any way caused or contributed to this accident; correct?
A. Correct.
Q. Or the head room on the stairway?
A. Correct.
Q. Or the nosing projection?
A. Correct.
Q. Or the tread or riser height or depth?
A. Correct.
Q. Or the dimensional uniformity?
A. Correct.
Q. Or the handrail?
A. Correct.
Q. Or the leading edge projection?
A. Correct.
Q. Or the guards?
A. Correct.
Q. Now, in your report of June of 2004 you reference no codes or standards other than the BOCA codes identified at page four. Correct?
A. That's correct.
Q. Now, in the last page of your report at page 20

you state that your opinion was that the stairs were defective in makeup, including materials construction. Now could you tell me, based on your review of the file materials, Jacob's notes, the photographs, and the documentation, the way in which you formulated your opinion as of June 9, 2004 that the stairway was defective in relation to materials construction.

A. If you give me a moment. Do you have the photos?

Q. Sure.

A. Regarding the materials construction, I'll be directing myself to your question. I notice a number of things based on the photographs: The wood surface tread, which is a plain wood without any non slip materials. Construction materials: Canvas with a rope wrapped around a railing; a broken or nonconnective railing from two points on the stairway; a curtain located as a break in the middle of the stairway.

Q. Is that materials construction? Is that what you mean by the term "materials construction"?

A. Generally materials in the stairway that are part of the stairway.

Q. That's what you mean by that?

A. Yes.

Q. Okay. Continue.
A. At the top tile going to wood, again, materials construction with some deformity located at the top, as you see in the picture.
Q. What deformity?
A. Near the edge, a little crack in the tile.
Q. Okay. You consider that a defect in materials construction as part of the stairway?
A. In a stairway every single defect is critical.
Q. Sure, sure.
A. The bottom materials construction, the railing not extending to the very bottom of where the stairs are. That's, I think, a fair summary.
Q. Does Jacob note any of those deficiencies in material construction anywhere in his notes?
A. In the notes or the report?
Q. Did he write the report?
A. No, I'm saying are you asking about his notes or my report?
Q. Listen to the question. Does Jacob mention any of those deficiencies in materials construction anywhere in his notes?
A. I have to read the notes.
Q. Do so.
A. On page one there's a note, "No rail on first step

of both." That's the only note he has regarding --.

Q. Is that a complete sentence?

A. That's the only note he has in those handwritten notes from his inspection, other than the photographs which I referred to.

Q. And without knowing how Mr. Noonan came to fall that evening, you can't formulate an opinion as to whether or not any of those alleged deficiencies in materials construction caused or contributed to the incident; correct?

A. Which one directly, no.

Q. Or if any. Correct?

A. The only case where I perceive I couldn't make that would be stepping down, as you identified before, from the very top landing to the first step where locomoting is pretty much just starting.

Q. If the incident happened when Mr. Noonan was stepping from the top landing down, and he was just engaged in conversation and simply missed the step and went tumbling down the stairs, none of these deficiencies referenced in your report would have caused or contributed to the incident. Correct?

A. Let me look at something. All righty.
Q. Do you want the question read back?
(Pending Question was repeated by the stenographer.)
A. No.
Q. No, that's not correct?
A. No, that's not correct.
Q. Okay. Why don't you tell the ladies and the gentlemen of the jury as to how you contend that any of those deficiencies alleged would have caused or contributed to the incident with the factual hypothetical I just provided to you.
A. The factual hypothetical you just provided, somebody is stepping down from the very top landing onto a first step where a tread and riser height make no impact, but he was just conversing and as you said missed, just misstepped. That is where the handrail becomes critical and the height of the handrail for grabbing would be important.
Q. So you need additional information in the hypothetical to know whether or not the height of the handrail in any way caused or contributed to the incident?
A. The height of the handrail would be important for using the stairs, right.

Q. All right. What was the height of the handrail at the top of the step?
A. It was -- the chart, I just had it. I believe it was 34 and a half inches, but it's in a chart in the report that I'd like to refer to. Here we are. Page 10, Handrail Measurements.
Q. So on the left and right the top handrail was 34 and a half inches?
A. For stairs 16 through 10.
Q. We're talking about the top of the stairs.
A. The top of the stairs. What you asked me, yes.
Q. So I said at the top of the stairs, both the left and right, the handrail height was 34 and a half inches?
A. Correct.
Q. And that would be from the landing, at the top of the stairs that would be from the landing to the top of the handrail?
A. Let me look at this a minute.
Q. Sure.
A. My recollection is that the Stair 1 would be the top, Stair 16 is at the bottom.
Q. Okay.
A. And based on that, Stair 1 --
Q. Stair 1 is the bottom?

A. I'm sorry, Stair 1 is the bottom. That's why I was looking for my -- Stair 1 is the bottom where the handrail didn't exist. So it would be 34 and a half at 16 at the top, yes.
Q. And that would be the measurement from the landing to the top of the handrail?
A. As we talked about in the report from the nosing riser leading edge.
Q. Which at the top of the landing would be the floor surface?
A. Correct.
Q. To the top of the handrail?
A. That's correct. Could I take a break?
Q. Let's finish this line of questioning. You don't know what that measurement is, do you?
A. It was measured 34 and a half inches.
Q. No, your son -- you never measured that yourself.
A. Correct.
Q. Your son's measurement was from the top of the 16th step, not the landing; correct?
A. Right.
Q. So you don't know what the distance is from the landing to the top of the handrail. Correct?
A. It wasn't measured but it should be 34 and a half if there's uniformity to the stairs going up.

Q. Have you either measured or seen a recording of the measurement from the top of the landing to the top of the handrail?
A. No.
Q. Now, the code required what distance?
A. I believe the code requires a 39 inch height for a railing.
Q. Do you know?
A. I'd have to look it up.
Q. Look it up.
A. I wish I could memorize. Could I take that break, please?
Q. Sure.
A. I need to make a phone call.
(Short break taken.)
Q. Have you ever been given any information about Mr. Noonan's level of intoxication at the time of this incident?
A. The only information was I think your defense expert, that was it, the report.
Q. So the first time you ever --
A. Are we on the record now? I'm sorry.
Q. Yeah, we are.
A. I didn't answer the last question you asked me. I had not answered that last question. You had

asked me a question.
Q. I'm on to something else.
A. Oh, okay.
Q. Okay. Is it fair to say that the first time you ever received any information with respect to Mr. Noonan's intoxication level was when you received and reviewed a copy of the defendant's experts' disclosure?
A. That's correct.
Q. And prior to that you never knew he was drunk at the time of this fall?
MR. PHILLIPS: Objection.
A. I don't know that he was drunk. I know what I read in the report. It's not for me to say.
Q. Well, do you understand that the plaintiff in this case is suing the Wharf Tavern in part for negligently serving him alcohol, causing him in fact to be intoxicated at the time of the incident?
A. I was not aware of that, no.
Q. You've never been informed that medical records at Rhode Island Hospital after this incident reflect that Mr. Noonan was grossly intoxicated at the time?
A. I know the data from the report your expert

provided.
Q. No. Are you aware of the fact that medical records from Rhode Island Hospital reflect that Mr. Noonan, when taken to the hospital after this incident, indicated he was grossly intoxicated at that time?
A. I have not seen medical records.
Q. Would --
A. Unless you're calling that report a medical record.
Q. Yeah, I am.
A. Based on that.
Q. No, I'm talking about the report from the hospital.
A. I don't recall if I saw a hospital report in that.
Q. Would that be of any relevance to you, whether or not this gentleman was drunk at the time of the fall?
A. Oh, certainly.
Q. Okay. Why would it be of relevance to you?
A. Alcohol can always cause a problem of balance and so forth, but it actually amplifies the importance of having -- the need to have a safe set of stairs, in my opinion, when you have alcohol present.

Q. Why do you persist on not answering my questions?
A. I answered your question.
Q. No, you didn't. My question to you was was it relevant -- strike that. My question was would it be relevant to you whether or not Mr. Noonan was drunk at the time of the incident, and you said yes.
A. That's correct.
Q. And my question to you is why would it be relevant to you whether or not Mr. Noonan was drunk at the time of the incident?
A. I did answer that.
Q. Could you answer it again?
A. I said, I believe close to what I said the last time, that alcohol can affect a person's balance so it would be relevant, and I certainly expanded upon that.
Q. Okay. Sitting here today do you have any information as to how Mr. Noonan came to fall that evening?
A. I have nothing in my file or report that indicates the actual method of the fall.
Q. Do you have any information as you sit here today as to how Mr. Noonan came to fall that evening?
A. It has been explained to me by counsel that he

recalls descending the stairs and that the break in the stairway where the railing breaks where the curtain was in the photograph, that he misstepped there and fell.

Q. When were you told that?

A. I was told that I believe on several occasions, including several weeks ago when I was speaking to counsel.

Q. When was the first time you were ever told that?

A. Several weeks ago.

Q. When did you first review the expert disclosure document you referred to?

A. That was just fairly recent.

Q. Since the conversation where you were told about Mr. Noonan's version of being down the stairs, the break in the handrail, that sort of thing?

A. I don't recall the timing; I really don't.

Q. In any event when you were told Mr. Noonan's version of events and that was related to you, you were not informed at that time at all with respect to his level of intoxication?

A. I'm sorry, sorry, repeat that.

Q. When you were told during this telephone call with counsel a couple weeks ago about how Mr. Noonan claims to have fallen, you weren't told anything

about his intoxication level at that time?
A. We never had that discussion about his intoxication.
Q. Are you aware of the fact that Mr. Noonan has given a deposition in this case?
A. Not specifically, no.
Q. Are you aware of the fact that a number of eyewitnesses to this incident have been deposed?
A. Not specifically, no, I'm not.
Q. When you're asked -- strike that. Have you ever, prior to this assignment, been asked to give opinions regarding stairways, handrails, treads and risers?
A. On other cases?
Q. Yes.
A. Yes, I have.
Q. In connection with other cases in litigation?
A. Yes.
Q. Is it typical for you, when you formulate opinions and conclusions with respect to stairways and the their characteristics and whether or not those characteristics caused or contributed to an incident, is it characteristic for you to be provided transcripts of depositions of the participants involved, including the plaintiff and

any eyewitnesses?
A. Yes.
Q. Did you ask for depositions in this case?
A. I probably did. I don't recall specifically.
Q. But it would be your practice to do so?
A. Yes.
Q. Could you tell me the way in which the stairs were defective in maintenance.
A. The only thing that comes to my mind first is the fact there were no nonslip treads or devices placed on the wooden stairs. That, in my opinion, is a maintenance item.
Q. Do you know of any testing that has been done at any time to determine co-efficient of friction on either the treads?
A. No, I do not.
Q. Turning to your April 12th, 2006 report --
A. Is that it or is there another copy? Did you want me to look at it? I'm sorry.
Q. Yes.
A. I don't -- do we have another copy of that?
Q. This isn't one that I took from your files. I have another copy that I can show you. Just take a look. In the first paragraph of that letter you state, "I believe the stair in question is

violative of numerous regulations over a period of many years." Do you see that?

A. Yes.

Q. What regulations are you referring to there?

A. When I look at stairs or items such as this I look to the national consensus standard, which would be the National Fire Protection Association Life Safety Code.

Q. Well, you use here "numerous regulations" in the plural. Is it your testimony that that is really a reference to this singular NFP Life Safety Code?

A. I reference it that way because the NFP Life Safety Code, that consensus document is a formative document for most all other locales in formulating their building codes. And of course in this case we also looked at the BOCA codes which were adopted by Rhode Island.

Q. Turning to paragraph one of your letter of April 12, 2006, could you identify for me the numerous regulations referenced in the second -- the first sentence of that first paragraph.

A. As indicated, I'm referring to the National Fire Protection Life Safety Code as well as the BOCA codes that we reviewed as part of this and as are in the June 9th report.

Q. You say, "over a period of many years." Do you see that?
A. Yes.
Q. What period of years are you referring to?
A. Over my 30 years of safety engineering work I reviewed a lot of codes, including other states' codes.
Q. You're losing it. Try to listen to the question.
A. I'm not losing it.
Q. You are.
A. No, I'm not.
Q. What period of many years are you referring to that this stairway was out of compliance with these numerous regulations? From what year to what year are you referring to?
A. Where are you reading? The first paragraph?
Q. First paragraph, first sentence, "violative of numerous regulations over a period of many years." What many years are you referring to?
A. That is a generalized statement that refers to those stairs which have been in that condition for I don't know how long, and for all those years, in my opinion, they've been out of compliance.
Q. For ever how long they've been in existence?
A. If they were built that way, which I would assume

they were, yes.

Q. Okay. What codes would have been applicable to them in 1895 on the date of construction?

A. 1895, I couldn't give you a code, but I could tell you good practice and good carpenters always built treads and risers equal.

Q. Well, I'm talking about the "numerous regulations over a period of many years," so, you know, I appreciate your knowledge and experience with respect to building practices prior to your birth, but what I'm really referring to is the numerous regulations you referenced over a period of many years. So the period of years you're talking about is from the date of construction, which as best we know here was 1895, up until the date of this report in 2006. So what regulations or codes would you be referencing as of 1895?

A. Beyond your cynical remarks, let me be clear on what I answered a moment ago. As a general statement what I'm trying to indicate, that over a number of years that those stairs have been in existence, which could be from 1925, whenever they were put in, that they've been out of compliance, and over those years there have been a variety of regulations that I'm aware of that address stairs.

Q. Okay. Would it be cynical for me to ask what regulations or codes would be applicable to 1925 to the stairs?
A. That's a legal question, but as a general rule for best --
Q. Would it be a legal question as well for 2003?
A. Certainly would.
Q. Okay.
A. I think it's a question that would legally be answered in a courtroom.
Q. So we can agree that that question as to what codes or regulations would apply to the stairway in 2003 would be a legal question. Correct?
A. Given our discussion of jurisdiction and, yes, statute, correct.
Q. Now, you reference here the -- strike that. You referenced in your testimony NFPA Life Safety Code. Is that right?
A. That's correct.
Q. All right. What provisions of the NFPA Life Safety Code does the stairway violate as of 2003?
A. It violates many of the same provisions that are identified in the BOCA standards, which include tread and riser differences of greater than 3/16 or 3/8 inch; continuous handrails not available;

height of the actual, height of the actual handrail itself on the stairway -- I'm sorry -- and among others that were identified in my report of June 9th which probably are 100 percent basis BOCA codes mimic the existing Life Safety Codes.

Q. So your testimony is the NFPA Life Safety Code in effect in 2003 would be identical to the BOCA code as it relates to stairways?

A. Correct.

Q. Now, do you have -- you have copies of provisions of the BOCA code in your, in your materials; correct?

A. Just what is in the report, I believe, and I'm not sure if there's any exception; I don't recall. But there are some in the back, yes.

Q. Do you have any references to sections of the NFPA Life Safety Code or that code anywhere in the materials?

A. I don't recall putting those in the file, but let me check. I don't have the actual code, but I have the Life Safety Code Handbook which is published by them, some portions of that.

Q. Could I see that?

A. Sure. You want me to keep going if I find any other ones?

Q. Sure, yeah.
A. This is actually Chapter 27 from that same handbook which talks about general requirements for existing business occupancies. Did you want that?
Q. Yes, thanks. Has the Life Safety Code Handbook, the 1997 version, been adopted in the state of Rhode Island at any time?
A. I know of no referenced pickup by the Rhode Island code, so the answer to that is no. There's references, that's what other states use as a reference standard where they adopt a consensus standard and put it in instead of writing all of them.
Q. In this first paragraph you also say that it is also out of compliance as it relates to, and you cite a particular provision in the Rhode Island General Laws.
A. Yes.
Q. Do you have a copy of that?
A. I know I have the code back here.
(Cell phone interruption.)
(Short break taken.)
Q. We were talking about that statute.
A. The Rhode Island codes, correct.

Q. Yes. You say here that the stairway is also out of compliance as it relates to Rhode Island Statute Health and Safety 23-27.3-106.5.
A. Correct.
Q. How is it out of compliance?
A. That code requires a 42 inch height for the railing, or as they call it, the guard, and I believe ours, as we referred to before, was 34 and a half inches.
Q. Could you show me that? Do you have a reference?
A. I was looking for that here. They reference it in 815.5 here but I didn't make that actual copy here. It's not in my folder, so.
Q. You're talking about BOCA again, right, 815.5?
A. I believe this comes out of the Rhode Island code.
Q. Do you know what 23-27.3-106.5 says?
A. Verbatim, no.
Q. How about generally?
A. I believe it talks about the height of the railing, unless I'm getting mixed up here.
Q. Well, you've got the title of it right there, Physical Value. Do you see that?
A. Back to...
Q. The report, first paragraph, first paragraph first sentence. See the statute reference? Do you see

it?

A. That statute is referring to, I believe, the physical value portion which we've been talking about all day on the 50 percent.

Q. Well, it says, "Is also out of compliance as it relates to the Rhode Island Statute Health and Safety 23-27.3-106.5, quote, physical value, end of quote." Do you see that?

A. Yes, I do now. I understand --

Q. How is it out of compliance with respect to that statute?

A. Perhaps a poor choice of words, but from my review it looked to me that the cost of the addition was more than 50 percent, or very close to it, than the total value of the building as compared to the total replacement value of the building.

Q. The first page, third paragraph, 108.52. Do you see that?

A. Yes.

Q. Where did you get that number?

A. Took that number off of commercial property index for that property.

Q. As of what date?

A. I'll have to refer to that, the document we've been talking about today, and that would be, that

is the date printed as inked on the Town of Warren commercial property card is 4/12/2006.
Q. The requirement of continuity with handrails, do you know what I'm referring to?
A. Yes.
Q. The handrail shown in the photographs from top to bottom, is that a continuous handrail?
A. May I see that again?
Q. Sure.
A. No.
Q. Where do you find a definition of "continuous" in the code?
A. My understanding of the word "continuous" --
Q. Where do you find a definition of the term in the code?
A. I couldn't point you to a specific definition in the code for "continuous."
Q. Did you read the deposition of the Warren town building official?
A. Yes, I did. That would be Mr. Jannitto.
Q. Jannitto. Did you disagree with anything that he said?
A. Building inspector Mr. Jannitto did not portray himself to be very knowledgeable, so I didn't agree with a lot of things he had to say.

Q. Did I -- thank you. What did you disagree with what Mr. Jannitto said?
A. Specifically I --
MR. PHILLIPS: You can have him review the deposition, right, Mark?
Q. Can you think of anything that you can recall that you read of Mr. Jannitto's testimony with which you disagree?
MR. PHILLIPS: Can he have a moment to look at the deposition?
MR. DOLAN: Just trying to speed it up.
MR. PHILLIPS: Do you have the deposition, Mr. Coniglio?
THE DEPONENT: I'm sure somewhere I do. I just had it in my hand.
MR. PHILLIPS: All I can say for the both of you gentlemen, it's a good thing I'm not handling these documents. You'd never find them.
Q. Let me withdraw the question. Have you ever consulted any reference literature of any kind that you've utilized in the formulation of your opinion as to the use of the term "continuous" with respect to hand railing in the BOCA code?
A. No.
Q. You have an opinion as to what that term means;

correct?
A. Yes.
Q. And how have you formulated your opinion in that regard?
A. From my years of working with National Fire Protection Association codes and what I perceive to be the meaning of the word "continuous" to prevent a fall, meaning you should have your hand on a railing that is smooth with no obstructions, a distance from the wall safely so your fingers will not be jammed, and there's no break where you have to let go of the railing as you're ascending or descending the stairs.
Q. So if Jacob felt that the handrail was continuous, you would disagree with his assessment in that regard?
A. He's not making a statement there. That's just a word, "continuous."
Q. I asked you a question. If Jacob formed a belief that the handrail was continuous, you would disagree with him in that regard. Is that correct?
A. On that hypothetical question you asked me I would disagree, yes. That is not what he's stating there.

Q. Did I ask you about anybody stating it in any way?
A. No.
Q. Okay. Then why do you do that?
A. Because the way you're framing the question I feel you're not properly representing what's on that document.
Q. Did you read Jacob's notes?
A. Yes.
Q. At any time before today?
A. Several times.
Q. Did you ever speak with your son about his notes?
A. Several times.
Q. All right. Did you ask Jacob what he meant when he used, memorialized the term "continuous" as it relates to the handrails on page five of the notes?
A. Yes.
Q. Okay. Now, you understand you're under oath today.
A. Yes.
Q. And you have a specific recollection, you're telling the jury, of discussing with Jacob his use of the term "continuous" as it relates to handrails on page five of the handwritten notes. Is that correct? You have a present recollection

of doing so today?
A. Not that specific page.
Q. Okay. So it's fair to say that you don't recall discussing with Jacob the use of his notation here "continuous" as it relates to handrails. Is that right?
A. I don't recall specifically that one word, no.
Q. Have you ever been a party to a lawsuit?
A. Me?
Q. Yes.
A. Personally or --
Q. You personally.
A. Yes.
Q. On how many occasions?
A. Our company?
Q. No. You personally.
A. Me personally, oh, me personally I think once.
Q. In connection with that?
A. I think it was an auto accident.
Q. Were you a plaintiff or defendant?
A. I was a defendant. This is going back to 19 -- all the way back.
Q. I'm not concerned about the date. But you were sued in connection with an automobile accident?
A. Yes.

Q. Have you ever been arrested?
A. Me?
Q. Yes.
A. No.
Q. Has OSEA ever been a party to a lawsuit?
A. Yes.
Q. On how many occasions?
A. I believe there were three occasions.
Q. In connection with what, briefly?
A. Our work. I can describe briefly as I recall the case, if you'd like.
Q. What's the most recent?
A. The most recent one has settled. I can't recall the dates that they occurred. Had to do with an allegation that we provided medical advice as related to a worker using a respirator..
Q. All right. And the second occasion?
A. That had to do with an allegation made that we were in some way responsible for elevator inspections or an elevator had failed when we were on site doing environmental work.
Q. And the first occasion?
A. That one had to do with an employee who, one of our clients, we were doing confined space rescue training and he alleged that he had injured his

back during the training exercise.

MR. DOLAN: That's all I have.

(Deposition concluded at 5:43 p.m.)

STATE OF RHODE ISLAND

ss. Providence, Rhode Island

COUNTY OF PROVIDENCE

BE IT KNOWN THAT I, Denise P. Veitch, Certified Shorthand Reporter and Notary Public, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth and nothing but the truth; that the testimony of said witness was reduced to typewriting under my direction; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition; that the deponent has not made the request to read and sign his deposition.

I, FURTHER CERTIFY that I am not of counsel nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 2nd day of August, 2006.

Denise Veitch

Denise P. Veitch
Certified Shorthand Reporter

My Commission Expires:
September 25, 2009



#2

#1

DEFENDANT'S EXHIBIT
C.
7/13/06

STATE OF RHODE ISLAND

ss. Providence, Rhode Island

COUNTY OF PROVIDENCE

BE IT KNOWN THAT I, Denise P. Veitch, Certified Shorthand Reporter and Notary Public, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth and nothing but the truth; that the testimony of said witness was reduced to typewriting under my direction; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition; that the deponent has not made the request to read and sign his deposition.

I, FURTHER CERTIFY that I am not of counsel nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 2nd day of August, 2006.

Denise Veitch

Denise P. Veitch
Certified Shorthand Reporter

My Commission Expires:
September 25, 2009